Steven T. Lovett, OSB No. 910701
stlovett@stoel.com
Steven E. Klein, OSB No. 051165
seklein@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| YETI ENTERPRISES INCORPORATED, an Oregon corporation, <br><br> Plaintiff, <br><br> v. <br><br> NPK, LLC, f/k/a N.P.K. DISTRIBUTORS, LLC, an Oregon limited liability company, OREGON GLOBAL DISTRIBUTION, INC., an Oregon corporation, RICHARD ROWE, an individual, RENY TOWNSEND, an individual, and ORION TANG, an individual, <br><br> Defendants. | Case No.: 3:13-cv-01203-ST <br><br> **PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Yeti Enterprises Incorporated ("Yeti"), for its First Amended Complaint

against NPK, LLC, f/k/a N.P.K. Distributors, LLC ("NPK"), Oregon Global Distribution,

Page 1   -   PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
COMPLAINT

Inc. ("OGD"), Richard Rowe ("Rowe"), Reny Townsend ("Townsend"), and Orion Tang ("Tang"), states as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.      Yeti is an Oregon corporation that was founded in Portland, Oregon, and is headquartered in Medford, Oregon.  Yeti invented, manufactures and sells horticulture products known as plant "washes" that are used by consumers to prevent pest infestation and mold growth, and to clean plants.  Yeti products are sold throughout Oregon, the United States, Canada, the United Kingdom, and Spain.

2.      NPK is an Oregon Limited Liability Company with its principal place of business at 1904 United Way, Suite 104, Medford, OR 97504 and a mailing address of 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, NPK is, and at all material times has been, directly or indirectly, owned or controlled by Richard Rowe, Reny Townsend, and Orion Tang.  NPK, together with OGD, owns, operates and does business under the Oregon assumed business name "NPK Industries."

3.      OGD is an Oregon corporation with its principal place of business at 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, OGD is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend and Tang.  OGD, together with NPK, owns, operates and does business under the Oregon assumed business name "NPK Industries."

4.      Richard Rowe is an individual and, on information and belief, a citizen of New Zealand, who resides in Medford, Oregon.  On information and belief, Rowe is, and at all material time has been, directly or indirectly, an owner, officer, manager and/or director of NPK and OGD.

Page 2   -   PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
            COMPLAINT

5.     Reny Townsend is an individual who resides in Medford, Oregon.  On information and belief, Townsend is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK and OGD.

6.     Orion Tang is an individual who resides in Medford, Oregon.  On information and belief, Tang is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK and OGD.

7.     NPK, OGD, Rowe, Townsend and Tang have, on information and belief, acted in concert with each other in furtherance of the improper and wrongful conduct alleged in this pleading.  At all relevant times, Rowe, Townsend and Tang was acting either in their individual capacities or as an agent of NPK and/or OGD.  Further discovery will inform when each was acting as an individual and/or as a an agent.

8.     This Court has original jurisdiction over Yeti's NPK's trademark and unfair competition claims under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. §§ 1120, 1125, Yeti's declaratory judgment claims under 28 U.S.C. § 2201 and 28 U.S.C. § 2202, and 15 U.S.C. § 1116(a), and supplemental jurisdiction over Yeti's state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in the United States District Court for the District of Oregon pursuant to 28 U.S.C. § 1391 because NPK, OGD, Rowe, Townsend and Tang reside in the State of Oregon and sell products in the State of Oregon.  Venue is also proper in the Portland Division pursuant to LR  3- 2 because the Distribution Agreement (the "Agreement") between the parties that is the subject of this dispute was negotiated and executed in Portland, Oregon, and provides: "In the event suit or action is necessary to enforce the terms of this Agreement, jurisdiction shall be exclusively in the State of Oregon with venue in Multnomah County."  A true copy of the Agreement is attached hereto as Exhibit A.

## II.  GENERAL ALLEGATIONS

**A.      Yeti's First Use of the Trademarks "That Stuff," "Mighty Wash", "Power Wash," "PM Wash," the "Power Button," and "Frequency Imprinted H2O."**

10.      Yeti is in the business of manufacturing and selling plant washes using a confidential and proprietary formula and process that includes electronic frequency imprinting.  In March 2009, Yeti began selling three washes from its Portland, Oregon, headquarters using the trade name and trademark "That Stuff."

11.      Yeti sold its products in specialty garden and plant stores throughout Oregon, Washington, Colorado and Montana.  One of the stores in which Yeti sold its products was NPK's garden store called "In and Out Gardens Hydroponic Superstore."

