Steven T. Lovett, OSB No. 910701
stlovett@stoel.com
Steven E. Klein, OSB No. 051165
seklein@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

     Attorneys for Plaintiffs


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION


| | |
|---|---|
| YETI ENTERPRISES INCORPORATED, an Oregon corporation, and ALEXANDER J. HEAGLE, an individual, | Case No.: 3:13-cv-01203-ST |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| v. | |
| NPK, LLC, f/k/a N.P.K. DISTRIBUTORS, LLC, an Oregon limited liability company, OREGON GLOBAL DISTRIBUTION, INC., an Oregon corporation, RICHARD ROWE, an individual, RENY TOWNSEND, an individual, and ORION TANG, an individual, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |


Page 1   -   SECOND AMENDED COMPLAINT

Plaintiffs Yeti Enterprises Incorporated ("Yeti") and Alexander J. Heagle ("Heagle"), for their Second Amended Complaint against NPK, LLC, f/k/a N.P.K. Distributors, LLC ("NPK"), Oregon Global Distribution, Inc. ("OGD"), Richard Rowe ("Rowe"), Reny Townsend ("Townsend"), and Orion Tang ("Tang"), state as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.      Yeti is an Oregon corporation that was founded in Portland, Oregon, and is headquartered in Medford, Oregon.  Yeti invented, manufactures and sells horticulture products known as plant "washes" that are used by consumers to prevent pest infestation and mold growth, and to clean plants.  Yeti products are sold throughout Oregon, the United States, Canada, the United Kingdom, and Spain.

2.      Heagle is an individual residing in Grants Pass, Oregon.  Heagle is a co-founder, shareholder and President of Yeti.

3.      NPK is an Oregon Limited Liability Company with its principal place of business at 1904 United Way, Suite 104, Medford, OR 97504 and a mailing address of 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, NPK is, and at all material times has been, directly or indirectly, owned or controlled by Richard Rowe, Reny Townsend, and Orion Tang.  NPK, together with OGD, owns, operates and does business under the Oregon assumed business name "NPK Industries."

4.      OGD is an Oregon corporation with its principal place of business at 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, OGD is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend and Tang.  OGD, together with NPK, owns, operates and does business under the Oregon assumed business name "NPK Industries."

5.      Richard Rowe is an individual and, on information and belief, a citizen of New Zealand, who resides in Medford, Oregon.  On information and belief, Rowe is, and at

Page 2    -    SECOND AMENDED COMPLAINT

all material time has been, directly or indirectly, an owner, officer, manager and/or director of NPK and OGD.

6.      Reny Townsend is an individual who resides in Medford, Oregon.  On information and belief, Townsend is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK and OGD.

7.      Orion Tang is an individual who resides in Medford, Oregon.  On information and belief, Tang is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK and OGD.

8.      NPK, OGD, Rowe, Townsend and Tang have, on information and belief, acted in concert with each other in furtherance of the improper and wrongful conduct alleged in this pleading.  At all relevant times, Rowe, Townsend and Tang were acting either in their individual capacities or as an agent of NPK and/or OGD.  Further discovery will inform when each was acting as an individual and/or as an agent.

9.      This Court has original jurisdiction over Yeti's NPK's trademark, unfair competition, and cybersquatting claims under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. §§ 1120, 1125, Yeti's declaratory judgment claims under 28 U.S.C. § 2201 and 28 U.S.C. § 2202, and 15 U.S.C. § 1116(a), and supplemental jurisdiction over Yeti's state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the United States District Court for the District of Oregon pursuant to 28 U.S.C. § 1391 because NPK, OGD, Rowe, Townsend and Tang reside in the State of Oregon, sell products in the State of Oregon, and because a substantial part of the events or omissions giving rise to the claims asserted occurred in the District of Oregon. Venue is also proper in the Portland Division pursuant to LR  3- 2 because the Distribution Agreement (the "Agreement") between the parties that is the subject of this dispute was negotiated and executed in Portland, Oregon, and provides: "In the event suit or action is

necessary to enforce the terms of this Agreement, jurisdiction shall be exclusively in the State of Oregon with venue in Multnomah County."  A true copy of the Agreement is attached hereto as Exhibit A.

## II.  GENERAL ALLEGATIONS

**A.     Yeti's First Use of the Trademarks "That Stuff," "Mighty Wash", "Power Wash," "PM Wash," the "Power Button," and "Frequency Imprinted H2O."**

11.     Yeti is in the business of manufacturing and selling plant washes using a confidential and proprietary formula and process that includes electronic frequency imprinting.  In March 2009, Yeti began selling three washes from its Portland, Oregon, headquarters using the trade name and trademark "That Stuff."

12.     Yeti sold its products in specialty garden and plant stores throughout Oregon, Washington, Colorado and Montana.  One of the stores in which Yeti sold its products was NPK's garden store called "In and Out Gardens Hydroponic Superstore."

13.     In 2010, Yeti consulted with NPK to design new marks for Yeti to use on Yeti's products.  On October 8 , 2010, Yeti began selling its three products with labels using the marks "Mighty Wash," "Power Wash" and "PM Wash," respectively.  Each label also contained the colored "Power Button" and a distinctive logo containing an electronic frequency graph and the words "Frequency Imprinted H2O."  Each label also contained the words "'That Stuff' presents" and identifies the products as "Manufactured by Yeti Enterprises, Inc."   The marks "That Stuff, "Mighty Wash," "Power Wash," "PM Wash," the "Power Button" and the "Frequency Imprinted H2O" mark shall be referred to herein collectively as "Yeti's Marks."  Copies of each of the three labels using Yeti's Mark's in October 2010 are attached hereto as Exhibit B and also pictured below:

Page 4   -   SECOND AMENDED COMPLAINT







14.     Using the marks shown above, Yeti manufactured, bottled, labeled, marketed, and sold Mighty Wash, Power Wash and PM Wash (collectively, the "Products") to garden and plant stores throughout Oregon, Washington, Colorado and Montana.

**B.      Yeti Entered into a Distribution Agreement with NPK.**

15.     On November 11, 2010, after Yeti began using Yeti's Marks, Yeti entered into a Distribution Agreement with NPK.   The Agreement recognized that Yeti manufactures "That Stuff Mighty Wash," "That Stuff PM Wash," and "That Stuff Power

Page 5    -    SECOND AMENDED COMPLAINT

Wash" (collectively, the "Products") and required NPK to bottle, label, market and physically distribute Yeti's Products.  The term of the Agreement was ten (10) years.

16.     Pursuant to the Agreement, NPK agreed to purchase a minimum of 12 totes of Products per month.  A "tote" is a plastic vessel and each one containing 260 gallons of liquid. The Agreement specified that NPK would pay $7 a gallon for That Stuff Mighty Wash and $5 a gallon for That Stuff PM Wash and That Stuff Power Wash.

17.     Under the agreement Yeti would invoice NPK monthly, on or about the 25th of the month and NPK was required to make payment on or before the 15th of the following month.

18.     NPK further agreed to purchase and maintain insurance for the Products, or if it failed to do so, to reimburse Yeti its costs to obtain insurance.