12.      In 2010, Yeti consulted with NPK to design new marks for Yeti to use on Yeti's products.  On October 8 , 2010, Yeti began selling its three products with labels using the marks "Mighty Wash," "Power Wash" and "PM Wash," respectively.  Each label also contained the colored "Power Button" and a distinctive logo containing an electronic frequency graph and the words "Frequency Imprinted H2O."  Each label also contained the words "'That Stuff' presents" and identifies the products as "Manufactured by Yeti Enterprises, Inc."   The marks "That Stuff, "Mighty Wash," "Power Wash," "PM Wash," the "Power Button" and the "Frequency Imprinted H2O" mark shall be referred to herein collectively as "Yeti's Marks."  Copies of each of the three labels using Yeti's Mark's in October 2010 are attached hereto as Exhibit B and also pictured below:







13.     Using the marks shown above, Yeti manufactured, bottled, labeled, marketed, and sold Mighty Wash, Power Wash and PM Wash (collectively, the "Products") to garden and plant stores throughout Oregon, Washington, Colorado and Montana.

**B.     Yeti Entered into a Distribution Agreement with NPK.**

14.     On November 11, 2010, after Yeti began using Yeti's Marks, Yeti entered into a Distribution Agreement with NPK.   The Agreement recognized that Yeti manufactures "That Stuff Mighty Wash," "That Stuff PM Wash," and "That Stuff Power Wash" (collectively, the "Products") and required NPK to bottle, label, market and physically distribute Yeti's Products.   The term of the Agreement was ten (10) years.

15.     Pursuant to the Agreement, NPK agreed to purchase a minimum of 12 totes of Products per month.   A "tote" is a plastic vessel and each one containing 260 gallons of liquid. The Agreement specified that NPK would pay $7 a gallon for That Stuff Mighty Wash and $5 a gallon for That Stuff PM Wash and That Stuff Power Wash.

Page 5   -   PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
                    COMPLAINT

16.     Under the agreement Yeti would invoice NPK monthly, on or about the 25th of the month and NPK was required to make payment on or before the 15th of the following month.

17.     NPK further agreed to purchase and maintain insurance for the Products, or if it failed to do so, to reimburse Yeti its costs to obtain insurance.

**C.     NPK Breaches the Distribution Agreement By Its Failure to Pay for Product.**

18.     The parties commenced performance of the Agreement and NPK began bottling, labeling, marketing and physically distributing Yeti's Products.

19.     By the end of 2011, NPK was in material breach of its obligations under the Distribution Agreement based on failing to pay Yeti's invoices in full by the 15th day of the following month, among other things.  As of January 15, 2012, the unpaid balance NPK owed Yeti exceeded $300,000.

20.     On or about February 8, 2012, Yeti and NPK met to discuss NPK's default and whether there was a way for NPK to pay off its substantial debt to Yeti and avoid termination.  During that meeting, Rowe represented to Yeti that NPK had been unable to keep current with Yeti's invoices because NPK's revenue from the sale of Yeti's Products in 2011 had been consumed by the allegedly substantial costs incurred by NPK to market and promote the Products.  Rowe further represented that NPK could only continue to perform its obligations under the Distribution Agreement and become current on NPK's past due balance to Yeti if Yeti agreed to lower the prices Yeti charged NPK for the Products.

21.     In reliance on Rowe's representations, Yeti agreed to lower the prices for the Products until the end of 2012.  Under the revised pricing, NPK would pay $5 a gallon for That Stuff Mighty Wash and $3 a gallon for That Stuff PM Wash and That Stuff Power Wash.  Yeti also agreed to extend payment terms from 15 days to 45 days from the billing date.  In exchange, NPK agreed to purchase a minimum of 37 totes of Mighty Wash per

month, and a combined total of 14 totes of Power Wash and PM Wash per month. NPK also agreed to a repayment schedule for the outstanding balance it owed Yeti. As part of the schedule, Yeti agreed to accept partial payment in "Pink Sauce," an ingredient used by Yeti in the process of manufacturing the Products. The parties agreed that pricing would be reviewed at the end of December 2012.

**D.    NPK Misappropriates Yeti's Trademarks and Engages in Unfair Competition and False Advertising.**

22.    On July 21, 2011, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 003. In the application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash." The specimen submitted with the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar version of "Frequency Imprinted H2O." Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf. On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that the representations made by Tang on NPK's behalf were false and made with the intent to induce the U.S. Patent and Trademark Office's ("PTO") reliance on the misrepresentation. On April 3, 2012, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

23.    On March 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 005. In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash." The specimen submitted with

Page 7    -    PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED COMPLAINT

the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, again signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on behalf of NPK were false and made with the intent to induce the PTO's reliance on the misrepresentation.  On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

24.     On or about March 29, 2012, the United States Environmental Protection Agency ("EPA") issued a "Stop Sale, Use, or Removal Order" to NPK directing NPK to cease the sale, use and distribution of the Products (the "Stop Sale Order").  A true and correct copy of the Stop Sale Order is attached hereto as Exhibit E.  The Stop Sale Order cited the EPA's determination that NPK was marketing Yeti's Products as pesticides because of certain claims made in the Product's "labeling and or advertising material."