**C.      NPK Breaches the Distribution Agreement By Its Failure to Pay for Product.**

19.     The parties commenced performance of the Agreement and NPK began bottling, labeling, marketing and physically distributing Yeti's Products.

20.     By the end of 2011, NPK was in material breach of its obligations under the Distribution Agreement based on failing to pay Yeti's invoices in full by the 15th day of the following month, among other things.  As of January 15, 2012, the unpaid balance NPK owed Yeti exceeded $300,000.

21.     On or about February 8, 2012, Yeti and NPK met to discuss NPK's default and whether there was a way for NPK to pay off its substantial debt to Yeti and avoid termination.  During that meeting, Rowe represented to Yeti that NPK had been unable to keep current with Yeti's invoices because NPK's revenue from the sale of Yeti's Products in 2011 had been consumed by the allegedly substantial costs incurred by NPK to market and promote the Products.  Rowe further represented that NPK could only continue to perform its

Page 6    -    SECOND AMENDED COMPLAINT

obligations under the Distribution Agreement and become current on NPK's past due balance to Yeti if Yeti agreed to lower the prices Yeti charged NPK for the Products.

22.    In reliance on Rowe's representations, Yeti agreed to lower the prices for the Products until the end of 2012.  Under the revised pricing, NPK would pay $5 a gallon for That Stuff Mighty Wash and $3 a gallon for That Stuff PM Wash and That Stuff Power Wash.  Yeti also agreed to extend payment terms from 15 days to 45 days from the billing date.  In exchange, NPK agreed to purchase a minimum of 37 totes of Mighty Wash per month, and a combined total of 14 totes of Power Wash and PM Wash per month.  NPK also agreed to a repayment schedule for the outstanding balance it owed Yeti.  As part of the schedule, Yeti agreed to accept partial payment in "Pink Sauce," an ingredient used by Yeti in the process of manufacturing the Products.  The parties agreed that pricing would be reviewed at the end of December 2012.

**D.    NPK Misappropriates Yeti's Trademarks and Engages in Unfair Competition and False Advertising.**

23.    On July 21, 2011, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 003.  In the application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash."  The specimen submitted with the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar version of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that the representations made by Tang on NPK's behalf were false and made with the intent to induce the U.S. Patent and Trademark Office's ("PTO") reliance on the misrepresentation.

Page 7    -    SECOND AMENDED COMPLAINT

On April 3, 2012, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

24.    On March 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 005.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash."  The specimen submitted with the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, again signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on behalf of NPK were false and made with the intent to induce the PTO's reliance on the misrepresentation.  On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

25.    On or about March 29, 2012, the United States Environmental Protection Agency ("EPA") issued a "Stop Sale, Use, or Removal Order" to NPK directing NPK to cease the sale, use and distribution of the Products (the "Stop Sale Order").  A true and correct copy of the Stop Sale Order is attached hereto as Exhibit E.  The Stop Sale Order cited the EPA's determination that NPK was marketing Yeti's Products as pesticides because of certain claims made in the Product's "labeling and or advertising material."

26.    On or about April 9, 2012, NPK contacted the EPA regarding the Stop Sale Order and represented, falsely, that NPK had never used the claims quoted in the Stop Sale Order in connection with the advertising of the Products.  NPK also provided copies of Yeti's

labels for the Products to show that the claims cited in the Stop Sale Order appeared nowhere on the labels.

27.    On or about April 9, 2012, the EPA responded to NPK that the Stop Sale Order had issued on the basis of an advertising brochure obtained during a marketplace inspection in December 2011.  The EPA represented that the brochure contained the claims that concerned the EPA.  That brochure was authored and distributed by NPK.  A true and correct copy of the brochure referenced by the EPA is attached hereto as Exhibit F.

28.    The EPA's April 9, 2012 response also addressed the specimens of Yeti's labels submitted by NPK, noting that the labels were acceptable, did not include pesticidal claims, and that the EPA's concern was with the advertising that was found with the product.

29.    On information and belief, after receiving the EPA's response, NPK revised its advertising brochures and Internet website to remove the pesticidal claims cited by the EPA and requested that the EPA issue authorization to resume sales of the Products.

30.    In or around April, 2012, NPK's Tang, acting at the direction of Rowe and Townsend, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products.  Tang did not explain the basis for the supposed demand and refused to provide Yeti a copy of the EPA's correspondence setting forth this demand.  Tang's representation that the EPA had demanded removal of the marks and manufacturer statement was false, and made with the intent of inducing Yeti's reliance on it.

31.    In bad faith and without obtaining Yeti's permission, NPK removed the marks "That Stuff" and "Manufactured by Yeti Enterprises, Inc." from the labels on Yeti's Products.  NPK replaced the words "That Stuff presents," with "NPK Industries presents." When Yeti noticed the change and asked why it had been made, NPK represented that EPA

Page 9    -    SECOND AMENDED COMPLAINT

had insisted on the change.  NPK shared with Yeti a June 21, 2012 letter from the EPA authorizing NPK to resume sale of the Products that stated, "Your April 10, 2012, email, and our subsequent review of your website showed that you have removed all pesticidal claims from your website, labeling, and advertising in accordance with the conditions outlined in the [Stop Sale] Order."  NPK falsely represented to Yeti that the EPA's June 21 letter had only been secured through removal of the "That Stuff" mark from the Product labels, when, in fact, all the EPA required was revision of the claims made by NPK in NPK's brochure and on NPK's Internet website.  NPK's false representations were, on information and belief, knowingly made with the intent to induce Yeti's reliance on them and in furtherance of NPK's efforts to misappropriate Yeti's Marks.

32.    On November 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "PM Wash," in international Class 003. In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "PM Wash."  The specimen submitted with the application was a photo of containers affixed with Yeti's label for "PM Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on them.  After this suit was filed, NPK abandoned the application.

33.    On November 21, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Power Wash," in international Class

003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Power Wash."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on the misrepresentation.  On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

34.     In or around December 2012, Yeti discovered that NPK had applied for and obtained a federal registration for the "Mighty Wash" mark without Yeti's knowledge or permission.

35.     In or around December 2012, Yeti made multiple requests that NPK provide copies of the Stop Sale Order and NPK's correspondence with the EPA regarding the Stop Sale Order.  On NPK's behalf, Rowe repeatedly represented that he would provide Yeti with copies of the Stop Sale Order and copies of the EPA correspondence.  Indeed, Rowe specifically represented that he would bring copies to a meeting scheduled with Yeti for January 2, 2013.

36.     On January 2, 2013, Rowe and Tang attended a meeting between NPK and Yeti.  At the meeting, Rowe provided Yeti with a copy of the same June 21, 2012 EPA letter authorizing NPK to resume sale and distribution of the Products that had already been shared with Yeti.  Rowe represented that he would have brought the Stop Sale Order and NPK's other correspondence with the EPA, but claimed that NPK was unable to locate them.

37.     Prior to the January 2, 2013 meeting, Yeti began receiving inquiries from customers confused that products sold under the names "Stack" and "Multiply" were new

Page 11   -   SECOND AMENDED COMPLAINT

Yeti products.  In fact, "Stack" and "Multiply" were not Yeti products, but new products introduced by NPK without Yeti's knowledge or involvement.