25.     On or about April 9, 2012, NPK contacted the EPA regarding the Stop Sale Order and represented, falsely, that NPK had never used the claims quoted in the Stop Sale Order in connection with the advertising of the Products.  NPK also provided copies of Yeti's labels for the Products to show that the claims cited in the Stop Sale Order appeared nowhere on the labels.

26.     On or about April 9, 2012, the EPA responded to NPK that the Stop Sale Order had issued on the basis of an advertising brochure obtained during a marketplace inspection in December 2011.  The EPA represented that the brochure contained the claims that concerned the EPA.  That brochure was authored and distributed by NPK.  A true and correct copy of the brochure referenced by the EPA is attached hereto as Exhibit F.

27.    The EPA's April 9, 2012 response also addressed the specimens of Yeti's labels submitted by NPK, noting that the labels were acceptable, did not include pesticidal claims, and that the EPA's concern was with the advertising that was found with the product.

28.    On information and belief, after receiving the EPA's response, NPK revised its advertising brochures and Internet website to remove the pesticidal claims cited by the EPA and requested that the EPA issue authorization to resume sales of the Products.

29.    In or around April, 2012, NPK's Tang, acting at the direction of Rowe and Townsend, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products.  Tang did not explain the basis for the supposed demand and refused to provide Yeti a copy of the EPA's correspondence setting forth this demand.  Tang's representation that the EPA had demanded removal of the marks and manufacturer statement was false, and made with the intent of inducing Yeti's reliance on it.

30.    In bad faith and without obtaining Yeti's permission, NPK removed the marks "That Stuff" and "Manufactured by Yeti Enterprises, Inc" from the labels on Yeti's Products. NPK replaced the words "That Stuff presents," with "NPK Industries presents."  When Yeti noticed the change and asked why it had been made, NPK represented that EPA had insisted on the change.  NPK shared with Yeti a June 21, 2012 letter from the EPA authorizing NPK to resume sale of the Products that stated, "Your April 10, 2012, email, and our subsequent review of your website showed that you have removed all pesticidal claims from your website, labeling, and advertising in accordance with the conditions outlined in the [Stop Sale] Order."  NPK falsely represented to Yeti that the EPA's June 21 letter had only been secured through removal of the "That Stuff" mark from the Product labels, when, in fact, all the EPA required was revision of the claims made by NPK in NPK's brochure and on NPK's

Internet website.  NPK's false representations were, on information and belief, knowingly made with the intent to induce Yeti's reliance on them and in furtherance of NPK's efforts to misappropriate Yeti's Marks.

31.    On November 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "PM Wash," in international Class 003. In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "PM Wash."  The specimen submitted with the application was a photo of containers affixed with Yeti's label for "PM Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on them.  After this suit was filed, NPK abandoned the application.

32.    On November 21, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Power Wash," in international Class 003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Power Wash."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on the

misrepresentation.  On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

33.    In or around December 2012, Yeti discovered that NPK had applied for and obtained a federal registration for the "Mighty Wash" mark without Yeti's knowledge or permission.

34.    In or around December 2012, Yeti made multiple requests that NPK provide copies of the Stop Sale Order and NPK's correspondence with the EPA regarding the Stop Sale Order.  On NPK's behalf, Rowe repeatedly represented that he would provide Yeti with copies of the Stop Sale Order and copies of the EPA correspondence.  Indeed, Rowe specifically represented that he would bring copies to a meeting scheduled with Yeti for January 2, 2013.

35.    On January 2, 2013, Rowe and Tang attended a meeting between NPK and Yeti.  At the meeting, Rowe provided Yeti with a copy of the same June 21, 2012 EPA letter authorizing NPK to resume sale and distribution of the Products that had already been shared with Yeti.  Rowe represented that he would have brought the Stop Sale Order and NPK's other correspondence with the EPA, but claimed that NPK was unable to locate them.

36.    Prior to the January 2, 2013 meeting, Yeti began receiving inquiries from customers confused that products sold under the names "Stack" and "Multiply" were new Yeti products.  In fact, "Stack" and "Multiply" were not Yeti products, but new products introduced by NPK without Yeti's knowledge or involvement.

37.    During the January 2, 2013 meeting, Yeti raised these customer inquiries with NPK and asked whether NPK knew why customers were confusing "Stack" and "Multiply" with Yeti and Yeti's Products.  NPK denied any knowledge of why customers might be confused and repeatedly attempted to change the subject.