38.     During the January 2, 2013 meeting, Yeti raised these customer inquiries with NPK and asked whether NPK knew why customers were confusing "Stack" and "Multiply" with Yeti and Yeti's Products.  NPK denied any knowledge of why customers might be confused and repeatedly attempted to change the subject.

39.     After the January 2, 2013 meeting, Yeti discovered that NPK had placed an advertisement in the December 2012 issue of "Maximum Yield," a magazine directed to plant and hydroponics consumers, that showed containers of NPK's "Stack" and "Multiply" products under the caption "From the Creators of 'Mighty Wash'."  The labels on the containers also prominently featured Yeti's "Power Button" mark.  A true and correct example of the ad is attached hereto as Exhibit D and also pictured below:



40.     NPK also failed to meet its minimum order requirements in 2012 for PM Wash and Power Wash.  Specifically, NPK was required to order a combined total of 154 totes of PM Wash and Power Wash in 2012, but only ordered 143 totes.

41.     On January 28, 2013, Yeti notified NPK that it was in default in its obligations under the Distribution Agreement based on multiple breaches.  Yeti's notice gave NPK a reasonable timeframe to comply with various demands, including that NPK immediately pay all amounts past due and owing to Yeti, that NPK assign to Yeti the trademark registration for "Mighty Wash" wrongfully obtained in the name of NPK, and that NPK cease all advertising of NPK's "Stack" and "Multiply" products as "From the Creators of 'Mighty Wash'".

42.     On February 6, 2013, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the "Power Button" mark in international Class 003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the "Power Button" mark.  The specimen submitted with the application was a photo of a container affixed with a "Mighty Wash" label that, upon information and belief, has never been used in interstate commerce.  NPK's declaration in support of the fraudulent application was signed by B. Anna McCoy, an attorney with the law firm of Alleman Hall McCoy Russell & Tuttle LLP, with the knowledge and approval of Rowe, Townsend and Tang.  On information and belief, Rowe, Townsend and Tang authorized McCoy to sign the declaration with the knowledge or belief that the representations made by McCoy on NPK's behalf were false and made with the intent to induce the USPTO's reliance on them.  On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in NPK's name.

Page 13  -    SECOND AMENDED COMPLAINT

**E.      NPK Agrees to Turnover Yeti's Marks and Wind Down The Agreement.**

43.      On February 11, 2013, NPK and Yeti met to discuss the matters raised in Yeti's notice.  During the meeting, which was attended by Rowe, Townsend and Tang, Yeti and NPK reached an oral agreement to modify the Distribution Agreement and resolve the issues cited by Yeti in its notice.  The parties' agreement included the following material terms:

    a.   Yeti agreed to not terminate the Agreement and to resume accepting orders for the Products from NPK;

    b.   The price for the Products under Section 5 of the Agreement (as amended in February 2011) was increased to $5.25 a gallon for Mighty Wash, $4.00 a gallon for PM Wash, and $3.50 a gallon for Power Wash;

    c.   The payment terms under Section 6 of the Agreement (as amended in February 2011) was shortened to require NPK to deliver payment within 30 days of receipt of the products;

    d.   The term set forth in Section 12 of the Agreement was shortened to provide that the Agreement would terminate on December 31, 2013;

    e.   NPK agreed to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

    f.   NPK agreed to relinquish to Yeti its account with the provider of "Pink Sauce";

    g.   NPK agreed that all bottles, caps and labels subsequently purchased or created for the Products would state that Yeti is the creator and manufacturer of the Products;

    h.   NPK agreed to obtain Yeti's prior approval of all prospective advertising of the Products;

    i.   NPK agreed not to produce, sell, market, distribute or manufacture any product that contains Pink Sauce from termination of the Agreement until January 1, 2016; and

j.    NPK agreed not to use Yeti's Marks or any confusingly similar variation in NPK's sale, distribution or marketing activities other than solely in connection with the Products during the Agreement's remaining term.

44.    Between February 13, 2013 and February 21, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, which promises and representations were reasonably expected by NPK to induce Yeti's reliance and performance, accepted orders for and delivered more than 25 totes of the Products to NPK.  Tang accepted delivery of the totes on NPK's behalf.

45.    On February 21, 2013, NPK emailed Yeti a draft written agreement purportedly memorializing the oral agreement reached between the parties at the February 11 meeting.  Although NPK's draft recited the essential terms discussed at the parties' February 11 meeting, it also included additional, material terms that had neither been discussed nor agreed upon during that meeting.  For example, NPK's draft purported to release NPK from any minimum purchase requirements for the Agreement's remaining term.  NPK's draft also would allow NPK to delay assignment of the applications NPK had improperly filed for Yeti's Marks and purported to make those assignments contingent upon Yeti's "satisfactory performance" of the party's agreement.  A true and correct copy of NPK's email and draft is attached as Exhibit G.

46.    On March 8, 2013, Yeti provided NPK with a revised draft written agreement that removed the terms unilaterally added by NPK and made certain suggested clarifications.  A true and correct copy of Yeti's March 8, 2013 draft is attached as Exhibit H.

47.    On April 5, 2013, NPK "rejected" Yeti's March 8 draft, contending that it did not accurately reflect the terms the parties agreed to on February 11.  Although Yeti did not agree with this characterization, on April 8, 2013, Yeti forwarded a second revised draft to NPK that attempted to address NPK's concerns. A true and correct copy of Yeti's April 8, 2013 draft is attached as Exhibit I.

Page 15   -    SECOND AMENDED COMPLAINT

48.     Between February 22, 2013 and April 10, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, continued to accept orders for and deliver Products to NPK, which deliveries were accepted.

49.     On April 12, 2013, NPK expressly repudiated the parties' February 11 agreement, citing unspecified "new information" that purportedly "changed the circumstances."

50.     In bad faith and without Yeti's permission, in or around April 2013, NPK and OGD, doing business as "NPK Industries," began manufacturing and selling their own knock off product using Yeti's marks, "Mighty Wash," "Power Wash," "PM Wash," and the "Power Button."  NPK and OGD also used a confusingly similar variation of Yeti's "Frequency Imprinted H2O" mark.  The labels on these products were virtually identical to those on Yeti's Products.  Copies of the labels from the knock off products are attached hereto as Exhibit C and also pictured below:







51.    NPK and OGD, doing business as "NPK Industries," sell and continue to sell their own knock off products using Yeti's Marks as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the same group of users. NPK and OGD also continue to sell non-Yeti products, including "Multiply" and "Stack," using one or more of Yeti's Marks, as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the same group of users.  As a result, NPK and OGD are causing actual consumer confusion in the marketplace.

52.    On information and belief, the formula and/or process used to manufacture NPK and OGD's knock off products does not include electronic frequency imprinting.

53.    NPK and OGD's knock off products are also much less effective than Yeti's Products.

Page 17   -   SECOND AMENDED COMPLAINT

54.     As a result, NPK and OGD are causing irreparable harm to Yeti's goodwill and reputation.

55.     NPK and OGD, doing business as "NPK Industries," advertise using Yeti's Marks in direct competition with Yeti through the same channels and to the same group of users, thereby causing actual and likely consumer confusion in the marketplace.  This false advertising is causing further irreparable harm to Yeti's goodwill and reputation.