Page 11  -    PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
             COMPLAINT

38.    After the January 2, 2013 meeting, Yeti discovered that NPK had placed an advertisement in the December 2012 issue of "Maximum Yield," a magazine directed to plant and hydroponics consumers, that showed containers of NPK's "Stack" and "Multiply" products under the caption "From the Creators of 'Mighty Wash'."  The labels on the containers also prominently featured Yeti's "Power Button" mark.  A true and correct example of the ad is attached hereto as Exhibit D and also pictured below:



39.    NPK also failed to meet its minimum order requirements in 2012 for PM Wash and Power Wash.  Specifically, NPK was required to order a combined total of 154 totes of PM Wash and Power Wash in 2012, but only ordered 143 totes.

40.    On January 28, 2013, Yeti notified NPK that it was in default in its obligations under the Distribution Agreement based on multiple breaches.  Yeti's notice gave NPK a reasonable timeframe to comply with various demands, including that NPK immediately pay all amounts past due and owing to Yeti, that NPK assign to Yeti the trademark registration for "Mighty Wash" wrongfully obtained in the name of NPK, and that NPK cease all

advertising of NPK's "Stack" and "Multiply" products as "From the Creators of 'Mighty Wash'".

41.    On February 6, 2013, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the "Power Button" mark in international Class 003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the "Power Button" mark.  The specimen submitted with the application was a photo of a container affixed with a "Mighty Wash" label that, upon information and belief, has never been used in interstate commerce.  NPK's declaration in support of the fraudulent application was signed by B. Anna McCoy, an attorney with the law firm of Alleman Hall McCoy Russell & Tuttle LLP, with the knowledge and approval of Rowe, Townsend and Tang.  On information and belief, Rowe, Townsend and Tang authorized McCoy to sign the declaration with the knowledge or belief that the representations made by McCoy on NPK's behalf were false and made with the intent to induce the USPTO's reliance on them.  On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in NPK's name.

**E.    NPK Agrees to Turnover Yeti's Marks and Wind Down The Agreement.**

42.    On February 11, 2013, NPK and Yeti met to discuss the matters raised in Yeti's notice.  During the meeting, which was attended by Rowe, Townsend and Tang, Yeti and NPK reached an oral agreement to modify the Distribution Agreement and resolve the issues cited by Yeti in its notice.  The parties' agreement included the following material terms:

    a.    Yeti agreed to not terminate the Agreement and to resume accepting orders for the Products from NPK;

b. The price for the Products under Section 5 of the Agreement (as amended in February 2011) was increased to $5.25 a gallon for Mighty Wash, $4.00 a gallon for PM Wash, and $3.50 a gallon for Power Wash;

c. The payment terms under Section 6 of the Agreement (as amended in February 2011) was shortened to require NPK to deliver payment within 30 days of receipt of the products;

d. The term set forth in Section 12 of the Agreement was shortened to provide that the Agreement would terminate on December 31, 2013;

e. NPK agreed to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

f. NPK agreed to relinquish to Yeti its account with the provider of "Pink Sauce";

g. NPK agreed that all bottles, caps and labels subsequently purchased or created for the Products would state that Yeti is the creator and manufacturer of the Products;

h. NPK agreed to obtain Yeti's prior approval of all prospective advertising of the Products;

i. NPK agreed not to produce, sell, market, distribute or manufacture any product that contains Pink Sauce from termination of the Agreement until January 1, 2016; and

j. NPK agreed not to use Yeti's Marks or any confusingly similar variation in NPK's sale, distribution or marketing activities other than solely in connection with the Products during the Agreement's remaining term.

43.    Between February 13, 2013 and February 21, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, which promises and representations were reasonably expected by NPK to induce Yeti's reliance and performance, accepted orders for and delivered more than 25 totes of the Products to NPK.  Tang accepted delivery of the totes on NPK's behalf.

44.     On February 21, 2013, NPK emailed Yeti a draft written agreement purportedly memorializing the oral agreement reached between the parties at the February 11 meeting.  Although NPK's draft recited the essential terms discussed at the parties' February 11 meeting, it also included additional, material terms that had neither been discussed nor agreed upon during that meeting.  For example, NPK's draft purported to release NPK from any minimum purchase requirements for the Agreement's remaining term.  NPK's draft also would allow NPK to delay assignment of the applications NPK had improperly filed for Yeti's Marks and purported to make those assignments contingent upon Yeti's "satisfactory performance" of the party's agreement.  A true and correct copy of NPK's email and draft is attached as Exhibit G.

45.     On March 8, 2013, Yeti provided NPK with a revised draft written agreement that removed the terms unilaterally added by NPK and made certain suggested clarifications.  A true and correct copy of Yeti's March 8, 2013 draft is attached as Exhibit H.