**F.     NPK's Additional Breaches of the Distribution Agreement.**

56.     In addition to making knockoff versions of Yeti's Products, NPK failed to perform its obligations under the Agreement.

57.     NPK refused to pay for insurance for 2011, 2012 and 2013, thereby forcing Yeti to purchase insurance at a total cost of $20,013.56, and NPK did not reimburse Yeti for that expense as required by the Agreement.

58.     NPK also failed to timely pay for Products delivered under the Agreement in 2010 and 2011.  As a result, pursuant to the terms of the Agreement, Yeti is entitled to interest in the amount of $56,860.31.

59.     NPK also failed to order the requisite number of totes of Products from Yeti, as required by the Agreement, and in April 2013 discontinued orders altogether.  NPK's failure to order the requisite number of totes for the remaining duration of the Agreement will result in lost revenue for Yeti in the amount of $5,370,820.00.

60.     Yeti notified NPK that it was in breach of the Agreement.

61.     NPK refuses to stop using Yeti's Marks and to pay amounts due and owing.

62.     Yeti also notified one of its customers, Sunlight Supply Incorporated ("Sunlight"), that Yeti was no longer working with NPK, and would instead work directly with Sunlight.  In response, NPK claimed that, by contacting customers directly, Yeti tortiously interfered with NPK's relationship and sued Yeti in Jackson County Circuit Court,

76381565.1 0048752-00001

Case No. 13CV01641.  However, the Agreement provides for exclusive jurisdiction in Multnomah County Circuit Court, and NPK subsequently dismissed the Jackson County action.

### III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (By Yeti Against All Defendants)

### Trademark Infringement and Unfair Competition — 15 U.S.C. § 1125(a)

63.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

64.     Yeti's Marks are valid and protectable trademarks.

65.     NPK and OGD have used and continue to use Yeti's Marks in connection with the sale of goods in commerce without permission.

66.     NPK and OGD's use of the Yeti's Marks occurred after Yeti began using the marks.

67.     NPK and OGD's use of Yeti's Marks, or variations of Yeti's Marks, is likely to cause consumer confusion or mistake, or to deceive, as to the affiliation, connection, or association of NPK and OGD with Yeti.

68.     At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

69.     Defendants are therefore liable under 15 U.S.C. § 1125(a) for infringement of Yeti's Marks and for unfair competition.

70.     Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

71.     Because Defendants' actions in using Yeti's Marks were intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

72.     This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

73.     In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future infringement by Defendants, Yeti is entitled to an injunction against Defendants' use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks.

## SECOND CLAIM FOR RELIEF

### (By Yeti Against All Defendants)

### False Advertising – 15 U.S.C. § 1125(a)

74.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

75.     Yeti's Marks are valid and protectable trademarks.

76.     Without Yeti's permission, NPK and OGD used Yeti's Marks in connection with the sale of goods in commercial advertising or promotion of NPK and OGD's non-Yeti products, including "Multiply" and "Stack," as well as their knock off products, thereby misrepresenting the nature, characteristics, and qualities of NPK and OGD's goods.  NPK and OGD's goods are not "from the creators of 'Mighty Wash.'"

77.     NPK and OGD are also falsely representing that their knock-off products are manufactured using an imprinted electronic frequency, like Yeti's Products.

78.     NPK and OGD's use of the Yeti's Marks occurred after Yeti began using the marks.

76381565.1 0048752-00001

79.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

80.    Defendants are therefore liable under 15 U.S.C. § 1125(a) for false advertising and unfair competition.

81.    Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

82.    Because Defendants' false advertising was intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

83.    This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

84.    In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future infringement by Defendants, Yeti is entitled to an injunction against NPK's use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks.

### THIRD CLAIM FOR RELIEF

### (By Yeti Against All Defendants)

### Common Law Infringement and Unfair Competition

85.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

86.    Prior to NPK and OGD's unlawful use, Yeti's Marks were well recognized by the consuming public of horticulture products and had come to be associated with and to identify the source of Yeti's Products.

87.     By misappropriating Yeti's Marks, NPK and OGD have created confusion or a likelihood of confusion, deception, and mistake in the marketplace, and in the minds of the public, as to the origin, sponsorship, and/or affiliation of NPK and OGD's products and services, thereby doing great and irreparable harm to Yeti's reputation and goodwill.

88.     At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

89.     Defendants' actions as herein alleged constitute common law unfair competition.

90.     Defendants' conduct as herein alleged has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief stopping Defendants' continued unfair competition using Yeti's Marks.

91.     In addition, as a direct and proximate result of Defendants' conduct, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

92.     Upon information and belief, as a direct and proximate result of Defendants' wrongful conduct, Defendants have realized and will continue to realize profits, gains, and other advantages from their infringing activities, all to the detriment of Yeti.  As a direct and proximate result of Defendants' wrongful conduct, Yeti has been damaged and is entitled to recover Defendants' wrongful profits and Yeti's actual damages, together with Yeti's attorneys' fees incurred in this action.

**FOURTH CLAIM FOR RELIEF**

**(By Yeti Against All NPK, Rowe, Townsend and Tang)**

**(Fraud – Federal Trademark Registration)**

**(Count 1)**

93.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

94.     NPK registered Yeti's trademark "Mighty Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

95.     Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

96.     On April 3, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

97.     As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

98.     As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4121193 for "Mighty Wash" in international Class 003 is invalid and void.

**(Count 2)**

99.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

100.     NPK registered Yeti's trademark "Mighty Wash" in international Class 005, by fraudulently representing that NPK was the owner of the mark.

101.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

102.    On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

103.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

104.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4241438 for "Might Wash" in international Class 005 is invalid and void.

**(Count 3)**

105.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

106.    NPK registered Yeti's trademark "Power Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

107.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

108.    On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

76381565.1 0048752-00001

109.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

110.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4346896 for "Power Wash" in international Class 003 is invalid and void.

**(Count 4)**

111.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

112.    NPK registered Yeti's "Power Button" trademark in international Class 003, by fraudulently representing that NPK was the owner of the mark.

113.    NPK's declaration contains intentional misrepresentations made at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, to induce the PTO's reliance on those misrepresentations and to misappropriate Yeti's Marks.

114.    On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in the name of NPK.

115.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

116.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4400010 "Power Button" trademark in international Class 003 is invalid and void.

## FIFTH CLAIM FOR RELIEF

### (By Yeti Against All NPK, Rowe, Townsend and Tang)

### (Common Law Fraud)

117.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

118.    In or around April 2012, NPK, at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products. NPK's statement was a material misrepresentation and was false.

119.    At the time NPK made the misrepresentation regarding the EPA's purported demand, NPK knew its misrepresentation was false.

120.    NPK intended Yeti to rely on the misrepresentation in order to misappropriate Yeti's Marks.

121.    Yeti justifiably relied on NPK's misrepresentation.

122.    As a result of NPK, Rowe, Townsend and Tang's fraud, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred herein.

## SIXTH CLAIM

### (By Yeti Against NPK)

### (Breach of Contract)

### (Count 1)

123.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

124.    The Agreement is a valid and enforceable contract between the parties.

125.    Yeti performed its obligations and conditions precedent under the Agreement.

Page 26  -    SECOND AMENDED COMPLAINT

126.    NPK breached the Agreement by misappropriating Yeti's Marks and engaging in false advertising and unfair competition.