46.     On April 5, 2013, NPK "rejected" Yeti's March 8 draft, contending that it did not accurately reflect the terms the parties agreed to on February 11.  Although Yeti did not agree with this characterization, on April 8, 2013, Yeti forwarded a second revised draft to NPK that attempted to address NPK's concerns. A true and correct copy of Yeti's April 8, 2013 draft is attached as Exhibit I.

47.     Between February 22, 2013 and April 10, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, continued to accept orders for and deliver Products to NPK, which deliveries were accepted.

48.     On April 12, 2013, NPK expressly repudiated the parties' February 11 agreement, citing unspecified "new information" that purportedly "changed the circumstances."

49.    In bad faith and without Yeti's permission, in or around April 2013, NPK and OGD, doing business as "NPK Industries," began manufacturing and selling their own knock off product using Yeti's marks, "Mighty Wash," "Power Wash," "PM Wash," and the "Power Button."  NPK and OGD also used a confusingly similar variation of Yeti's "Frequency Imprinted H2O" mark.  The labels on these products were virtually identical to those on Yeti's Products.  Copies of the labels from the knock off products are attached hereto as Exhibit C and also pictured below:







50.     NPK and OGD, doing business as "NPK Industries," sell and continue to sell their own knock off products using Yeti's Marks as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the same group of users. NPK and OGD also continue to sell non-Yeti products, including "Multiply" and "Stack," using one or more of Yeti's Marks, as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the same group of users.  As a result, NPK and OGD are causing actual consumer confusion in the marketplace.

51.     On information and belief, the formula and/or process used to manufacture NPK and OGD's knock off products does not include electronic frequency imprinting.

52.     NPK and OGD's knock off products are also much less effective than Yeti's Products.

53.     As a result, NPK and OGD are causing irreparable harm to Yeti's goodwill and reputation.

54.     NPK and OGD, doing business as "NPK Industries," advertise using Yeti's Marks in direct competition with Yeti through the same channels and to the same group of users, thereby causing actual and likely consumer confusion in the marketplace.  This false advertising is causing further irreparable harm to Yeti's goodwill and reputation.

**F.    NPK's Additional Breaches of the Distribution Agreement.**

55.    In addition to making knockoff versions of Yeti's Products, NPK failed to perform its obligations under the Agreement.

56.    NPK refused to pay for for 2011, 2012 and 2013, thereby forcing Yeti to purchase insurance at a total cost of $20,013.56, and NPK did not reimburse Yeti for that expense as required by the Agreement.

57.    NPK also failed to timely pay for Products delivered under the Agreement in 2010 and 2011.  As a result, pursuant to the terms of the Agreement, Yeti is entitled to interest in the amount of $56,860.31.

58.    NPK also failed to order the requisite number of totes of Products from Yeti, as required by the Agreement, and in April 2013 discontinued orders altogether.  NPK's failure to order the requisite number of totes for the remaining duration of the Agreement will result in lost revenue for Yeti in the amount of $5,370,820.00.

59.    Yeti notified NPK that it was in breach of the Agreement.

60.    NPK refuses to stop using Yeti's Marks and to pay amounts due and owing.

61.    Yeti also notified one of its customers, Sunlight Supply Incorporated ("Sunlight"), that Yeti was no longer working with NPK, and would instead work directly with Sunlight.  In response, NPK claimed that, by contacting customers directly, Yeti tortiously interfered with NPK's relationship and sued Yeti in Jackson County Circuit Court, Case No. 13CV01641.  However, the Agreement provides for exclusive jurisdiction in Multnomah County Circuit Court, and NPK subsequently dismissed the Jackson County action.

### III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Trademark Infringement and Unfair Competition — 15 U.S.C. § 1125(a)

62.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

63.    Yeti's Marks are valid and protectable trademarks.

64.    NPK and OGD have used and continue to use Yeti's Marks in connection with the sale of goods in commerce without permission.

65.    NPK and OGD's use of the Yeti's Marks occurred after Yeti began using the marks.

66.    NPK and OGD's use of Yeti's Marks, or variations of Yeti's Marks, is likely to cause consumer confusion or mistake, or to deceive, as to the affiliation, connection, or association of NPK and OGD with Yeti.

67.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

68.    Defendants are therefore liable under 15 U.S.C. § 1125(a) for infringement of Yeti's Marks and for unfair competition.

69.    Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

70.    Because Defendants' actions in using Yeti's Marks were intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

71.    This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

75845977.2 0048752-00001

72.     In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future infringement by Defendants, Yeti is entitled to an injunction against Defendants' use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks.