127.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices, plus lost profits in an amount to be determined at trial, plus reputational damage in an amount to be determined at trial.

128.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 2)**

129.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

130.    The Agreement is a valid and enforceable contract between the parties.

131.    Yeti performed its obligations and conditions precedent under the Agreement.

132.    NPK breached the Agreement by failing to pay for insurance or to reimburse Yeti for insurance costs.

133.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices.

134.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 3)**

135.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

136.    The Agreement is a valid and enforceable contract between the parties.

137.    Yeti performed its obligations and conditions precedent under the Agreement.

138.    NPK breached the Agreement by failing to pay interest owed on untimely paid invoices.

139.    As a result of NPK's breach, Yeti has suffered damages in the amount of $56,860.31.

140.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 4)**

141.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

142.    The Agreement is a valid and enforceable contract between the parties.

143.    Yeti performed its obligations and conditions precedent under the Agreement.

144.    NPK breached the Agreement by failing to order the required number of totes of Product.

145.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

146.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 5)**

**(in the Alternative)**

147.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

148.    On February 11, 2013, the parties entered into an oral agreement to amend the Distribution Agreement and for certain additional undertakings (the "February 11 Agreement").

149.    The February 11 Agreement is a valid and enforceable contract between the parties.

150.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

151.    NPK breached the February 11 Agreement by failing to pay the price for the Products under Section 5 of the Agreement (as amended by the February 11 Agreement) (i.e., $5.25/gallon for Mighty Wash, $4.00/gallon for PM Wash, and $3.50/gallon for Power Wash).

152.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

153.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred, pursuant to section 21 of the Agreement

**(Count 6)**

**(in the Alternative)**

154.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

155.    The February 11 Agreement is a valid and enforceable contract between the parties.

156.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

157.    NPK breached the February 11 Agreement by failing to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill.

Page 29  -    SECOND AMENDED COMPLAINT

158.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to specifically perform its obligations to assign the marks to Yeti.

159.    In addition, as a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

160.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

161.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

## (Count 7)

## (in the Alternative)

162.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

163.    The February 11 Agreement is a valid and enforceable contract between the parties.

164.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

165.    NPK breached the February 11 Agreement by failing to relinquish to Yeti its account with the provider of "Pink Sauce."

Page 30  -    SECOND AMENDED COMPLAINT

166.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in the amount in an amount to be determined at trial.

167.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

**(Count 8)**

**(in the Alternative)**

168.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

169.    The February 11 Agreement is a valid and enforceable contract between the parties.

170.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

171.    NPK breached the February 11 Agreement by failing to state on all bottles, caps and labels subsequently purchased or created for the Products that Yeti is the creator and manufacturer of the Products.

172.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

173.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

174.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

Page 31  -    SECOND AMENDED COMPLAINT

**(Count 9)**

**(in the Alternative)**

175.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

176.    The February 11 Agreement is a valid and enforceable contract between the parties.

177.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

178.    NPK breached the February 11 Agreement by failing to obtain Yeti's prior approval of all prospective advertising of the Products.

179.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

180.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

181.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

**(Count 10)**

**(in the Alternative)**

182.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

183.    The February 11 Agreement is a valid and enforceable contract between the parties.

184.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

185.    NPK breached the February 11 Agreement by producing, selling, marketing, distributing or manufacturing non-Yeti products that contain Pink Sauce prior to January 1, 2016;

186.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to comply with its obligations through January 1, 2016.

187.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

188.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

189.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

## SEVENTH CLAIM FOR RELIEF

### (By Yeti Against NPK)

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

190.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

191.    The Agreement is a valid and enforceable contract between the parties.

192.    Yeti performed its obligations and conditions precedent under the Agreement.

Page 33  -    SECOND AMENDED COMPLAINT

193.    The Agreement contains an implied covenant of good faith and fair dealing.

194.    NPK breached the implied covenant of good faith and fair dealing by misappropriating Yeti's Marks and engaging in unfair competition and false advertising as alleged in this Complaint.

195.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

196.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

## EIGHTH CLAIM FOR RELIEF

### (By Yeti Against NPK)

### (Declaratory Judgment – ORS Chapter 28)

197.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

198.    There is a justiciable controversy between the parties regarding whether the Agreement terminated by no later than December 31, 2013; whether the Agreement provided NPK the exclusive right to distribute Yeti's products; whether Yeti may notify its buyers, including Sunlight, that Yeti will no longer be working with NPK; and whether Yeti may sell its products directly to buyers, including Sunlight, using Yeti's Marks.

199.    This court has jurisdiction over the dispute because it arises out of the parties' Agreement which provides for jurisdiction only in Multnomah County.

200.    Yeti is entitled to a declaratory judgment that: (a) the Agreement terminated by no later than December 31, 2013; (b) the Agreement does not give NPK exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d) Yeti's

communication with Sunlight or any other buyer does not constitute tortious interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using Yeti's Marks.

### NINTH CLAIM FOR RELIEF

### (By Yeti Against All Defendants)

### Cybersquatting — 15 U.S.C. § 1125(d)

201.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

202.    Yeti has engaged in substantially exclusive and continuous interstate commerce under Yeti's Marks since at least October 8, 2010 and Yeti's use predates any arguable use by NPK, OGD, Rowe, Townsend or Tang.

203.    Yeti is the owner of Yeti's Marks, which are valid and protectable trademarks.

204.    On February 3, 2013, after NPK had received Yeti's January 28, 2013 letter, Rowe, acting in his individual capacity and/or in his corporate capacity as member, officer and/or managing agent of NPK and/or OGD, and with the knowledge, participation or approval of Townsend and Tang, registered the following 40 Internet domain names incorporating certain of Yeti's marks:

- mightywash.biz
- mightywash.co
- mightywash.info
- mightywash.me
- mightywash.mobi
- mightywash.net
- mightywash.org
- mightywash.us
- mighty-wash.biz
- mighty-wash.co
- mighty-wash.info
- mighty-wash.me
- mighty-wash.mobi
- mighty-wash.net
- mighty-wash.org
- mighty-wash.us
- pmwash.biz

Page 35   -    SECOND AMENDED COMPLAINT

- pmwash.co
- pmwash.info
- pmwash.me
- pmwash.mobi
- pmwash.net
- pmwash.org
- pmwash.us
- pm-wash.biz
- pm-wash.com
- pm-wash.info
- pm-wash.me
- pm-wash.mobi
- pm-wash.net
- pm-wash.org
- pm-wash.us
- power-wash.biz
- power-wash.co
- power-wash.info
- power-wash.me
- power-wash.mobi
- power-wash.net
- power-wash.org
- power-wash.us

These domains shall be referred to collectively as the "Yeti Mark Domains."

205.    At the time Rowe registered the Yeti Mark Domains, Rowe and the other Defendants had actual knowledge of Yeti and its ownership of Yeti's Marks.

206.    Indeed, on February 11, 2013, only days after Rowe registered the Yeti Mark Domains, NPK agreed to, among other things, transfer to Yeti all rights in Yeti's Marks that had been misappropriated by NPK, as detailed herein.  At that time Rowe and Defendants failed to disclose Rowe's registration of the Yeti Mark Domains to Yeti.