### SECOND CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### False Advertising – 15 U.S.C. § 1125(a)

73.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

74.     Yeti's Marks are valid and protectable trademarks.

75.     Without Yeti's permission, NPK and OGD used Yeti's Marks in connection with the sale of goods in commercial advertising or promotion of NPK and OGD's non-Yeti products, including "Multiply" and "Stack," as well as their knock off products, thereby misrepresenting the nature, characteristics, and qualities of NPK and OGD's goods.  NPK and OGD's goods are not "from the creators of 'Mighty Wash.'"

76.     NPK and OGD are also falsely representing that their knock-off products are manufactured using an imprinted electronic frequency, like Yeti's Products.

77.     NPK and OGD's use of the Yeti's Marks occurred after Yeti began using the marks.

78.     At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

79.     Defendants are therefore liable under 15 U.S.C. § 1125(a) for false advertising and unfair competition.

Page 20  -    PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
              COMPLAINT

80.    Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

81.    Because Defendants' false advertising was intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

82.    This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

83.    In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future infringement by Defendants, Yeti is entitled to an injunction against NPK's use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks.

## THIRD CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS)

### Common Law Infringement and Unfair Competition

84.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

85.    Prior to NPK and OGD's unlawful use, Yeti's Marks were well recognized by the consuming public of horticulture products and had come to be associated with and to identify the source of Yeti's Products.

86.    By misappropriating Yeti's Marks, NPK and OGD have created confusion or a likelihood of confusion, deception, and mistake in the marketplace, and in the minds of the public, as to the origin, sponsorship, and/or affiliation of NPK and OGD's products and services, thereby doing great and irreparable harm to Yeti's reputation and goodwill.

87.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

88.    Defendants' actions as herein alleged constitute common law unfair competition.

89.    Defendants' conduct as herein alleged has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief stopping Defendants' continued unfair competition using Yeti's Marks.

90.    In addition, as a direct and proximate result of Defendants' conduct, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

91.    Upon information and belief, as a direct and proximate result of Defendants' wrongful conduct, Defendants have realized and will continue to realize profits, gains, and other advantages from their infringing activities, all to the detriment of Yeti.  As a direct and proximate result of Defendants' wrongful conduct, Yeti has been damaged and is entitled to recover Defendants' wrongful profits and Yeti's actual damages, together with Yeti's attorneys' fees incurred in this action.

**FOURTH CLAIM FOR RELIEF**
**(AGAINST NPK, ROWE, TOWNSEND AND TANG)**

**(Fraud – Federal Trademark Registration)**

**(Count 1)**

92.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

75845977.2 0048752-00001

93.     NPK registered Yeti's trademark "Mighty Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

94.     Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

95.     On April 3, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

96.     As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

97.     As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4121193 for "Mighty Wash" in international Class 003 is invalid and void.

**(Count 2)**

98.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

99.     NPK registered Yeti's trademark "Mighty Wash" in international Class 005, by fraudulently representing that NPK was the owner of the mark.

100.     Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PRO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

101.      On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

102.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

103.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4241438 for "Might Wash" in international Class 005 is invalid and void.

**(Count 3)**

104.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

105.    NPK registered Yeti's trademark "Power Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

106.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

107.    On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

108.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

109.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4346896 for "Power Wash" in international Class 003 is invalid and void.

75845977.2 0048752-00001

**(Count 4)**

110.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

111.    NPK registered Yeti's "Power Button" trademark in international Class 003, by fraudulently representing that NPK was the owner of the mark.

112.    NPK's declaration contains intentional misrepresentations made at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, to induce the PTO's reliance on those misrepresentations and to misappropriate Yeti's Marks.

113.    On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in the name of NPK.

114.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

115.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4400010 "Power Button" trademark in international Class 003 is invalid and void.

## FIFTH CLAIM FOR RELIEF
### (AGAINST NPK, ROWE, TOWNSEND AND TANG)

### (Common Law Fraud)

116.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

117.    In or around April 2012, NPK, at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products.  NPK's statement was a material misrepresentation and was false.

118.    At the time NPK made the misrepresentation regarding the EPA's purported demand, NPK knew its misrepresentation was false.

119.    NPK intended Yeti to rely on the misrepresentation in order to misappropriate Yeti's Marks.

120.    Yeti justifiably relied on NPK's misrepresentation.

121.    As a result of NPK, Rowe, Townsend and Tang's fraud, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred herein.

## SIXTH CLAIM (AGAINST NPK)

### (Breach of Contract)

### (Count 1)

122.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

123.    The Agreement is a valid and enforceable contract between the parties.

124.    Yeti performed its obligations and conditions precedent under the Agreement.

125.    NPK breached the Agreement by misappropriating Yeti's Marks and engaging in false advertising and unfair competition.

126.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices, plus lost profits in an amount to be determined at trial, plus reputational damage in an amount to be determined at trial.