207.    Defendants have no trademark or other intellectual property rights in Yeti's Marks or the Yeti Mark Domains.  The Yeti Mark Domains do not consist of the legal name of any Defendant or a name that is commonly used to refer to any Defendant.

208.    Defendants have never sought or received permission from Yeti to register the Yeti Mark Domains.

209.    Each of Yeti's Marks is distinctive and was distinctive before Defendants registered the Yeti Mark Domains.

Page 36  -    SECOND AMENDED COMPLAINT

210.    Each of the Yeti Mark Domains is identical to and/or confusingly similar to one of Yeti's Marks.

211.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, for purposes of seeking to gain leverage in NPK's ongoing business dispute with Yeti over NPK's fraud, misappropriation of Yeti's trademarks, false advertising and unfair competition and breach of the Distribution Agreement.

212.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, for purposes of seeking to extort monetary and other consideration from Yeti.

213.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, with the intent to divert customers, business associates, and members of the public seeking to purchase products sold under Yeti's Marks to one or more Internet websites owned or controlled by Defendants that offer competing NPK and/or OGD products neither authorized nor manufactured by Yeti, including the websites at www.npk-industries.com and www.ogdonline.com.

214.    Defendants registered, trafficked in, and or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, with the intent to create confusion regarding the source, sponsorship and affiliation of NPK and/or OGD's goods.

215.    On information and belief, Defendants did not believe and had no reasonable grounds to believe that the registration, trafficking in, or use of the Yeti Mark Domains was fair use or was otherwise lawful.

Page 37  -    SECOND AMENDED COMPLAINT

216.    Yeti has been, and continues to be, damaged and irreparably harmed by Defendants' activities and conduct, which constitute cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and Defendants have profited thereby.

217.    Defendants have caused and, unless enjoined, will continue to cause irreparable harm and injury to Yeti and the goodwill and reputation of Yeti.

218.    As provided under 15 U.S.C. § 1125(d)(1)(C), Yeti is entitled to an order directing the transfer of the Yeti Mark Domains to Yeti.

219.    As a direct and proximate result of Defendants' wrongful acts, Yeti has, on information and belief, suffered pecuniary damages from Defendants' actions based on diverted sales in an amount to be determined at trial.

220.    Alternatively, at its election, Yeti is entitled to recover statutory damages in an amount of not less than $1,000 and not more than $100,000 per domain name, as provided under 15 U.S.C. § 1117(d).

221.    Because Defendants' actions in registering the Yeti Mark Domains were intentional and in bad faith, Yeti is entitled to an award of enhanced damages under 15 U.S.C. § 1117 in an amount up to three times the actual damages.

222.    As this in an exceptional case, Yeti is also entitled to recover its costs and reasonable attorneys' fees associated with this action pursuant to 15 U.S.C. § 1117.

**TENTH CLAIM FOR RELIEF**

**(By Yeti against NPK)**

**Declaratory Judgment of Non-infringement**

223.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

224.    There is a justiciable controversy between the parties regarding whether Yeti or NPK owns the "Mighty Wash," "Power Wash," and "Power Button" marks, and whether Yeti is free to use the "Mighty Wash," "Power Wash, and "Power Button" marks that are the subject of  U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010 issued in the name of NPK, without infringing any valid and enforceable right of NPK.

225.    There is a justiciable controversy between the parties regarding whether Yeti or NPK owns the "PM Wash" and "Frequency Logo" marks and whether Yeti is free to use the "PM Wash" and "Frequency Logo" marks without infringing any valid and enforceable right of NPK.

226.    In Count II of the Thirteenth Claim for Relief of Defendants' amended counterclaims, NPK alleges that there is an actual and justiciable controversy between NPK and Yeti, not only with regard to ownership of Yeti's Marks, but with regard to "Yeti's ability to sell its plant washes" using those marks if they are owned by NPK, as NPK alleges. Indeed, NPK seeks a declaration of NPK's ownership of the marks and that "Yeti's cannot use NPK's Marks to sell Yeti's plant washes without NPK's written consent."

227.    Count II of NPK's Thirteenth Claim for Relief in essence pleads a request for declaratory judgment that Yeti's use of Yeti's Marks constitutes actionable trademark infringement and, thus, creates a reasonable apprehension that NPK has, or will, sue Yeti for infringement of these marks.

228.    Yeti denies that its use of Yeti's Marks has or will constitute infringement of any valid or enforceable trademark owned by NPK and therefore seeks a declaration of non-infringement of the   and of U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010.

229.    Since at least as early as October 8 , 2010, Yeti has engaged in substantially exclusive and continuous interstate commerce using labels bearing Yeti's Marks and Yeti's

first use was prior to and superior to any use of those marks by NPK.  Thus, Yeti is the owner of the marks and associated goodwill.

230.    Yeti maintained and controlled the quality and uniformity of the products sold under Yeti's Marks and consumers identify these products with Yeti, and have made complaints to Yeti about the products.

231.    Accordingly, as Yeti is the owner and prior user of Yeti's Marks, Yeti is entitled to a declaration of non-infringements of those marks and of U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010.

## ELEVENTH CLAIM FOR RELIEF

### (By Yeti against NPK)

### Declaratory Judgment of Invalidity of Federal Trademark Registration

### (Count 1 - U.S. Reg. No. 4,121,193)

232.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

233.    On information and belief, on July 21, 2011, NPK filed an application to register the mark "Mighty Wash" in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,121,193, issued on April 3, 2012.

234.    Yeti would be damaged by the continued registration of "Mighty Wash" as to the goods recited therein for International Class 3.

235.    Yeti first used the identical mark "Mighty Wash" in connection with the identical goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Mighty Wash" mark.

Page 40   -    SECOND AMENDED COMPLAINT

236.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,121,193 and Yeti's "Mighty Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's "Mighty Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

237.    Because Yeti is the owner and prior user of the "Mighty Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,121,193 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,121,193.

**(Count 2 - U.S. Reg. No. 4,241,438)**

238.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

239.    On information and belief, on March 19, 2012, NPK filed an application to register the mark "Mighty Wash" in International Class 5 in connection with "pesticides," which application matured into U.S. Reg. No. 4,241,438, issued on November 13, 2012.

240.    Yeti would be damaged by the continued registration of "Mighty Wash" as to the goods recited therein for International Class 5.

241.    Yeti first used the identical mark "Mighty Wash" in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK. Yeti therefore owns prior, common law rights in the "Mighty Wash" mark.

242.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,241,438 and Yeti's "Mighty Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's

Page 41  -   SECOND AMENDED COMPLAINT

"Mighty Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 5.

243.    Because Yeti is the owner and prior user of the "Mighty Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,241,438 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,241,438.

**(Count 3 - U.S. Reg. No. 4,346,896)**

244.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

245.    On information and belief, on November 21, 2012, NPK filed an application to register the mark "Power Wash" in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,346,896, issued on June 4, 2013.

246.    Yeti would be damaged by the continued registration of "Power Wash" as to the goods recited therein for International Class 3.

247.    Yeti first used the identical mark "Power Wash" in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Power Wash" mark.