127.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 2)**

128.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

129.    The Agreement is a valid and enforceable contract between the parties.

130.    Yeti performed its obligations and conditions precedent under the Agreement.

131.    NPK breached the Agreement by failing to pay for insurance or to reimburse Yeti for insurance costs.

132.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices.

133.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 3)**

134.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

135.    The Agreement is a valid and enforceable contract between the parties.

136.    Yeti performed its obligations and conditions precedent under the Agreement.

137.    NPK breached the Agreement by failing to pay interest owed on untimely paid invoices.

138.    As a result of NPK's breach, Yeti has suffered damages in the amount of $56,860.31.

139.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 4)**

140.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

141.    The Agreement is a valid and enforceable contract between the parties.

75845977.2 0048752-00001

142.    Yeti performed its obligations and conditions precedent under the Agreement.

143.    NPK breached the Agreement by failing to order the required number of totes of Product.

144.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

145.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 5)**

**(in the Alternative)**

146.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

147.    On February 11, 2013, the parties entered into an oral agreement to amend the Distribution Agreement and for certain additional undertakings (the "February 11 Agreement").

148.    The February 11 Agreement is a valid and enforceable contract between the parties.

149.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

150.    NPK breached the February 11 Agreement by failing to pay the price for the Products under Section 5 of the Agreement (as amended by the February 11 Agreement) (i.e., $5.25/gallon for Mighty Wash, $4.00/gallon for PM Wash, and $3.50/gallon for Power Wash).

151.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

152.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred, pursuant to section 21 of the Agreement

**(Count 6)**

**(in the Alternative)**

153.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

154.    The February 11 Agreement is a valid and enforceable contract between the parties.

155.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

156.    NPK breached the February 11 Agreement by failing to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill.

157.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to specifically perform its obligations to assign the marks to Yeti.

158.    In addition, as a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

159.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's

breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

160.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

## (Count 7)

## (in the Alternative)

161.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

162.    The February 11 Agreement is a valid and enforceable contract between the parties.

163.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

164.    NPK breached the February 11 Agreement by failing to relinquish to Yeti its account with the provider of "Pink Sauce."

165.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in the amount in an amount to be determined at trial.

166.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

## (Count 8)

## (in the Alternative)

167.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

168.    The February 11 Agreement is a valid and enforceable contract between the parties.

169.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

170.    NPK breached the February 11 Agreement by failing to state on all bottles, caps and labels subsequently purchased or created for the Products that Yeti is the creator and manufacturer of the Products.

171.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

172.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

173.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

**(Count 9)**

**(in the Alternative)**

174.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

175.    The February 11 Agreement is a valid and enforceable contract between the parties.

176.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

177.    NPK breached the February 11 Agreement by failing to obtain Yeti's prior approval of all prospective advertising of the Products.

178.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

179.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

180.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

## (Count 10)

### (in the Alternative)

181.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

182.    The February 11 Agreement is a valid and enforceable contract between the parties.

183.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

184.    NPK breached the February 11 Agreement by producing, selling, marketing, distributing or manufacturing non-Yeti products that contain Pink Sauce prior to January 1, 2016;

185.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to comply with its obligations through January 1, 2016.

186.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

187.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

188.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

## SEVENTH CLAIM FOR RELIEF (AGAINST NPK)

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

189.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

190.    The Agreement is a valid and enforceable contract between the parties.

191.    Yeti performed its obligations and conditions precedent under the Agreement.

192.    The Agreement contains an implied covenant of good faith and fair dealing.

193.    NPK breached the implied covenant of good faith and fair dealing by misappropriating Yeti's Marks and engaging in unfair competition and false advertising as alleged in this Complaint.

194.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

195.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

75845977.2 0048752-00001

## EIGHTH CLAIM FOR RELIEF (AGAINST NPK)

### (Declaratory Judgment – ORS Chapter 28)

196.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

197.    There is a justiciable controversy between the parties regarding whether the Agreement terminated by no later than December 31, 2013; whether the Agreement provided NPK the exclusive right to distribute Yeti's products; whether Yeti may notify its buyers, including Sunlight, that Yeti will no longer be working with NPK; and whether Yeti may sell its products directly to buyers, including Sunlight, using Yeti's Marks.

198.    This court has jurisdiction over the dispute because it arises out of the parties' Agreement which provides for jurisdiction only in Multnomah County.

199.    Yeti is entitled to a declaratory judgment that: (a) the Agreement terminated by no later than December 31, 2013; (b) the Agreement does not give NPK exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d) Yeti's communication with Sunlight or any other buyer does not constitute tortious interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using Yeti's Marks.