248.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,346,896 and Yeti's "Power Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's "Power Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

Page 42  -    SECOND AMENDED COMPLAINT

249.    Because Yeti is the owner and prior user of the "Power Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,346,896 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,346,896.

**(Count 4 - U.S. Reg. No. 4,400,010)**

250.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

251.    On information and belief, on February 6, 2013, NPK filed an application to register the "Power Button" logo mark in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,400,010, issued on September 10, 2013.

252.    Yeti would be damaged by the continued registration of the "Power Button" mark as to the goods recited therein for International Class 3.

253.    Yeti first used the identical "Power Button" mark in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Power Button" mark.

254.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,400,010 and Yeti's "Power Button" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Button" mark so resembles Yeti's "Power Button" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

255.    Because Yeti is the owner and prior user of the "Power Button" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No.

Page 43  -    SECOND AMENDED COMPLAINT

4,400,010 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,400,010.

**TWELFTH CLAIM FOR RELIEF**

**(By Yeti and Heagle Against NPK, Rowe and Tang)**

**Breach of Confidentiality and Non-Disclosure Contract**

256.    Yeti and Heagle reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

257.    Between 2010 and January 2013, Yeti, on its own behalf and on behalf and for the benefit of Heagle, entered into agreements with NPK and its members pursuant to which NPK and its members agreed to hold in strict confidence and to not disclose to any third party confidential and proprietary information belonging to Yeti and/or Heagle that Yeti shared with NPK regarding, among other things, Yeti's products and the processes used in manufacturing Yeti's products.  NPK and its members also agreed to use such proprietary and confidential information for no purpose other than those authorized by Yeti and Heagle. These agreements included, but were not limited to the September 9, 2010 Confidentiality Contracts between Yeti, Heagle, Rowe and Tang as well as the January 8, 2013 Confidentiality Agreement between Yeti and NPK attached as Exhibit 4 to Defendants' Answer to the First Amended Complaint.

258.    The agreements between Yeti, NPK, and its members are valid and binding contracts.  Heagle is an intended third-party beneficiary of the same, as the parties recognized through the express language of the September 9, 2010 Confidentiality Contracts, that Heagle and/or Yeti both had interests, in whole or in part, in the confidential information, including the processes, personnel, and formulas, used in the manufacture of Yeti's products, and that

76381565.1 0048752-00001

this information could not be disclosed or used without written consent from Heagle and Yeti.

259.    Between 2010 and January 2013, in reliance on the defendants' agreement to maintain confidentiality, Yeti disclosed to NPK certain confidential and proprietary information concerning one of the ingredients of Yeti's Mighty Wash plant wash, which the parties called "pink sauce," including confidential information regarding the source, supplier and content of pink sauce. Yeti disclosed this confidential information to NPK solely for the purpose of using the information for Yeti's benefit.

260.    On information and belief, since at least as early as May 5, 2013, NPK, Rowe, Townsend and Tang have used Yeti's confidential and proprietary information about pink sauce solely for the benefit of NPK and the other Defendants, including to manufacture NPK and/or OGD's knock-off products sold without Yeti's authorization under Yeti's "Mighty Wash" mark. On information and belief, NPK, Rowe, Townsend and Tang have disclosed Yeti's confidential and proprietary information about pink sauce to third parties, including but not limited to OGD and other of the Defendants' affiliates, without Yeti or Heagle's authorization. On information and belief, Defendants have, since at least as early as August 2013, used Yeti's confidential and proprietary information about pink sauce to manufacture and sell a product under the name "Ultimate Wash," which Defendants have advertised as "exactly the same as Mighty Wash," just without Mighty Wash's pink color.

261.    The conduct of NPK, Rowe, Townsend and Tang set forth above constitutes material breach of one or more of the confidentiality agreements between Yeti, NPK, Rowe, Townsend and Tang.

262.    NPK, Rowe and Tang's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti and/or Heagle that cannot be adequately compensated or measured by money alone. Yeti and/or Heagle have no adequate remedy at

Page 45  -    SECOND AMENDED COMPLAINT

law and are entitled to permanent injunctive relief directing NPK, Rowe and Tang to specifically perform their obligations not to disclose or use Yeti and/or Heagle's confidential and proprietary information without authorization.

263.    In addition, as a direct and proximate result of NPK, Rowe, Townsend and Tang's breach, Yeti and/or Heagle have suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial, including but not limited to damages measured by the loss in value of NPK, Rowe and Tang's performance or the reasonable value of the benefit conferred on NPK, Rowe and Tang.

## THIRTEENTH CLAIM FOR RELIEF

### (By Yeti and Heagle Against All Defendants)

### Misappropriation of Trade Secrets -- ORS 646.461

264.    Yeti and Heagle reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

265.    The confidential information about pink sauce and its use in the process of manufacturing Yeti's products was developed by Heagle and implemented by Yeti at substantial cost and effort, and derives extensive independent value by not being known by others who could benefit from them, including Yeti and Heagle's competitors and customers. Among other things, such information would be highly valuable to Yeti and Heagle's competitors, who could use it to duplicate certain of Yeti and Heagle's proprietary processes and know-how to compete in the market place.

266.    Yeti and Heagle have taken reasonable efforts under the circumstances to keep and maintain this information secret, including but not limited to securing agreements of confidentiality from those with whom it is shared.

Page 46  -    SECOND AMENDED COMPLAINT

267.    The confidential information set forth above derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

268.    As a result, the confidential information regarding pink sauce and its use in the process of manufacturing Yeti's products qualify as trade secrets under ORS 646.461(4).

269.    Defendants have acquired, used or disclosed Yeti and Heagle's trade secret information without Yeti and Heagle's authorization, for their own benefit and/or for the benefit of third parties, including to manufacture NPK and/or OGD's unauthorized "Mighty Wash" and "Ultimate Wash" knock-off products.

270.    At the time Defendants acquired, used or disclosed Yeti and Heagle's trade secret information, Defendants knew or had reason to know that the trade secret information had been acquired by improper means; or constituted trade secrets the knowledge of which had been acquired by accident or mistake; or that the trade secrets were either derived from or through a person who had utilized improper means to acquire them, had been acquired under circumstances giving rise to a duty to main their secrecy or limit their use, or derived from or through a person who owed a duty to Yeti and or Heagle to maintain their secrecy or limit their use.

271.    The conduct of Defendants set forth above constitutes misappropriation of Yeti and Heagle's trade secrets in violation of ORS 646.461 et seq.

272.    Defendants' misappropriation of Yeti and Heagle's trade secrets has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti and Heagle that cannot be adequately compensated or measured by money alone.  Yeti and Heagle have no adequate remedy at law and are entitled to permanent injunctive relief enjoining Defendants from further misappropriation.

273.    In addition, as a direct and proximate result of Defendants' misappropriation of Yeti and Heagle's trade secrets, Yeti and Heagle have suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

274.    On information and belief, as a direct and proximate result of Defendants' misappropriation of Yeti and Heagle's trade secrets, Defendants have realized and will continue to realize profits, gains and other advantages from their misappropriation, all to the detriment of Yeti and Heagle.  As a direct and proximate result of Defendants' misappropriation, Yeti and Heagle have been damaged and are entitled to disgorgement of Defendants' unjustly gained profits.