### PRAYER FOR RELIEF

WHEREFORE, Yeti requests a judgment in its favor and against Defendants, including the following:

A.    **On Yeti's First and Second Claims for Relief:**

1.    Pursuant to 15 U.S.C. § 1117(a), Yeti's actual damages, Defendants' profits, and the costs of the action;

2.    Pursuant to 15 U.S.C. § 1117(a)(3), enhanced damages in an amount up to three times actual damages;

3.    Pursuant to 15 U.S.C. § 1117(a)(3), Yeti's reasonable attorneys' fees and costs; and

75845977.2 0048752-00001

4.      An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, using in the future Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks, or any indication that Yeti's Products are affiliated with Defendants' products; or any false advertising.

**B.      On Yeti's Third Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Defendants' profits;

3.      Yeti's reasonable attorneys' fees and costs; and

4.      An injunction against Defendants' continued unfair competition using Yeti's Marks.

**C.      On Yeti's Fourth Claim for Relief (Counts 1 through 4):**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Punitive damages;

3.      Yeti's reasonable attorneys' fees and costs;

4.      A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 003 is invalid and void;

5.      A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 005 is invalid and void.

6.      A declaratory judgment that NPK's trademark registration of "Power Wash" in international Class 003 is invalid and void;

7.      A declaratory judgment that NPK's trademark registration of the "Power Button" mark in international Class 003 is invalid and void;

**D.      On Yeti's Fifth Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Punitive damages; and

Page 35   -    PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
                  COMPLAINT

3.      Yeti's reasonable attorneys' fees and costs.

**E.      On Yeti's Sixth Claim for Relief (Counts 1 through 10) and Seventh Claim for Relief:**

1.      Damages in the amount of $20,013.56 for insurance costs;

2.      Damages in the amount of $56,860.31 for interest on untimely paid invoices;

3.      Yeti's lost profits in an amount to be determined at trial;

4.      Yeti's reputational damage in an amount to be determined at trial;

5.      An injunction enjoining NPK, its successors and assigns, and all persons acting in concert with it, from producing, selling, marketing, distributing or manufacturing any product that contains Pink Sauce prior to January 1, 2016 and directing NPK to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

6.      Pursuant to section 21 of the Agreement, Yeti's reasonable attorneys' fees and costs.

**F.      On Yeti's Eighth Claim for Relief:**

7.      A declaratory judgment that: (a) the Distribution Agreement terminated by no later than December 31, 2013; (b) the Agreement does not give NPK exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d) Yeti's communication with Sunlight or any other buyer does not constitute tortious interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using Yeti's Marks.

///

**G.    On All Claims for Relief:**

1.    Yeti's prevailing party fees, attorneys' fees, costs, pre-judgment and post-judgment interest; and

2.    For such further relief as the Court deems just and equitable.

DATED:  April 11, 2014.

STOEL RIVES LLP


s/ Steven E. Klein
STEVEN T. LOVETT, OSB No. 910701
stlovett@stoel.com
STEVEN E. KLEIN, OSB No. 051165
seklein@stoel.com

Attorneys for Plaintiff Yeti Enterprises Inc.

75845977.2 0048752-00001

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing on the following **PLAINTIFF YETI**

**ENTERPRISES INCORPORATED'S FIRST AMENDED COMPLAINT** named

persons on the date indicated below by

    ☐   mailing with postage prepaid

    ☐   hand delivery

    ☐   facsimile transmission

    ☐   overnight delivery

    ☒   ECF Filing

to said persons a true copy thereof, contained in a sealed envelope if by mail, addressed to

said persons at his or her last-known addresses indicated below.

| | |
|---|---|
| Renée E. Rothauge<br>Jeffrey M. Edelson<br>Steffan Alexander<br>Markowitz, Herbold, Glade & Melhaf, PC<br>1211 SW Fifth Avenue, Suite 3000<br>Portland, OR 97204-3730<br>ReneeRothauge@MHGM.com<br>JeffEdelson@MHGM.com<br>SteffanAlexander@MHGM.com<br><br>Attorneys for Defendants NPK, LLC and<br>Oregon Global Distribution, Inc. | Robert B. Miller<br>Kilmer Voorhees & Laurick PC<br>732 NW 19th Avenue<br>Portland, OR 97209<br>bobmiller@kilmerlaw.com<br><br>Attorneys for Defendants Orion Tang,<br>Richard Rowe and Reny Townsend |

DATED:  April 11, 2014.     STOEL RIVES LLP

s/ Steven E. Klein
Steven E. Klein, OSB No. 051165
Telephone:  (503)-224-3380
Attorneys for Plaintiff Yeti Enterprises Inc.

Page 1   -   PLAINTIFF YETI ENTERPRISES INCORPORATED'S FIRST AMENDED
           COMPLAINT