275.    Defendants' misappropriation was, on information and belief, willful and malicious, such that the Court should award Yeti and Heagle their reasonable attorneys' fees pursuant to ORS 646.467.

## IV.  DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims in this action.

## V.  PRAYER FOR RELIEF

WHEREFORE, Yeti and Heagle request a judgment in its favor and against Defendants, including the following:

**A.    On Yeti's First and Second Claims for Relief:**

1.    Pursuant to 15 U.S.C. § 1117(a), Yeti's actual damages, Defendants' profits, and the costs of the action;

2.    Pursuant to 15 U.S.C. § 1117(a)(3), enhanced damages in an amount up to three times actual damages;

3.    Pursuant to 15 U.S.C. § 1117(a)(3), Yeti's reasonable attorneys' fees and costs; and

Page 48  -    SECOND AMENDED COMPLAINT

4.      An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, using in the future Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks, or any indication that Yeti's Products are affiliated with Defendants' products; or any false advertising.

**B.      On Yeti's Third Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Defendants' profits;

3.      Yeti's reasonable attorneys' fees and costs; and

4.      An injunction against Defendants' continued unfair competition using Yeti's Marks.

**C.      On Yeti's Fourth Claim for Relief (Counts 1 through 4):**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Punitive damages;

3.      Yeti's reasonable attorneys' fees and costs;

4.      A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 003 is invalid and void;

5.      A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 005 is invalid and void.

6.      A declaratory judgment that NPK's trademark registration of "Power Wash" in international Class 003 is invalid and void;

7.      A declaratory judgment that NPK's trademark registration of the "Power Button" mark in international Class 003 is invalid and void;

**D.      On Yeti's Fifth Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Punitive damages; and

76381565.1 0048752-00001

3.     Yeti's reasonable attorneys' fees and costs.

**E.     On Yeti's Sixth Claim for Relief (Counts 1 through 10) and Seventh Claim for Relief:**

1.     Damages in the amount of $20,013.56 for insurance costs;

2.     Damages in the amount of $56,860.31 for interest on untimely paid invoices;

3.     Yeti's lost profits in an amount to be determined at trial;

4.     Yeti's reputational damage in an amount to be determined at trial;

5.     An injunction enjoining NPK, its successors and assigns, and all persons acting in concert with it, from producing, selling, marketing, distributing or manufacturing any product that contains Pink Sauce prior to January 1, 2016 and directing NPK to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

6.     Pursuant to section 21 of the Agreement, Yeti's reasonable attorneys' fees and costs.

**F.     On Yeti's Eighth Claim for Relief:**

1.     A declaratory judgment that: (a) the Distribution Agreement terminated by no later than December 31, 2013; (b) the Agreement does not give NPK exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d) Yeti's communication with Sunlight or any other buyer does not constitute tortious interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using Yeti's Marks.

76381565.1 0048752-00001

**G.    On Yeti's Ninth Claim for Relief:**

1.    Pursuant to 15 U.S.C. § 1117(a), Yeti's actual damages, Defendants' profits, and the costs of the action;

2.    Pursuant to 15 U.S.C. § 1117(a)(3), enhanced damages in an amount up to three times actual damages;

3.    Pursuant to 15 U.S.C. § 1117(d), at Yeti's election, statutory damages in an amount of not less than $1,000 and not more than $100,000 per domain name;

4.    Pursuant to 15 U.S.C. § 1117(a)(3), Yeti's reasonable attorneys' fees and costs; and

5.    An injunction against NPK, Rowe, Townsend and Tang, their successors and assigns, and all persons acting in concert with them, compelling the transfer of the Yeti Mark Domains to Yeti and enjoining them from registering, trafficking in, or using, in bad faith, domain names identical to confusingly similar to Yeti's Marks.

**H.    On Yeti's Tenth and Eleventh Claims for Relief:**

1.    A declaration that:  (1) Yeti is the owner of the "Mighty Wash," "Power Wash," "Power Button," "PM Wash" and "Frequency Logo" marks; (2) Yeti's use of the "Mighty Wash," "Power Wash," "Power Button," "PM Wash" and "Frequency Logo" marks does not infringe U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010, or any valid or enforceable right of NPK; and (3) U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010 are invalid and must be cancelled.

2.    An order directing the USPTO to cancel U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010.

76381565.1 0048752-00001

**I.      On Yeti and Heagle's Twelfth Claim for Relief:**

  1.  Yeti's actual damages in an amount to be determined at trial; and

  2.  An injunction against Defendants' continued unauthorized use and/or disclosure of Yeti and/or Heagle's confidential information.

**J.      On Yeti and Heagle's Thirteenth Claim for Relief:**

  1.  Yeti's actual damages in an amount to be determined at trial;

  2.  Defendants' profits;

  3.  Yeti's reasonable attorneys' fees and costs pursuant to ORS 646.467; and

  4.  An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, enjoining their continued misappropriation of Yeti and Heagle's trade secrets

**K.      On All Claims for Relief:**

  1.  Yeti and Heagle's prevailing party fees, attorneys' fees, costs, pre-judgment and post-judgment interest; and

  2.  For such further relief as the Court deems just and equitable.

DATED:  June 18, 2014.

      STOEL RIVES LLP


      s/ Steven E. Klein
      STEVEN T. LOVETT, OSB No. 910701
      stlovett@stoel.com
      STEVEN E. KLEIN, OSB No. 051165
      seklein@stoel.com

      Attorneys for Plaintiffs Yeti Enterprises Inc.
       and Alexander J. Heagle


Page 52  -    SECOND AMENDED COMPLAINT

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing on the following **SECOND AMENDED**

**COMPLAINT** named persons on the date indicated below by

☐   mailing with postage prepaid

☐   hand delivery

☐   facsimile transmission

☐   overnight delivery

☒   ECF Filing

to said persons a true copy thereof, contained in a sealed envelope if by mail, addressed to

said persons at his or her last-known addresses indicated below.

Renée E. Rothauge
Jeffrey M. Edelson
Chad Colton
Steffan Alexander
Markowitz, Herbold, Glade & Melhaf, PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204-3730
ReneeRothauge@MHGM.com
JeffEdelson@MHGM.com
ChadColton@MHGM.com
SteffanAlexander@MHGM.com

Attorneys for Defendants NPK, LLC and
Oregon Global Distribution, Inc.

Philip S. Griffin
Griffin Law Group
121 SW Salmon St Ste 1100
Portland, OR 97204
503-471-1400
Fax: 503-244-3264
Email: phil@griffinlawgroup.com

Attorneys for Third-Party Defendant
Nicholas Jackson

Robert B. Miller
Kilmer Voorhees & Laurick PC
732 NW 19th Avenue
Portland, OR 97209
bobmiller@kilmerlaw.com

Attorneys for Defendants Orion Tang,
Richard Rowe and Reny Townsend

Page 1    -    SECOND AMENDED COMPLAINT

DATED:  April 18, 2014.          STOEL RIVES LLP


s/ Steven E. Klein
Steven E. Klein, OSB No. 051165
Telephone:  (503)-224-3380
Attorneys for Plaintiffs

Page 2    -    SECOND AMENDED COMPLAINT