Steven T. Lovett, OSB No. 910701
stlovett@stoel.com
Steven E. Klein, OSB No. 051165
seklein@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

      Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| YETI ENTERPRISES INCORPORATED, an Oregon corporation, ALEXANDER J. HEAGLE, an individual, and FREQ WATER, INC., an Oregon corporation, | Case No.: 3:13-cv-01203-ST |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| NPK, LLC, f/k/a N.P.K. DISTRIBUTORS, LLC, an Oregon limited liability company, OREGON GLOBAL DISTRIBUTION, INC., an Oregon corporation, RICHARD ROWE, an individual, RENY TOWNSEND, an individual, ORION TANG, an individual, WETA, INC., an Oregon corporation, IN AND OUT GARDENS LLC, an Oregon limited liability company, and HEADQUARTERS, LLC, an Oregon limited liability company, | **REDACTED FOR PUBLIC FILING** |
| Defendants. | |

Page 1  -  THIRD AMENDED COMPLAINT

Plaintiffs Yeti Enterprises Incorporated ("Yeti"), Freq Water, Inc. ("Freq Water") and Alexander J. Heagle ("Heagle"), for their Third Amended Complaint against NPK, LLC, f/k/a N.P.K. Distributors, LLC ("NPK"), Oregon Global Distribution, Inc. ("OGD"), Weta, Inc. ("Weta"), In and Out Gardens LLC ("In and Out"), Headquarters, LLC ("Headquarters"), Richard Rowe ("Rowe"), Reny Townsend ("Townsend"), and Orion Tang ("Tang"), state as follows:

## I.  PARTIES, JURISDICTION AND VENUE

1.      Yeti is an Oregon corporation that was founded in Portland, Oregon, and is headquartered in Medford, Oregon.  Yeti invented, manufactures and sells horticulture products known as plant "washes".  Yeti products are sold throughout Oregon, the United States, Canada, the United Kingdom, and Spain.

2.      Freq Water, Inc. is an Oregon corporation with its principal place of business in Medford, Oregon.  Freq Water manufactures and sells plant washes.

3.      Heagle is an individual residing in Grants Pass, Oregon.  Heagle is a co-founder, shareholder and President of Yeti and a co-founder, shareholder and President of Freq Water.

4.      NPK is an Oregon Limited Liability Company with its principal place of business at 1904 United Way, Suite 104, Medford, OR 97504 and a mailing address of 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, NPK is, and at all material times has been, directly or indirectly, owned or controlled by Richard Rowe, Reny Townsend, and Orion Tang.  NPK, together with OGD, owns, operates and does business under the Oregon assumed business name "NPK Industries."

5.      OGD is an Oregon corporation with its principal place of business at 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, OGD is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend

and Tang.  OGD, together with NPK, owns, operates and does business under the Oregon assumed business name "NPK Industries."

6.      In and Out Gardens is an Oregon limited liability company with its office at 1600 Skypark Drive Suite 215, Medford, Oregon 97501.  On information and belief, In and Out Gardens is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend and Tang.

7.      Headquarters is an Oregon limited liability company with its principal place of business at 1600 Skypark Drive, Suite 215, Medford, Oregon 97504. On information and belief, Headquarters is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend and Tang.

8.      Weta is an Oregon corporation with its principal place of business at 1600 Skypark Drive Suite 215, Medford, Oregon 97504.  On information and belief, Weta is, and at all material times has been, directly or indirectly, owned or controlled by Rowe, Townsend and Tang.

9.      Richard Rowe is an individual and, on information and belief, a citizen of New Zealand, who resides in Medford, Oregon.  On information and belief, Rowe is, and at all material time has been, directly or indirectly, an owner, officer, manager and/or director of NPK, OGD, In and Out Gardens, Headquarters, and Weta.  On information and belief, Rowe's foreign citizenship disqualifies him from legally owning any membership interest in certain Oregon limited liability companies, including but not limited to NPK, Headquarters and In and Out Gardens.  On information and belief, Rowe nevertheless maintains indirect interests in the ownership and control of NPK, In and Out Gardens, and Headquarters through one or more voting agreements with persons that hold legal title to membership interests in those entities as proxies for Rowe. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 3    -    THIRD AMENDED COMPLAINT

████████████████████████████████████████████████████

████████████████████████████████████████████  As a result,

Townsend now purports to hold a 55% membership interest in NPK, the majority of which (i.e., 32.5%) is, on information and belief, held for the benefit of, and as proxy for, Rowe, who directs Townsend's exercise of the interest.

10.    Reny Townsend is an individual who resides in Medford, Oregon.  On information and belief, Townsend is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK, OGD, In and Out, Headquarters, and Weta, including through one or more voting agreements with persons that hold legal title to ownership interests in one or more of those entities as proxies for Townsend.

11.    Orion Tang is an individual who resides in Medford, Oregon.  On information and belief, Tang is, and at all material time has been, directly or indirectly, an owner, officer, manager, and/or director of NPK, OGD, In and Out, Headquarters, and Weta, including through one or more voting agreements with persons that hold legal title to ownership interests in one or more of those entities as proxies for Tang.

12.    NPK, OGD, In and Out, Headquarters, Weta, Rowe, Townsend and Tang have, on information and belief, acted in concert with each other in furtherance of the improper and wrongful conduct alleged in this pleading.  At all relevant times, Rowe, Townsend and Tang were acting either in their individual capacities or as an agent of NPK OGD, In and Out, Headquarters and/or Weta.  On information and belief, Rowe, Townsend and/or Tang have entered into one or more agreements and or undertakings with each other and/or one or more other third party proxies, that allow Rowe, Townsend and/or Tang to indirectly own, operate or control one or more of NPK, OGD, In and Out, Headquarters and/or Weta, even in the absence of any direct legal ownership or interest.  Further discovery will inform when each was acting as an individual and/or as an agent.

Page 4    -    THIRD AMENDED COMPLAINT

13.     This Court has original jurisdiction over Yeti's  trademark, unfair competition, and cybersquatting claims under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 15 U.S.C. §§ 1120, 1125, Yeti's declaratory judgment claims under 28 U.S.C. § 2201 and 28 U.S.C. § 2202, and 15 U.S.C. § 1116(a), and supplemental jurisdiction over Yeti's state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the United States District Court for the District of Oregon pursuant to 28 U.S.C. § 1391 because NPK, OGD, In and Out Gardens, Headquarters, Weta, Rowe, Townsend and Tang reside in the State of Oregon, sell products or provide services in the State of Oregon, and because a substantial part of the events or omissions giving rise to the claims asserted occurred in the District of Oregon.  Venue is also proper in the Portland Division pursuant to LR 3- 2 because the Distribution Agreement (the "Agreement") between the parties that is the subject of this dispute was negotiated and executed in Portland, Oregon, and provides: "In the event suit or action is necessary to enforce the terms of this Agreement, jurisdiction shall be exclusively in the State of Oregon with venue in Multnomah County."  A true copy of the Agreement is attached hereto as Exhibit A.

## II.  GENERAL ALLEGATIONS

### A.     Plaintiff Yeti Enterprises and its Plant Wash Products.

15.     Yeti is in the business of manufacturing and selling plant washes using a confidential and proprietary formula and process that includes electronic frequency imprinting.

16.     In March 2009, Yeti began selling three washes from its Portland, Oregon, headquarters using the trade name and trademark "That Stuff."  Yeti sold its products in specialty garden and plant stores throughout Oregon, Washington, Colorado and Montana.

17.     Yeti's co-founder, Jim Heagle, was instrumental to developing the market for Yeti's products in Oregon, Washington, Colorado, and Montana.  Heagle attended trade

Page 5   -   THIRD AMENDED COMPLAINT

shows and vendor days and traveled to individual garden stores to introduce himself, pitch Yeti's products and provide free samples for customers to test out.  Through these efforts to get its products out into the market, Yeti was able to build a budding market for "That Stuff" products among consumers, who often retuned to the stores supplied by Yeti to ask for more of "That Stuff" by name.

**B.      Defendant NPK and Its Lack of Products or Distribution Experience.**

18.      Rowe, Tang and Townsend collectively own, control, operate and/or manage, directly or indirectly, an associated family of businesses.  On information and belief, as of early 2010, this family of businesses included, but was not limited to, In and Out Gardens (a hydroponics and gardening a retail store with locations in Medford and Junction City, Oregon); Forsite, LLC (a construction, development and property management business); one or more "grow houses" for cultivating and harvesting medical marijuana; and Headquarters (which handled the books and finances of all the businesses in the family).

19.      In June 2010, Rowe, Tang and Townsend decided to form NPK with a fourth individual, Nicholas Jackson, to distribute garden supplies to other retailers such as In and Out Gardens.  At the time, Rowe, Tang and Townsend lacked any background or experience in the distribution, sale and marketing of garden supplies.  Only Jackson had the background, experience and established contacts in the industry.  Although Jackson was nominally a member of NPK, Rowe, Tang and Townsend worked in concert to exclude Jackson from the actual management and operation of NPK's business, as well as from the enjoyment of its benefits.

20.      The first products NPK attempted to distribute were two soil supplements called "Gorilla Grow" and "Dino Grow."  Jackson was responsible for sales calls to potential accounts, drawn from his personal list of contacts.  As Jackson began calling on accounts, it became apparent that there was little customer interest in "Gorilla Grow" and "Dino Grow."

Page 6    -    THIRD AMENDED COMPLAINT

When Jackson asked what products customers were interested in, several of his contacts gave the same response: "That Stuff" plant washes.

21.     As it happened, Jackson was familiar with Yeti and its "That Stuff" plant wash line. In and Out Gardens had been carrying Yeti's "That Stuff" products for several months, ever since Heagle had come into the store to introduce Yeti's products and drop off free samples for customers to try. Jackson, who worked at the store, had been impressed with Heagle and the products.

22.     After Jackson shared the feedback from his contacts about Yeti's products, Rowe directed Jackson to approach Heagle about the possibility of NPK becoming a distributor of Yeti's three plant wash products. Heagle indicated that Yeti was open to the idea. Heagle also told Jackson that Yeti had decided to design new marks and labels to use on Yeti's plant wash products. Jackson offered on NPK's behalf to consult with Yeti on new label designs.

**C.    Yeti's First Use of the Trademarks "Mighty Wash", "Power Wash," "PM Wash," the "Power Button," and "Frequency Imprinted H2O."**

23.     During late-August and early-September 2010, Yeti discussed concepts for the new marks and label designs with NPK. By September 16, 2010, Yeti had settled on new label designs that featured three new marks: "Mighty Wash," "Power Wash," and "PM Wash." Each label also contained the colored "Power Button" logo and a distinctive logo containing an electronic frequency graph (the "Frequency Imprinted H2O" mark). Each label also contained the words "'That Stuff'™ presents" and identified the products as "Manufactured by Yeti Enterprises, Inc." The marks "That Stuff, "Mighty Wash," "Power Wash," "PM Wash," the "Power Button" and the "Frequency Imprinted H2O" mark shall be referred to herein collectively as "Yeti's Marks."

Page 7    -    THIRD AMENDED COMPLAINT

24.    On or about September 21, 2010, a print run of Yeti's new labels, comprising 1,000 Mighty Wash labels, 1,000 Power Wash labels and 1,000 PM Wash labels, was ordered for shipment to Yeti's Portland, Oregon headquarters.   An order for an additional run of 5,000 labels, also for shipment to Yeti in Portland, was placed on September 29, 2010.

25.    At least as early as September 24, 2010, Yeti created labels for affixing to the cartons Yeti used to package and ship bottles of Yeti's three plant wash products.  The labels read "That Stuff Mighty Wash," "That Stuff Power Wash" and "That Stuff PM Spray."

26.    At least as early as October 8, 2010, Yeti began affixing new labels bearing Yeti's Marks to individual containers of Yeti's "Mighty Wash," "Power Wash" and "PM Wash" plant wash products and placing those products in the stream of commerce.  During this period, Yeti made sales and/or deliveries of Yeti's plant wash products affixed with labels bearing Yeti's marks to, among other customers, Evergreen Garden Supply in Portland, Oregon; Oregon's Constant Gardener in Springfield, Oregon; The Garden Spout in Portland, Oregon; Roseburg Hydroponics, in Roseburg, Oregon; Marco Industries, Inc. dba American Agriculture in Portland, Oregon; In and Out Gardens in Medford and Junction City, Oregon; Northern Lights in Grants Pass, Oregon; and Paradise Supply in Ashland, Oregon.

27.    Each of these orders was personally delivered to the stores by Heagle and one or more Yeti employees.  While at the stores, Heagle and the other Yeti employees also affixed Yeti's new labels to all containers of Yeti's three plant wash product already on the shelf (or in the store's inventory) and placed the containers back on the shelf for sale to the public.  Representative examples of the three labels using Yeti's Marks are attached hereto as Exhibit B.

28.    In addition to bottling and labeling the products, Yeti packed and delivered them in cartons affixed with labels bearing Yeti's marks.  Yeti also provided each store with

Page 8    -    THIRD AMENDED COMPLAINT

a Yeti price list giving the wholesale and suggested retail prices for "That Stuff Mighty Wash," "That Stuff PM Wash," and "That Stuff Power Wash," together with contact information for ordering the products.  A copy of the price list is attached as Exhibit C.

29.     At least as early as October 10, 2010, Yeti made additional sales and/or shipments of Yeti's plant wash products affixed with labels bearing Yeti's marks to, among other customers, Indoor Garden & Lighting Inc. in Tacoma, Washington; and Renton Indoor Garden Center in Renton, Washington; and Healthcrafts Inc. in Olympia, Washington.

30.     Yeti continued to manufacture, bottle, label, market, and sell Mighty Wash, Power Wash and PM Wash (collectively, the "Products") using Yeti's Marks to garden and plant stores throughout Oregon, Washington, Colorado and Montana.

**D.     Yeti Enters into a Distribution Agreement with NPK.**

31.     On November 11, 2010, after Yeti began using Yeti's Marks, Yeti entered into a Distribution Agreement with NPK.  The Agreement recognized that Yeti manufactures "That Stuff Mighty Wash," "That Stuff PM Wash," and "That Stuff Power Wash" (collectively, the "Products") and required NPK to bottle, label, market and physically distribute Yeti's Products.  The term of the Agreement was ten (10) years.

32.     Pursuant to the Agreement, NPK agreed to purchase a minimum of 12 totes of Products per month.  A "tote" is a plastic vessel and each one containing 260 gallons of liquid. The Agreement specified that NPK would pay $7 a gallon for That Stuff Mighty Wash and $5 a gallon for That Stuff PM Wash and That Stuff Power Wash.

33.     Under the agreement Yeti would invoice NPK monthly, on or about the 25th of the month, and NPK was required to make payment on or before the 15th of the following month.

34.     NPK further agreed to purchase and maintain insurance for the Products, or if it failed to do so, to reimburse Yeti its costs to obtain insurance.

77936204.3 0048752-00001

35.    The Distribution Agreement did not provide NPK with any exclusive distribution rights.  This was the parties' intent.  At the time the parties entered into the Distribution Agreement, NPK had only been in business for five months and had only succeeded in distributing approximately ▮▮▮ of "Gorilla Grow" and "Dino Grow" combined.  In addition, Jackson was the only member of NPK who had any background or experience in sales and distribution of garden products.  Due to NPK's inexperience, Yeti was unwilling to entrust NPK with exclusive distribution rights to Yeti's three plant wash products.

36.    NPK knew at the time it entered the Distribution Agreement that the agreement did not provide NPK with any exclusive distribution rights.  On or about November 11, 2010, Heagle met with the members of NPK, including Rowe, Townsend and Tang, in a back room office at the In and Out Gardens location in Medford to review the provisions of the Distribution Agreement prior to execution.  During the meeting Heagle pointed out to Rowe, Townsend and Tang that the agreement did not grant NPK any exclusive rights and explained that Yeti was not going to grant NPK any exclusive rights due to NPK's lack of experience as a distributor.  Heagle stressed that Yeti would continue to have the right to distribute its products through other distributors, as well as directly to retail stores and consumers.

37.    After reviewing the terms, the only change to the Distribution Agreement NPK requested was an extension of the initial term in paragraph 12 from five years to ten years.  The parties wrote in and initialed that change and executed the agreement.

38.    The parties commenced performance of the Agreement and NPK began bottling, labeling, marketing and physically distributing Yeti's Products, using the three labels attached as Exhibit D and also pictured below:

Page 10   -    THIRD AMENDED COMPLAINT







**E.    Yeti's Set-up and Supervision of NPK's Bottling and Labeling Line.**

39.    At the time NPK entered into the Distribution Agreement, it had no experience bottling or labeling products and had no equipment or line set up for doing so.

40.    Yeti's Heagle personally designed, set up and installed NPK's bottling and labeling line.

41.    Heagle also trained NPK's employees on how to bottle and label the products to Yeti's specifications.

Page 11   -   THIRD AMENDED COMPLAINT

42.    Among other things, Yeti had full access at all times to the warehouse area used by NPK to bottle, label, and store Yeti's products.  This allowed Yeti to supervise NPK's work.

43.    For quality control purposes, Yeti utilized a form Heagle designed to track each tote of product delivered to NPK for bottling and labeling.  The information tracked using the form included a sequential "batch" number assigned to each tote, its date of manufacture, a code indicating certain equipment used by Yeti to manufacture the tote, the Yeti employee that prepared the tote for delivery, and the NPK employee that acknowledged delivery of the tote.

44.    As part of the bottling and labeling process, NPK was required by Yeti to label each bottle with the batch number of the tote used to fill the bottle.  If complaints or quality issues arose once Yeti's products were distributed to retailers and sold to the public, Yeti could use the recorded batch information, including the date of manufacture, to review for and correct potential manufacturing or bottling issues.

**F.    NPK Breaches the Distribution Agreement.**

45.    In early 2011 NPK began to default on its obligations under the Distribution Agreement to timely pay Yeti in full for "That Stuff" plant washes that Yeti provided to NPK for bottling and distribution.

46.    On information and belief, at the time NPK began defaulting on payment on Yeti's invoices, NPK was generating a significant profit on distribution of Yeti's "That Stuff" plant wash products.  ████████████████████████████████
████████████████████████████████████████████████████
████████████

47.    On information and belief, NPK's failure to timely pay Yeti's invoices in full was not due to any shortfall in revenue or profits, but was part of a deliberate scheme by

Rowe, Townsend and Tang to divert the revenues earned by NPK from distribution of Yeti's "That Stuff" plant wash products to their own personal use and/or the use of the other business ventures owned and/or controlled by Rowe, Townsend and Tang as part of their "family" of associated businesses.

48. By January 15, 2012, the unpaid balance NPK owed Yeti exceeded $300,000.

49. On or about February 8, 2012, Yeti and NPK met to discuss NPK's default and whether there was a way for NPK to pay off its substantial debt to Yeti and avoid termination. During that meeting, Rowe represented to Yeti that NPK had been unable to keep current with Yeti's invoices because NPK's revenue from the sale of Yeti's Products in 2011 had been consumed by the allegedly substantial costs incurred by NPK to market and promote the Products. Rowe further represented that NPK could only continue to perform its obligations under the Distribution Agreement and become current on NPK's past due balance to Yeti if Yeti agreed to lower the prices Yeti charged NPK for the Products.

50. In reliance on Rowe's representations, Yeti agreed to lower the prices for the Products until the end of 2012. Under the revised pricing, NPK would pay $5 a gallon for That Stuff Mighty Wash and $3 a gallon for That Stuff PM Wash and That Stuff Power Wash. Yeti also agreed to extend payment terms from 15 days to 45 days from the billing date. In exchange, NPK agreed to purchase a minimum of 37 totes of Mighty Wash per month, and a combined total of 14 totes of Power Wash and PM Wash per month. NPK also agreed to a repayment schedule for the outstanding balance it owed Yeti. As part of the schedule, Yeti agreed to accept partial payment in "Pink Sauce," an ingredient used by Yeti in the process of manufacturing the Products. The parties agreed that pricing would be reviewed at the end of December 2012.

51. On information and belief, Rowe's representations that NPK had been unable to keep current with Yeti's invoices because NPK's revenue from the sale of Yeti's Products

Page 13  -  THIRD AMENDED COMPLAINT

in 2011 had been consumed by the allegedly substantial costs incurred by NPK to market and promote the Products were knowingly false at the time they were made.

**G.    NPK Misappropriates Yeti's Trademarks and Engages in Unfair Competition and False Advertising.**

52.    On July 21, 2011, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 003.  In the application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash."  The specimen submitted with the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar version of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that the representations made by Tang on NPK's behalf were false and made with the intent to induce the U.S. Patent and Trademark Office's ("PTO") reliance on the misrepresentation.  On April 3, 2012, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

53.    On March 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Mighty Wash," in international Class 005.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Mighty Wash."  The specimen submitted with the application was a copy of Yeti's label for "Mighty Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and

Page 14   -   THIRD AMENDED COMPLAINT

approval, again signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on behalf of NPK were false and made with the intent to induce the PTO's reliance on the misrepresentation.  On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

54.    On or about March 29, 2012, the United States Environmental Protection Agency ("EPA") issued a "Stop Sale, Use, or Removal Order" to NPK directing NPK to cease the sale, use and distribution of the Products (the "Stop Sale Order").  A true and correct copy of the Stop Sale Order is attached hereto as Exhibit E.  The Stop Sale Order cited the EPA's determination that NPK was marketing Yeti's Products as pesticides because of certain claims made in the Product's "labeling and or advertising material."

55.    On or about April 9, 2012, NPK contacted the EPA regarding the Stop Sale Order and represented, falsely, that NPK had never used the claims quoted in the Stop Sale Order in connection with the advertising of the Products.  NPK also provided copies of Yeti's labels for the Products to show that the claims cited in the Stop Sale Order appeared nowhere on the labels.

56.    On or about April 9, 2012, the EPA responded to NPK that the Stop Sale Order had issued on the basis of an advertising brochure obtained during a marketplace inspection in December 2011.  The EPA represented that the brochure contained the claims that concerned the EPA.  That brochure was authored and distributed by NPK.  A true and correct copy of the brochure referenced by the EPA is attached hereto as Exhibit F.

57.    The EPA's April 9, 2012 response also addressed the specimens of Yeti's labels submitted by NPK, noting that the labels were acceptable, did not include pesticidal claims, and that the EPA's concern was with the advertising that was found with the product.

Page 15  -  THIRD AMENDED COMPLAINT

58.     On information and belief, after receiving the EPA's response, NPK revised its advertising brochures and Internet website to remove the pesticidal claims cited by the EPA and requested that the EPA issue authorization to resume sales of the Products.

59.     In or around April, 2012, NPK's Tang, acting at the direction of Rowe and Townsend, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products.  Tang did not explain the basis for the supposed demand and refused to provide Yeti a copy of the EPA's correspondence setting forth this demand.  Tang's representation that the EPA had demanded removal of the marks and manufacturer statement was false, and made with the intent of inducing Yeti's reliance on it.

60.     In bad faith and without obtaining Yeti's permission, NPK removed the marks "That Stuff" and "Manufactured by Yeti Enterprises, Inc." from the labels on Yeti's Products.  NPK replaced the words "That Stuff presents," with "NPK Industries presents." When Yeti noticed the change and asked why it had been made, NPK represented that EPA had insisted on the change.  NPK shared with Yeti a June 21, 2012 letter from the EPA authorizing NPK to resume sale of the Products that stated, "Your April 10, 2012, email, and our subsequent review of your website showed that you have removed all pesticidal claims from your website, labeling, and advertising in accordance with the conditions outlined in the [Stop Sale] Order."  NPK falsely represented to Yeti that the EPA's June 21 letter had only been secured through removal of the "That Stuff" mark from the Product labels, when, in fact, all the EPA required was revision of the claims made by NPK in NPK's brochure and on NPK's Internet website.  NPK's false representations were, on information and belief, knowingly made with the intent to induce Yeti's reliance on them and in furtherance of NPK's efforts to misappropriate Yeti's Marks, goodwill and products.

Page 16   -   THIRD AMENDED COMPLAINT

61.     On November 19, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "PM Wash," in international Class 003. In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "PM Wash."  The specimen submitted with the application was a photo of containers affixed with Yeti's label for "PM Wash" that included Yeti's other marks, "That Stuff," the "Power Button," and a confusingly similar variation of "Frequency Imprinted H2O."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on them.  After this suit was filed, NPK abandoned the application.

62.     On November 21, 2012, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the mark "Power Wash," in international Class 003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the mark "Power Wash."  Tang, at the direction of Rowe and Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application on NPK's behalf.  On information and belief, Tang, Rowe and Townsend acted with the knowledge or belief that Tang's representations on NPK's behalf were false and were made the intent to induce the PTO's reliance on the misrepresentation.  On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

Page 17   -   THIRD AMENDED COMPLAINT

63.     In or around December 2012, Yeti discovered that NPK had applied for and obtained a federal registration for the "Mighty Wash" mark without Yeti's knowledge or permission.

64.     In or around December 2012, Yeti made multiple requests that NPK provide copies of the Stop Sale Order and NPK's correspondence with the EPA regarding the Stop Sale Order.  On NPK's behalf, Rowe repeatedly represented that he would provide Yeti with copies of the Stop Sale Order and copies of the EPA correspondence.  Indeed, Rowe specifically represented that he would bring copies to a meeting scheduled with Yeti for January 2, 2013.

65.     On January 2, 2013, Rowe and Tang attended a meeting between NPK and Yeti.  At the meeting, Rowe provided Yeti with a copy of the same June 21, 2012 EPA letter authorizing NPK to resume sale and distribution of the Products that had already been shared with Yeti.  Rowe represented that he would have brought the Stop Sale Order and NPK's other correspondence with the EPA, but claimed that NPK was unable to locate them.

66.     Prior to the January 2, 2013 meeting, Yeti began receiving inquiries from customers confused that products sold under the names "Stack" and "Multiply" were new products.  In fact, "Stack" and "Multiply" were not Yeti products, but new products introduced by NPK without Yeti's knowledge or involvement.

67.     During the January 2, 2013 meeting, Yeti raised these customer inquiries with NPK and asked whether NPK knew why customers were confusing "Stack" and "Multiply" with Yeti and Yeti's Products.  NPK denied any knowledge of why customers might be confused and repeatedly attempted to change the subject.

68.     After the January 2, 2013 meeting, Yeti discovered that NPK had placed an advertisement in the December 2012 issue of "Maximum Yield," a magazine directed to plant and hydroponics consumers, that showed containers of NPK's "Stack" and "Multiply"

Page 18   -   THIRD AMENDED COMPLAINT

products under the caption "From the Creators of 'Mighty Wash'."  The labels on the containers also prominently featured Yeti's "Power Button" mark.  A true and correct example of the ad is attached hereto as Exhibit G and also pictured below:



69.    NPK also failed to meet its minimum order requirements in 2012 for PM Wash and Power Wash.  Specifically, NPK was required to order a combined total of 154 totes of PM Wash and Power Wash in 2012, but only ordered 143 totes.

70.    On January 28, 2013, Yeti notified NPK that it was in default in its obligations under the Distribution Agreement based on multiple breaches.  Yeti's notice gave NPK a reasonable timeframe to comply with various demands, including that NPK immediately pay all amounts past due and owing to Yeti, that NPK assign to Yeti the trademark registration for "Mighty Wash" wrongfully obtained in the name of NPK, and that NPK cease all advertising of NPK's "Stack" and "Multiply" products as "From the Creators of 'Mighty Wash'".

Page 19   -    THIRD AMENDED COMPLAINT

71.     On February 6, 2013, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the "Power Button" mark in international Class 003. In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the "Power Button" mark. The specimen submitted with the application was a photo of a container affixed with a "Mighty Wash" label that, upon information and belief, has never been used in interstate commerce. NPK's declaration in support of the fraudulent application was signed by B. Anna McCoy, an attorney with the law firm of Alleman Hall McCoy Russell & Tuttle LLP, with the knowledge and approval of Rowe, Townsend and Tang. On information and belief, Rowe, Townsend and Tang authorized McCoy to sign the declaration with the knowledge or belief that the representations made by McCoy on NPK's behalf were false and made with the intent to induce the USPTO's reliance on them. On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in NPK's name.

**H.     NPK Agrees to Turnover Yeti's Marks and Wind Down The Agreement.**

72.     On February 11, 2013, NPK, Yeti, and their respective attorneys met to discuss the matters raised in Yeti's notice of default. During the meeting, Yeti and NPK reached an oral agreement, confirmed by their respective attorneys, to modify the Distribution Agreement and resolve the issues cited by Yeti in its notice. The parties' agreement included the following material terms:

   a.  Yeti agreed to not terminate the Agreement and to resume accepting orders for the Products from NPK;

   b.  The price for the Products under Section 5 of the Agreement (as amended in February 2011) was increased to $5.25 a gallon for Mighty Wash, $4.00 a gallon for PM Wash, and $3.50 a gallon for Power Wash;

Page 20  -   THIRD AMENDED COMPLAINT

c.  The payment terms under Section 6 of the Agreement (as amended in February 2011) was shortened to require NPK to deliver payment within 30 days of receipt of the products;

d.  The term set forth in Section 12 of the Agreement was shortened to provide that the Agreement would terminate on December 31, 2013;

e.  NPK agreed to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

f.  NPK agreed to relinquish to Yeti its account with the provider of "Pink Sauce";

g.  NPK agreed that all bottles, caps and labels subsequently purchased or created for the Products would state that Yeti is the creator and manufacturer of the Products;

h.  NPK agreed to obtain Yeti's prior approval of all prospective advertising of the Products;

i.  NPK agreed not to produce, sell, market, distribute or manufacture any product that contains Pink Sauce from termination of the Agreement until January 1, 2016; and

j.  NPK agreed not to use Yeti's Marks or any confusingly similar variation in NPK's sale, distribution or marketing activities other than solely in connection with the Products during the Agreement's remaining term.

73.    Between February 13, 2013 and February 21, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, which promises and representations were reasonably expected by NPK to induce Yeti's reliance and performance, accepted orders for and delivered more than 25 totes of the Products to NPK.  Tang accepted delivery of the totes on NPK's behalf.

74.    On February 21, 2013, NPK emailed Yeti a draft written agreement purportedly memorializing the oral agreement reached between the parties at the February 11 meeting.  Although NPK's draft recited the essential terms discussed at the parties' February

Page 21  -   THIRD AMENDED COMPLAINT

11 meeting, it also included additional, material terms that had neither been discussed nor agreed upon during that meeting.  For example, NPK's draft purported to release NPK from any minimum purchase requirements for the Agreement's remaining term.  NPK's draft also would allow NPK to delay assignment of the applications NPK had improperly filed for Yeti's Marks and purported to make those assignments contingent upon Yeti's "satisfactory performance" of the party's agreement.

75.    On March 8, 2013, Yeti provided NPK with a revised draft written agreement that removed the terms unilaterally added by NPK and made certain suggested clarifications.

76.    On April 5, 2013, NPK "rejected" Yeti's March 8 draft, contending that it did not accurately reflect the terms the parties agreed to on February 11.  Although Yeti did not agree with this characterization, on April 8, 2013, Yeti forwarded a second revised draft to NPK that attempted to address NPK's concerns.

77.    Between February 22, 2013 and April 10, 2013, Yeti, in reliance on NPK's promises and representations at the February 11 meeting, continued to accept orders for and deliver Products to NPK, which deliveries were accepted.

78.    On April 12, 2013, NPK expressly repudiated the parties' February 11 agreement, citing unspecified "new information" that purportedly "changed the circumstances."

79.    In bad faith and without Yeti's permission, in or around April 2013, NPK and OGD, doing business as "NPK Industries," began manufacturing and selling their own knock off product using Yeti's marks, "Mighty Wash," "Power Wash," "PM Wash," and the "Power Button."  NPK and OGD also used a confusingly similar variation of Yeti's "Frequency Imprinted H2O" mark.  The labels on these products were virtually identical to those on Yeti's Products.  Copies of the labels from the knock off products are attached hereto as Exhibit H and also pictured below:

Page 22   -    THIRD AMENDED COMPLAINT







80.     On information and belief, since at least as early as August 2013, Weta has manufactured and sold through OGD and NPK a product under the name "Ultimate Wash," which OGD, NPK and Weta have advertised as "exactly the same as Mighty Wash," just without Mighty Wash's pink color.

Page 23   -    THIRD AMENDED COMPLAINT

81.     On information and belief, through its breach of the Distribution Agreement and misappropriation of Yeti's proprietary and confidential information regarding the formulation and manufacture of Mighty Wash, NPK wrongfully appropriated for itself and its affiliates the revenues and profits that rightfully belonged to Yeti. ███████████

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████

82.     On December 13, 2013, without Yeti's knowledge or permission, NPK applied for federal trademark registration of the "PM WASH" mark in international Class 003.  In this application, NPK fraudulently represented to the Trademark Office that NPK was the owner of the mark, despite knowing at the time the application was filed that Yeti was the owner of and had superior rights in the "PM WASH" mark.  NPK's declaration in support of the fraudulent application was signed by B. Anna McCoy, an attorney with the law firm of Alleman Hall McCoy Russell & Tuttle LLP, with the knowledge and approval of Rowe, Townsend and Tang.  On information and belief, Rowe, Townsend and Tang authorized McCoy to sign the declaration with the knowledge or belief that the representations made by McCoy on NPK's behalf were false and made with the intent to induce the USPTO's reliance on them.  On October 21, 2014, in reliance on NPK's false representation, the PTO issued Reg. No. 4623730 for the "PM WASH" mark in NPK's name.

83.     NPK and OGD, doing business as "NPK Industries," sell and continue to sell their own knock off products using Yeti's Marks as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the

Page 24   -   THIRD AMENDED COMPLAINT

same group of users. NPK and OGD also continue to sell non-Yeti products, including "Multiply" and "Stack," using one or more of Yeti's Marks, as shown above, and/or marks confusingly similar to Yeti's Marks, in direct competition with Yeti, through the same channels and to the same group of users.  As a result, NPK and OGD are causing actual consumer confusion in the marketplace.

84.    On information and belief, the formula and/or process used to manufacture NPK and OGD's knock off products does not include electronic frequency imprinting.

85.    NPK and OGD's knock off products are also much less effective than Yeti's Products.

86.    As a result, NPK and OGD are causing irreparable harm to Yeti's goodwill and reputation.

87.    NPK and OGD, doing business as "NPK Industries," advertise using Yeti's Marks in direct competition with Yeti through the same channels and to the same group of users, thereby causing actual and likely consumer confusion in the marketplace.  This false advertising is causing further irreparable harm to Yeti's goodwill and reputation.

**I.    NPK's Additional Breaches of the Distribution Agreement.**

88.    In addition to making knockoff versions of Yeti's Products, NPK failed to perform its obligations under the Agreement.

89.    NPK refused to pay for insurance for 2011, 2012 and 2013, thereby forcing Yeti to purchase insurance at a total cost of $20,013.56, and NPK did not reimburse Yeti for that expense as required by the Agreement.

90.    NPK also failed to timely pay for Products delivered under the Agreement in 2010 and 2011.  As a result, pursuant to the terms of the Agreement, Yeti is entitled to interest in the amount of $56,860.31.

Page 25  -    THIRD AMENDED COMPLAINT

91.     NPK also failed to order the requisite number of totes of Products from Yeti, as required by the Agreement, and in April 2013 discontinued orders altogether.  NPK's failure to order the requisite number of totes for the remaining duration of the Agreement will result in lost revenue for Yeti in the amount of $5,370,820.00.

92.     Yeti notified NPK that it was in breach of the Agreement.

93.     NPK refuses to stop using Yeti's Marks and to pay amounts due and owing.

94.     Yeti also notified one of its customers, Sunlight Supply Incorporated ("Sunlight"), that Yeti was no longer working with NPK, and would instead work directly with Sunlight.  In response, NPK claimed that, by contacting customers directly, Yeti tortiously interfered with NPK's relationship and sued Yeti in Jackson County Circuit Court, Case No. 13CV01641.  However, the Agreement provides for exclusive jurisdiction in Multnomah County Circuit Court, and NPK subsequently dismissed the Jackson County action.

95.     On information and belief, Defendants' wrongful conduct set forth above was undertaken intentionally and for the purpose of injuring Yeti and Heagle.

## III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (By Yeti Against NPK, OGD, Rowe, Townsend and Tang)

### Trademark Infringement and Unfair Competition — 15 U.S.C. § 1125(a)

96.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

97.     Yeti's Marks are valid and protectable trademarks.

98.     NPK and OGD have used and continue to use Yeti's Marks in connection with the sale of goods in commerce without permission.

Page 26  -   THIRD AMENDED COMPLAINT

99.     NPK and OGD's use of the Yeti's Marks occurred after Yeti began using the marks.

100.     NPK and OGD's use of Yeti's Marks, or variations of Yeti's Marks, is likely to cause consumer confusion or mistake, or to deceive, as to the affiliation, connection, or association of NPK and OGD with Yeti.

101.     At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD, and knowingly participated in the wrongful acts of NPK and OGD, or directed or approved of those acts.

102.     Defendants NPK, OGD, Rowe, Townsend and Tang are therefore liable under 15 U.S.C. § 1125(a) for infringement of Yeti's Marks and for unfair competition.

103.     Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

104.     Because Defendants' actions in using Yeti's Marks were intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

105.     This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

106.     In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future infringement by Defendants, Yeti is entitled to an injunction against Defendants' use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks.

Page 27   -   THIRD AMENDED COMPLAINT

## SECOND CLAIM FOR RELIEF

### (By Yeti Against NPK, OGD, Weta, Rowe, Townsend, and Tang)

### False Advertising – 15 U.S.C. § 1125(a)

107.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

108.    Yeti's Marks are valid and protectable trademarks.

109.    Without Yeti's permission, NPK, OGD and Weta used Yeti's Marks in connection with the sale of goods in commercial advertising or promotion of NPK, OGD and Weta's non-Yeti products, including "Multiply" and "Stack," as well as their knock off products, thereby misrepresenting the nature, characteristics, and qualities of NPK, OGD and Weta's goods.  NPK, OGD and Weta's goods are not "from the creators of 'Mighty Wash.'"

110.    NPK, OGD and Weta are also falsely representing that their knock-off products are manufactured using an imprinted electronic frequency, like Yeti's Products.

111.    NPK, OGD, and Weta's use of the Yeti's Marks occurred after Yeti began using the marks.

112.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK, OGD and Weta, and knowingly participated in the wrongful acts of NPK, OGD and Weta, or directed or approved of those acts.

113.    Defendants NPK, OGD, Weta, Rowe, Townsend and Tang are therefore liable under 15 U.S.C. § 1125(a) for false advertising and unfair competition.

114.    Pursuant to 15 U.S.C. § 1117(a), Yeti is entitled to recover its actual damages, Defendants' profits, and the costs of the action.

115.    Because Defendants' false advertising was intentional and in bad faith, the court should enter an award of enhanced damages under 15 U.S.C. § 1117(a)(3) in an amount up to three times the actual damages.

Page 28   -   THIRD AMENDED COMPLAINT

116.    This case is exceptional under 15 U.S.C. § 1117(a)(3), and Yeti should be awarded its reasonable attorneys' fees.

117.    In addition, because Yeti's remedies under 15 U.S.C. § 1117(a), while necessary, are not sufficient to fully protect Yeti's continuing interest in preserving its marks against future false advertising by Defendants, Yeti is entitled to an injunction against Defendants' use in the future of Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks to engage in false advertising.

### THIRD CLAIM FOR RELIEF

### (By Yeti Against NPK, OGD, Rowe, Townsend and Tang)

### Common Law Infringement and Unfair Competition

118.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

119.    Prior to NPK and OGD's unlawful use, Yeti's Marks were well recognized by the consuming public of horticulture products and had come to be associated with and to identify the source of Yeti's Products.

120.    By misappropriating Yeti's Marks, NPK and OGD have created confusion or a likelihood of confusion, deception, and mistake in the marketplace, and in the minds of the public, as to the origin, sponsorship, and/or affiliation of NPK and OGD's products and services, thereby doing great and irreparable harm to Yeti's reputation and goodwill.

121.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD and knowingly participated in the wrongful acts of NPK and OGD or directed or approved of those acts.

122.    Defendants NPK, OGD, Rowe, Townsend and Tang's actions as herein alleged constitute common law unfair competition.

Page 29   -   THIRD AMENDED COMPLAINT

123.    Defendants' conduct as herein alleged has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone. Yeti has no adequate remedy at law and is entitled to permanent injunctive relief stopping Defendants' continued unfair competition using Yeti's Marks.

124.    In addition, as a direct and proximate result of Defendants' conduct, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

125.    Upon information and belief, as a direct and proximate result of Defendants' wrongful conduct, Defendants have realized and will continue to realize profits, gains, and other advantages from their infringing activities, all to the detriment of Yeti. As a direct and proximate result of Defendants' wrongful conduct, Yeti has been damaged and is entitled to recover Defendants' wrongful profits and Yeti's actual damages, together with Yeti's attorneys' fees incurred in this action.

## FOURTH CLAIM FOR RELIEF

### (By Yeti Against NPK, Rowe, Townsend and Tang)

### (Fraud – Federal Trademark Registration)

### (Count 1)

126.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

127.    NPK registered Yeti's trademark "Mighty Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

128.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration

Page 30  -    THIRD AMENDED COMPLAINT

contains intentional misrepresentations to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

129.    On April 3, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4121193 for the "Mighty Wash" mark in the name of NPK.

130.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

131.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4121193 for "Mighty Wash" in international Class 003 is invalid and void.

**(Count 2)**

132.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

133.    NPK registered Yeti's trademark "Mighty Wash" in international Class 005, by fraudulently representing that NPK was the owner of the mark.

134.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

135.    On November 13, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4241438 for the "Mighty Wash" mark in the name of NPK.

136.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

Page 31   -   THIRD AMENDED COMPLAINT

137.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4241438 for "Might Wash" in international Class 005 is invalid and void.

**(Count 3)**

138.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

139.    NPK registered Yeti's trademark "Power Wash" in international Class 003, by fraudulently representing that NPK was the owner of the mark.

140.    Tang, at the direction of Rowe and/or Townsend, or with their knowledge and approval, signed a declaration in support of the fraudulent application. Tang's declaration contains intentional misrepresentations made to induce the PTO's reliance on those misrepresentations and to attempt to misappropriate Yeti's Marks.

141.    On June 4, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4346896 for the "Power Wash" mark in the name of NPK.

142.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

143.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4346896 for "Power Wash" in international Class 003 is invalid and void.

**(Count 4)**

144.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

145.    NPK registered Yeti's "Power Button" trademark in international Class 003, by fraudulently representing that NPK was the owner of the mark.

Page 32   -   THIRD AMENDED COMPLAINT

146.    NPK's declaration contains intentional misrepresentations made at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, to induce the PTO's reliance on those misrepresentations and to misappropriate Yeti's Marks.

147.    On September 10, 2013, in reliance on NPK's false representation, the PTO issued Reg. No. 4400010 for the "Power Button" mark in the name of NPK.

148.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

149.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4400010 "Power Button" trademark in international Class 003 is invalid and void.

**(Count 5)**

150.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

151.    NPK registered Yeti's "PM WASH" trademark in international Class 003, by fraudulently representing that NPK was the owner of the mark.

152.    NPK's declaration contains intentional misrepresentations made at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, to induce the PTO's reliance on those misrepresentations and to misappropriate Yeti's Marks.

153.    On October 21, 2014, in reliance on NPK's false representation, the PTO issued Reg. No. 4623730 for the "PM WASH" mark in the name of NPK.

154.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred.

Page 33   -   THIRD AMENDED COMPLAINT

155.    As a result of the fraud by NPK, Rowe, Townsend and Tang, Yeti is further entitled to a declaration that NPK's Reg. No. 4623730 "PM WASH" trademark in international Class 003 is invalid and void.

## FIFTH CLAIM FOR RELIEF

### (By Yeti Against NPK, Rowe, Townsend and Tang)

### (Common Law Fraud)

### (Count 1)

156.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

157.    In or around April 2012, NPK, at the direction of Rowe, Townsend and Tang, or with their knowledge and approval, told Yeti that the EPA had contacted NPK and demanded removal of the trademark "That Stuff" and the words "Manufactured by Yeti Enterprises, Inc." from the labels of Yeti's Products.  NPK's statement was a material misrepresentation and was false.

158.    At the time NPK made the misrepresentation regarding the EPA's purported demand, NPK knew its misrepresentation was false.

159.    NPK intended Yeti to rely on the misrepresentation in order to misappropriate Yeti's Marks.

160.    Yeti justifiably relied on NPK's misrepresentation.

161.    As a result of NPK, Rowe, Townsend and Tang's fraud, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred herein.

### (Count 2)

162.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

Page 34   -   THIRD AMENDED COMPLAINT

163.    In or around February 2012, NPK represented to Yeti that NPK had been unable to keep current with Yeti's invoices because NPK's revenue from the sale of Yeti's Products in 2011 had been consumed by the allegedly substantial costs incurred by NPK to market and promote the Products.  NPK further represented that NPK could only continue to perform its obligations under the Distribution Agreement and become current on NPK's past due balance to Yeti if Yeti agreed to lower the prices Yeti charged NPK for the Products.

164.    At the time NPK made these misrepresentations regarding NPK's purported cash flow and financial positions, NPK knew its misrepresentations were false.

165.    NPK intended Yeti to rely on the misrepresentation in order to induce Yeti to lower the prices Yeti charged NPK for Yeti's plant washes, provide NPK with favorable credit terms for paying off its substantial unpaid balance, and to not terminate NPK for its material breach.

166.    Yeti justifiably relied on NPK's misrepresentation.

167.    As a result of NPK, Rowe, Townsend and Tang's fraud, Yeti is entitled to damages in an amount to be determined at trial, plus punitive damages, plus its reasonable attorneys' fees and costs incurred herein.

## SIXTH CLAIM

### (By Yeti Against NPK)

### (Breach of Contract)

#### (Count 1)

168.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

169.    The Agreement is a valid and enforceable contract between the parties.

170.    Yeti performed its obligations and conditions precedent under the Agreement.

77936204.3 0048752-00001

171.    NPK breached the Agreement by misappropriating Yeti's Marks and engaging in false advertising and unfair competition.

172.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices, plus lost profits in an amount to be determined at trial, plus reputational damage in an amount to be determined at trial.

173.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 2)**

174.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

175.    The Agreement is a valid and enforceable contract between the parties.

176.    Yeti performed its obligations and conditions precedent under the Agreement.

177.    NPK breached the Agreement by failing to pay for insurance or to reimburse Yeti for insurance costs.

178.    As a result of NPK's breach, Yeti has suffered damages in the amount of $20,013.56 for insurance costs, plus $56,860.31 in interest on untimely paid invoices.

179.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 3)**

180.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

181.    The Agreement is a valid and enforceable contract between the parties.

182.    Yeti performed its obligations and conditions precedent under the Agreement.

77936204.3 0048752-00001

183.    NPK breached the Agreement by failing to pay interest owed on untimely paid invoices.

184.    As a result of NPK's breach, Yeti has suffered damages in the amount of $56,860.31.

185.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 4)**

186.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

187.    The Agreement is a valid and enforceable contract between the parties.

188.    Yeti performed its obligations and conditions precedent under the Agreement.

189.    NPK breached the Agreement by failing to order the required number of totes of Product.

190.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

191.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

**(Count 5)**

**(in the Alternative)**

192.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

193.    On February 11, 2013, the parties entered into an oral agreement to amend the Distribution Agreement and for certain additional undertakings (the "February 11 Agreement").

194.    The February 11 Agreement is a valid and enforceable contract between the parties.

195.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

196.    NPK breached the February 11 Agreement by failing to pay the price for the Products under Section 5 of the Agreement (as amended by the February 11 Agreement) (i.e., $5.25/gallon for Mighty Wash, $4.00/gallon for PM Wash, and $3.50/gallon for Power Wash).

197.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in an amount to be determined at trial.

198.    Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred, pursuant to section 21 of the Agreement

**(Count 6)**

**(in the Alternative)**

199.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

200.    The February 11 Agreement is a valid and enforceable contract between the parties.

201.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

202.    NPK breached the February 11 Agreement by failing to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill.

Page 38    -    THIRD AMENDED COMPLAINT

203.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to specifically perform its obligations to assign the marks to Yeti.

204.    In addition, as a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

205.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

206.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

## (Count 7)

### (in the Alternative)

207.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

208.    The February 11 Agreement is a valid and enforceable contract between the parties.

209.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

210.    NPK breached the February 11 Agreement by failing to relinquish to Yeti its account with the provider of "Pink Sauce."

211.    As a result of NPK's breach, Yeti has suffered damages, including lost profits, in the amount in an amount to be determined at trial.

212.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement

**(Count 8)**

**(in the Alternative)**

213.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

214.    The February 11 Agreement is a valid and enforceable contract between the parties.

215.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

216.    NPK breached the February 11 Agreement by failing to state on all bottles, caps and labels subsequently purchased or created for the Products that Yeti is the creator and manufacturer of the Products.

217.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

218.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

219.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

Page 40   -    THIRD AMENDED COMPLAINT

**(Count 9)**

**(in the Alternative)**

220.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

221.    The February 11 Agreement is a valid and enforceable contract between the parties.

222.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

223.    NPK breached the February 11 Agreement by failing to obtain Yeti's prior approval of all prospective advertising of the Products.

224.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

225.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages from its breach, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

226.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

**(Count 10)**

**(in the Alternative)**

227.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

228.    The February 11 Agreement is a valid and enforceable contract between the parties.

Page 41    -    THIRD AMENDED COMPLAINT

229.    Yeti performed its obligations and conditions precedent under the February 11 Agreement.

230.    NPK breached the February 11 Agreement by producing, selling, marketing, distributing or manufacturing non-Yeti products that contain Pink Sauce prior to January 1, 2016;

231.    NPK's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief directing NPK to comply with its obligations through January 1, 2016.

232.    As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

233.    Upon information and belief, as a direct and proximate result of NPK's breach, NPK has realized and will continue to realize profits, gains, and other advantages, all to the detriment of Yeti.  As a direct and proximate result of NPK's breach, Yeti has been damaged and is entitled to recover NPK's unjustly gained profits and Yeti's actual damages.

234.    Yeti is also entitled to recover its reasonable attorneys' fees and costs, pursuant to section 21 of the Agreement.

### SEVENTH CLAIM FOR RELIEF

### (By Yeti Against NPK)

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

235.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

236.    The Agreement is a valid and enforceable contract between the parties.

237.    Yeti performed its obligations and conditions precedent under the Agreement.

Page 42  -    THIRD AMENDED COMPLAINT

238.     The Agreement contains an implied covenant of good faith and fair dealing.

239.     NPK breached the implied covenant of good faith and fair dealing by misappropriating Yeti's Marks and engaging in unfair competition and false advertising as alleged in this Complaint.

240.     As a direct and proximate result of NPK's breach, Yeti has suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

241.     Yeti is also entitled to recover its reasonable attorneys' fees and costs incurred herein, pursuant to section 21 of the Agreement.

### EIGHTH CLAIM FOR RELIEF

### (By Yeti Against NPK)

### (Declaratory Judgment – ORS Chapter 28)

242.     Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

243.     There is a justiciable controversy between the parties regarding whether the Agreement terminated by no later than December 31, 2013; whether the Agreement provided NPK the exclusive right to distribute Yeti's products; whether Yeti may notify its buyers, including Sunlight, that Yeti will no longer be working with NPK; and whether Yeti may sell its products directly to buyers, including Sunlight, using Yeti's Marks.

244.     This court has jurisdiction over the dispute because it arises out of the parties' Agreement which provides for jurisdiction only in Multnomah County.

245.     Yeti is entitled to a declaratory judgment that: (a) the Agreement terminated by no later than December 31, 2013; (b) the Agreement does not give NPK exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d) Yeti's

Page 43   -   THIRD AMENDED COMPLAINT

communication with Sunlight or any other buyer does not constitute tortious interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using Yeti's Marks.

## NINTH CLAIM FOR RELIEF

### (By Yeti Against NPK, OGD, Rowe, Townsend and Tang)

### Cybersquatting — 15 U.S.C. § 1125(d)

246.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

247.    Yeti has engaged in substantially exclusive and continuous interstate commerce under Yeti's Marks since at least October 8, 2010 and Yeti's use predates any arguable use by NPK, OGD, Rowe, Townsend or Tang.

248.    Yeti is the owner of Yeti's Marks, which are valid and protectable trademarks.

249.    On February 3, 2013, after NPK had received Yeti's January 28, 2013 letter, Rowe, acting in his individual capacity and/or in his corporate capacity as member, officer and/or managing agent of NPK and/or OGD, and with the knowledge, participation or approval of Townsend and Tang, registered the following 40 Internet domain names incorporating certain of Yeti's marks:

- mightywash.biz
- mightywash.co
- mightywash.info
- mightywash.me
- mightywash.mobi
- mightywash.net
- mightywash.org
- mightywash.us
- mighty-wash.biz
- mighty-wash.co
- mighty-wash.info
- mighty-wash.me
- mighty-wash.mobi
- mighty-wash.net
- mighty-wash.org
- mighty-wash.us
- pmwash.biz

Page 44   -   THIRD AMENDED COMPLAINT

- pmwash.co
- pmwash.info
- pmwash.me
- pmwash.mobi
- pmwash.net
- pmwash.org
- pmwash.us
- pm-wash.biz
- pm-wash.com
- pm-wash.info
- pm-wash.me
- pm-wash.mobi
- pm-wash.net
- pm-wash.org
- pm-wash.us
- power-wash.biz
- power-wash.co
- power-wash.info
- power-wash.me
- power-wash.mobi
- power-wash.net
- power-wash.org
- power-wash.us

These domains shall be referred to collectively as the "Yeti Mark Domains."

250.    At the time Rowe registered the Yeti Mark Domains, Rowe and the other Defendants had actual knowledge of Yeti and its ownership of Yeti's Marks.

251.    Indeed, on February 11, 2013, only days after Rowe registered the Yeti Mark Domains, NPK agreed to, among other things, transfer to Yeti all rights in Yeti's Marks that had been misappropriated by NPK, as detailed herein.  At that time Rowe and Defendants failed to disclose Rowe's registration of the Yeti Mark Domains to Yeti.

252.    Defendants have no trademark or other intellectual property rights in Yeti's Marks or the Yeti Mark Domains.  The Yeti Mark Domains do not consist of the legal name of any Defendant or a name that is commonly used to refer to any Defendant.

253.    Defendants have never sought or received permission from Yeti to register the Yeti Mark Domains.

254.    Each of Yeti's Marks is distinctive and was distinctive before Defendants registered the Yeti Mark Domains.

Page 45  -    THIRD AMENDED COMPLAINT

255.    Each of the Yeti Mark Domains is identical to and/or confusingly similar to one of Yeti's Marks.

256.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, for purposes of seeking to gain leverage in NPK's ongoing business dispute with Yeti over NPK's fraud, misappropriation of Yeti's trademarks, false advertising and unfair competition and breach of the Distribution Agreement.

257.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, for purposes of seeking to extort monetary and other consideration from Yeti.

258.    Defendants registered, trafficked in, and/or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, with the intent to divert customers, business associates, and members of the public seeking to purchase products sold under Yeti's Marks to one or more Internet websites owned or controlled by Defendants that offer competing NPK and/or OGD products neither authorized nor manufactured by Yeti, including the websites at www.npk-industries.com and www.ogdonline.com.

259.    Defendants registered, trafficked in, and or used the Yeti Mark Domains with a bad faith intent to profit from Yeti's Marks and the associated goodwill, including, on information and belief, with the intent to create confusion regarding the source, sponsorship and affiliation of NPK and/or OGD's goods.

260.    On information and belief, Defendants did not believe and had no reasonable grounds to believe that the registration, trafficking in, or use of the Yeti Mark Domains was fair use or was otherwise lawful.

Page 46  -    THIRD AMENDED COMPLAINT

261.    Yeti has been, and continues to be, damaged and irreparably harmed by Defendants' activities and conduct, which constitute cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), and Defendants have profited thereby.

262.    Defendants have caused and, unless enjoined, will continue to cause irreparable harm and injury to Yeti and the goodwill and reputation of Yeti.

263.    As provided under 15 U.S.C. § 1125(d)(1)(C), Yeti is entitled to an order directing the transfer of the Yeti Mark Domains to Yeti.

264.    As a direct and proximate result of Defendants' wrongful acts, Yeti has, on information and belief, suffered pecuniary damages from Defendants' actions based on diverted sales in an amount to be determined at trial.

265.    Alternatively, at its election, Yeti is entitled to recover statutory damages in an amount of not less than $1,000 and not more than $100,000 per domain name, as provided under 15 U.S.C. § 1117(d).

266.    Because Defendants' actions in registering the Yeti Mark Domains were intentional and in bad faith, Yeti is entitled to an award of enhanced damages under 15 U.S.C. § 1117 in an amount up to three times the actual damages.

267.    As this in an exceptional case, Yeti is also entitled to recover its costs and reasonable attorneys' fees associated with this action pursuant to 15 U.S.C. § 1117.

## TENTH CLAIM FOR RELIEF

### (By Yeti against NPK)

### Declaratory Judgment of Non-infringement

268.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

Page 47   -   THIRD AMENDED COMPLAINT

269.    There is a justiciable controversy between the parties regarding whether Yeti or NPK owns the "Mighty Wash," "Power Wash," "PM Wash, and "Power Button" marks, and whether Yeti is free to use the "Mighty Wash," "Power Wash, "PM Wash," and "Power Button" marks that are the subject of U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896, 4,400,010, and 4,623,730 issued in the name of NPK, without infringing any valid and enforceable right of NPK.

270.    There is a justiciable controversy between the parties regarding whether Yeti or NPK owns the "Frequency Logo" mark and whether Yeti is free to use the "Frequency Logo" mark without infringing any valid and enforceable right of NPK.

271.    In Count II of the Thirteenth Claim for Relief of Defendants' amended counterclaims, NPK alleges that there is an actual and justiciable controversy between NPK and Yeti, not only with regard to ownership of Yeti's Marks, but with regard to "Yeti's ability to sell its plant washes" using those marks if they are owned by NPK, as NPK alleges. Indeed, NPK seeks a declaration of NPK's ownership of the marks and that "Yeti's cannot use NPK's Marks to sell Yeti's plant washes without NPK's written consent."

272.    Count II of NPK's Thirteenth Claim for Relief in essence pleads a request for declaratory judgment that Yeti's use of Yeti's Marks constitutes actionable trademark infringement and, thus, creates a reasonable apprehension that NPK has, or will, sue Yeti for infringement of these marks.

273.    Yeti denies that its use of Yeti's Marks has or will constitute infringement of any valid or enforceable trademark owned by NPK and therefore seeks a declaration of non-infringement of U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896, 4,400,010, and 4,623,730.

274.    Since at least as early as October 8 , 2010, Yeti has engaged in substantially exclusive and continuous interstate commerce using labels bearing Yeti's Marks and Yeti's

Page 48   -   THIRD AMENDED COMPLAINT

first use was prior to and superior to any use of those marks by NPK. Thus, Yeti is the owner of the marks and associated goodwill.

275.    Yeti maintained and controlled the quality and uniformity of the products sold under Yeti's Marks and consumers identify these products with Yeti, and have made complaints to Yeti about the products.

276.    Accordingly, as Yeti is the owner and prior user of Yeti's Marks, Yeti is entitled to a declaration of non-infringements of those marks and of U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896, 4,400,010, and 4,623,730.

**ELEVENTH CLAIM FOR RELIEF**

**(By Yeti against NPK)**

**Declaratory Judgment of Invalidity of Federal Trademark Registration**

**(Count 1 - U.S. Reg. No. 4,121,193)**

277.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

278.    On information and belief, on July 21, 2011, NPK filed an application to register the mark "Mighty Wash" in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,121,193, issued on April 3, 2012.

279.    Yeti would be damaged by the continued registration of "Mighty Wash" as to the goods recited therein for International Class 3.

280.    Yeti first used the identical mark "Mighty Wash" in connection with the identical goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK. Yeti therefore owns prior, common law rights in the "Mighty Wash" mark.

Page 49   -    THIRD AMENDED COMPLAINT

281.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,121,193 and Yeti's "Mighty Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's "Mighty Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

282.    Because Yeti is the owner and prior user of the "Mighty Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,121,193 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,121,193.

**(Count 2 - U.S. Reg. No. 4,241,438)**

283.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

284.    On information and belief, on March 19, 2012, NPK filed an application to register the mark "Mighty Wash" in International Class 5 in connection with "pesticides," which application matured into U.S. Reg. No. 4,241,438, issued on November 13, 2012.

285.    Yeti would be damaged by the continued registration of "Mighty Wash" as to the goods recited therein for International Class 5.

286.    Yeti first used the identical mark "Mighty Wash" in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Mighty Wash" mark.

287.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,241,438 and Yeti's "Mighty Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's

Page 50   -    THIRD AMENDED COMPLAINT

"Mighty Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 5.

288.    Because Yeti is the owner and prior user of the "Mighty Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,241,438 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,241,438.

**(Count 3 - U.S. Reg. No. 4,346,896)**

289.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

290.    On information and belief, on November 21, 2012, NPK filed an application to register the mark "Power Wash" in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,346,896, issued on June 4, 2013.

291.    Yeti would be damaged by the continued registration of "Power Wash" as to the goods recited therein for International Class 3.

292.    Yeti first used the identical mark "Power Wash" in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Power Wash" mark.

293.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,346,896 and Yeti's "Power Wash" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Wash" mark so resembles Yeti's "Power Wash" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

Page 51   -    THIRD AMENDED COMPLAINT

294.    Because Yeti is the owner and prior user of the "Power Wash" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No. 4,346,896 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,346,896.

### (Count 4 - U.S. Reg. No. 4,400,010)

295.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

296.    On information and belief, on February 6, 2013, NPK filed an application to register the "Power Button" logo mark in International Class 3 in connection with "cleaning and shining preparations for plant leaves," which application matured into U.S. Reg. No. 4,400,010, issued on September 10, 2013.

297.    Yeti would be damaged by the continued registration of the "Power Button" mark as to the goods recited therein for International Class 3.

298.    Yeti first used the identical "Power Button" mark in connection with related goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "Power Button" mark.

299.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg. No. 4,400,010 and Yeti's "Power Button" mark and the related nature of the parties' respective goods, among other things, NPK's "Mighty Button" mark so resembles Yeti's "Power Button" mark, as to be likely to cause confusion or to cause mistake, or to deceive when used in connection with goods and services in International Class 3.

300.    Because Yeti is the owner and prior user of the "Power Button" mark, and in view of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No.

Page 52   -    THIRD AMENDED COMPLAINT

4,400,010 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together

with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No.

4,400,010.

(<strong>Count 5 - U.S. Reg. No. 4,400,010</strong>)

301.    Yeti realleges and incorporates by reference its allegations in each of the

preceding paragraphs of this Complaint.

302.    On information and belief, on December 13, 2013, NPK filed an application

to register the "PM Wash" mark in International Class 3 in connection with "cleaning and

shining preparations for plant leaves," which application matured into U.S. Reg. No.

4,623,730, issued on October 21, 2014.

303.    Yeti would be damaged by the continued registration of the "PM Wash" mark

as to the goods recited therein for International Class 3.

304.    Yeti first used the identical "PM Wash" mark in connection with related

goods, namely, "cleaning and shining preparations for plant leaves," prior to any arguable

first use of the mark by NPK.  Yeti therefore owns prior, common law rights in the "PM

Wash" mark.

305.    In view of the similarity of the mark that is the subject of NPK's U.S. Reg.

No. 4,623,730 and Yeti's "PM Wash" mark and the related nature of the parties' respective

goods, among other things, NPK's "PM Wash" mark so resembles Yeti's "PM Wash" mark,

as to be likely to cause confusion or to cause mistake, or to deceive when used in connection

with goods and services in International Class 3.

306.    Because Yeti is the owner and prior user of the "PM Wash" mark, and in view

of the likelihood of confusion, Yeti is entitled to a declaration that NPK's U.S. Reg. No.

4,623,730 is invalid and must be cancelled, pursuant to 15 U.S.C. § § 1052(d), 1119, together

77936204.3 0048752-00001

with an order directing the U.S. Patent and Trademark Office to cancel U.S. Reg. No. 4,623,730.

**TWELFTH CLAIM FOR RELIEF**

**(By Yeti and Heagle Against NPK, Rowe and Tang)**

**Breach of Confidentiality and Non-Disclosure Contract**

307.    Yeti and Heagle reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

308.    Between 2010 and January 2013, Yeti, on its own behalf and on behalf and for the benefit of Heagle, entered into agreements with NPK and its members pursuant to which NPK and its members agreed to hold in strict confidence and to not disclose to any third party confidential and proprietary information belonging to Yeti and/or Heagle that Yeti shared with NPK regarding, among other things, Yeti's products and the processes used in manufacturing Yeti's products.  NPK and its members also agreed to use such proprietary and confidential information for no purpose other than those authorized by Yeti and Heagle. These agreements included, but were not limited to the September 9, 2010 Confidentiality Contracts between Yeti, Heagle, Rowe and Tang as well as the January 8, 2013 Confidentiality Agreement between Yeti and NPK attached as Exhibit 4 to Defendants' Answer to the First Amended Complaint.

309.    The agreements between Yeti, NPK, and its members are valid and binding contracts.  Heagle is an intended third-party beneficiary of the same, as the parties recognized through the express language of the September 9, 2010 Confidentiality Contracts, that Heagle and/or Yeti both had interests, in whole or in part, in the confidential information, including the processes, personnel, and formulas, used in the manufacture of Yeti's products, and that this information could not be disclosed or used without written consent from Heagle and Yeti.

Page 54   -   THIRD AMENDED COMPLAINT

310.    Between 2010 and January 2013, in reliance on the defendants' agreement to maintain confidentiality, Yeti disclosed to NPK certain confidential and proprietary information concerning one of the ingredients of Yeti's Mighty Wash plant wash, which the parties called "pink sauce," including confidential information regarding the source, supplier and content of pink sauce.  Yeti disclosed this confidential information to NPK solely for the purpose of using the information for Yeti's benefit.

311.    On information and belief, since at least as early as December 2011, NPK, Rowe, Townsend and Tang have used Yeti's confidential and proprietary information about pink sauce solely for the benefit of NPK and the other Defendants, including to manufacture NPK, Weta, and/or OGD's knock-off products sold without Yeti's authorization under Yeti's "Mighty Wash" mark.

312.    On information and belief, NPK, Rowe, Townsend and Tang have disclosed Yeti's confidential and proprietary information about pink sauce to third parties, including but not limited to OGD, Weta, and other of the Defendants' affiliates, without Yeti or Heagle's authorization.

313.



314.

Page 55   -    THIRD AMENDED COMPLAINT

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████████ti.

315.   ████████████████████████████

████████████████████████



316.   On information and belief, Defendants have, since at least as early as August 2013, used Yeti's confidential and proprietary information about pink sauce to manufacture and sell a product under the name "Ultimate Wash," which Defendants have advertised as "exactly the same as Mighty Wash," just without Mighty Wash's pink color.

317.   On information and belief, Defendants have used Yeti's confidential and proprietary information about pink sauce to ████████████████████████████ ████████████████████████

318.   The conduct of NPK, Rowe, Townsend and Tang set forth above constitutes material breach of one or more of the confidentiality agreements between Yeti, NPK, Rowe, Townsend and Tang.

319.   NPK, Rowe and Tang's breach has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti and/or Heagle that cannot be adequately compensated or measured by money alone.  Yeti and/or Heagle have no adequate remedy at law and are entitled to permanent injunctive relief directing NPK, Rowe and Tang to

Page 56  -   THIRD AMENDED COMPLAINT

specifically ███████████████████████████████████████████
███████████████████████████████.

320.     In addition, as a direct and proximate result of NPK, Rowe, Townsend and Tang's breach, Yeti and/or Heagle have suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial, including but not limited to damages measured by the loss in value of NPK, Rowe and Tang's performance or the reasonable value of the benefit conferred on NPK, Rowe and Tang.

## THIRTEENTH CLAIM FOR RELIEF

**(By Yeti and Heagle Against NPK, OGD, Weta, Rowe, Townsend and Tang)**

**Misappropriation of Trade Secrets -- ORS 646.461**

321.     Yeti and Heagle reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

322.     The confidential information about pink sauce and its use in the process of manufacturing Yeti's products was developed by Heagle and implemented by Yeti at substantial cost and effort, and derives extensive independent value by not being known by others who could benefit from them, including Yeti and Heagle's competitors and customers. Among other things, such information would be highly valuable to Yeti and Heagle's competitors, who could use it to duplicate certain of Yeti and Heagle's proprietary processes and know-how to compete in the market place.

323.     Yeti and Heagle have taken reasonable efforts under the circumstances to keep and maintain this information secret, including but not limited to securing agreements of confidentiality from those with whom it is shared.

Page 57   -   THIRD AMENDED COMPLAINT

324.    The confidential information set forth above derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

325.    As a result, the confidential information regarding pink sauce and its use in the process of manufacturing Yeti's products qualify as trade secrets under ORS 646.461(4).

326.    Defendants have acquired, used or disclosed Yeti and Heagle's trade secret information without Yeti and Heagle's authorization, for their own benefit and/or for the benefit of third parties, including to manufacture NPK, Weta and/or OGD's unauthorized "Mighty Wash" and "Ultimate Wash" knock-off products

327.    At the time Defendants acquired, used or disclosed Yeti and Heagle's trade secret information, Defendants knew or had reason to know that the trade secret information had been acquired by improper means; or constituted trade secrets the knowledge of which had been acquired by accident or mistake; or that the trade secrets were either derived from or through a person who had utilized improper means to acquire them, had been acquired under circumstances giving rise to a duty to main their secrecy or limit their use, or derived from or through a person who owed a duty to Yeti and or Heagle to maintain their secrecy or limit their use.

328.    The conduct of Defendants NPK, OGD, Weta, Rowe, Townsend and Tang set forth above constitutes misappropriation of Yeti and Heagle's trade secrets in violation of ORS 646.461 et seq.

329.    Defendants' misappropriation of Yeti and Heagle's trade secrets has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti and Heagle that cannot be adequately compensated or measured by money alone.  Yeti and Heagle have no adequate remedy at law and are entitled to permanent injunctive relief enjoining Defendants from further misappropriation.

330.    In addition, as a direct and proximate result of Defendants' misappropriation of Yeti and Heagle's trade secrets, Yeti and Heagle have suffered and will continue to suffer damages in an amount that is presently unknown but that will be determined according to proof at trial.

331.    On information and belief, as a direct and proximate result of Defendants' misappropriation of Yeti and Heagle's trade secrets, Defendants have realized and will continue to realize profits, gains and other advantages from their misappropriation, all to the detriment of Yeti and Heagle.  As a direct and proximate result of Defendants' misappropriation, Yeti and Heagle have been damaged and are entitled to disgorgement of Defendants' unjustly gained profits.

332.    Defendants' misappropriation was, on information and belief, willful and malicious, such that the Court should award Yeti and Heagle their reasonable attorneys' fees pursuant to ORS 646.467.

## FOURTEENTH CLAIM FOR RELIEF

### (By Yeti Against NPK, OGD, Rowe, Townsend and Tang)
### Breach of Fiduciary Duty and Constructive Trust

333.    Yeti realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

334.    In or about September 2010, Yeti shared with NPK on a confidential basis ██████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████ would open new distribution channels for Yeti's products and provide Yeti the opportunity to significantly grow its

Page 59  -   THIRD AMENDED COMPLAINT

business.  While Yeti and NPK discussed NPK possibly assisting Yeti ███████████

██████████, nothing came of their talks at that time.

335.    In or about the Spring of 2011, Heagle had one or more conversations with

Rowe about NPK's repeated failure to timely pay Yeti's invoices and how it was interfering

with Yeti's ability to profitably operate its business and pursue new opportunities, such as

████████████████████████████████████████████

336.    In response, Rowe suggested to Heagle that NPK ██████████████

████████████████████████████████████████████

██████████.  Rowe proposed that NPK ██████████████████████

██████████████████████████████████████████████

████████████████████████████████████████.

337.    Heagle, believing that Rowe and NPK had Yeti's best interests in mind,

agreed to entrust to NPK responsibility for █████████████████████████

█████████████████████████████████, subject to

Yeti's direction and approval.  Among other things, Yeti delegated to NPK responsibility for

██████████████████████████████████████████████

████████████████████████.

338.    To assist NPK in carrying out its obligations, Yeti provided NPK with

confidential information regarding the aspects of Yeti's manufacturing process relevant to

██████████████, including information regarding the source, manufacture and use

of Pink Sauce.  Consistent with the parties' prior practice, and the confidentiality agreements

entered into between Yeti and NPK, Yeti provided this information to NPK on the condition

that NPK maintain the information as confidential and use it only for ██████████

██████████████ on Yeti's behalf.

339.    Based on the information Yeti provided, NPK, through Rowe, Townsend and Tang, ██████████████████████████████████████████████████

███████████████████████████████. As part of that process, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████.

340.    Thereafter, NPK, through Rowe, Townsend and Tang, from time to time

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████. Yeti provided the requested information with the

understanding that NPK would use it solely in connection with ███████████████

██████████████████████████ on Yeti's behalf.

341.    In or about April 2012, NPK asked Heagle if Yeti could ██████████████

███████████████████████████████████████████████████████

██████████████████████████████████. In response, Heagle specially ██████████

██████████████████████ with the understanding that it would be used solely in

connection with ████████████████████████████.

342.    On information and belief, ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ without Yeti's knowledge or permission.

343.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████.

Page 61   -   THIRD AMENDED COMPLAINT

344.    ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

345.    On information and belief, Rowe, Townsend and Tang ████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████.

346.    Thereafter, NPK actively worked to conceal ████████████████████
█████████████████████████████████████████████████
██████████████████████████████████.

347.    On information and belief, ████████████████████████████
██████████████████.  NPK, however, continued to conceal from Yeti t████████████
████████████████████████████.

348.    On information and belief, ████████████████████████████████
█████████████████████████████████████████████████.  NPK ████████
███████████████  with full knowledge of, Yeti's January 28, 2015 letter notifying NPK
that it was in material breach of its obligations under the Distribution Agreement.

349.    On or after February 11, 2013, NPK disclosed to Yeti for the first time that █
███████████████████████████████████████████████████████████
NPK, however, failed to ████████████████████████████████████
███████████████████████████████████████████████████



. Rather, NPK falsely represented to Yeti that ████████████████████████████████████████ ████████████████████████████████████████ . On information and belief, NPK made these false representations to Yeti in an effort to induce Yeti into ████████ ████████████████████████████████ and in the hope that Yeti would execute a general release absolving NPK for any liability in connection with its conduct before discovering the true facts.

350.    On information and belief, ████████████████████ ████████████████████████████████████████ ████████████████████████████

351.    On or about ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████ .

352.    On or about ████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████ .

353.    On information and belief, ████████████████████ ████████████████████████████████████████ ████████████████████████████

354.    On or about █████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

355.    On or about July 15, 2013, Rowe, Townsend and Tang caused Griffin Holdings and Intelligent Technologies, Inc. to be merged into OGD, with OGD as the surviving entity.

356.    Since commencement of this action, NPK and OGD have continued their efforts to ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

357.    On information and belief, ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████

358.    On information and belief, ██████████████████████████
████████████████████████████████████████████████████
███████████████████

359.    On information and belief, ██████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████



360. ███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

361. On information and belief, ██████████████
████████████████████████████████████████
████████████████████████████████████████
█████████

362. On information and belief, ██████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████

363. NPK expressly and/or impliedly agreed to act on behalf of Yeti, █████████
████████████████████████████████████████

Page 65  -    THIRD AMENDED COMPLAINT

███████████████████████████████████████████████

█████████, creating an relationship of agent and principal between NPK and Yeti such that NPK should be held accountable as an agent of and fiduciary to Yeti.

364.    NPK expressly and/or impliedly agreed to act in the best interests of Yeti ██ ███████████████████████████████ and held itself out as looking after Yeti's interests and having special knowledge concerning ██████████████████ ████████████████

365.    By its express and/or implicit agreement to act in the best interest of Yeti ██ █████████████████████████████████ ██████████████████████████████████████ █████████, NPK created a relationship of control and dependency between NPK and Yeti resulting in a special relationship such that NPK should be held accountable as a fiduciary to Yeti █████████████████████████████████████

366.    NPK breached its fiduciary duties of loyalty, fair dealing and full disclosure to Yeti by, ███████████████████████████████ ████████████████████████████████████ ████████████████████████████ █████████████████████████████████ and by failing to timely and/or fully disclose to Yeti NPK's conduct and actions in pursuing the same.

367.    As a result of defendant's breach of its fiduciary duties, NPK wrongfully █████████████████████████████████

368.    NPK further breached its fiduciary its fiduciary duties of loyalty, fair dealing and full disclosure by ████████████████████████████ ████████████████████████████████████

Page 66   -    THIRD AMENDED COMPLAINT

369.    On information and belief, NPK ███████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████

370.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████

371.    On information and belief, ████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████

372.    Because NPK breached its fiduciary duty of full disclosure, Yeti did not learn of NPK's breach ████████████████████████████████████

██████ until after Yeti commenced this action on June 18, 2013.

373.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK and OGD, and knowingly participated in the wrongful acts of NPK and OGD, or directed or approved of those acts.

374.    The conduct of Defendants NPK, OGD, Rowe, Townsend and Tang set forth above constitutes breach of fiduciary duty.

375.    Defendants' breach of fiduciary duty has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti that cannot be adequately compensated or measured by money alone.  Yeti has no adequate remedy at law and is entitled to permanent injunctive relief enjoining Defendants from further breaches.

Page 67   -   THIRD AMENDED COMPLAINT

376.    In addition, as a direct and proximate result of Defendants' breach of fiduciary duty, Yeti has suffered and will continue to suffer damages, including ███████████ ███████████████████████████████████████████████████, in an amount that is presently unknown but that will be determined according to proof at trial.  On information and belief, Defendants' wrongful conduct set forth above was undertaken intentionally and for the purpose of injuring Yeti and, thus, Yeti is also entitled to punitive damages.

377.    On information and belief, as a direct and proximate result of Defendants' breach of fiduciary duty, Defendants have realized and will continue to realize profits, gains and other advantages from their breach, all to the detriment of Yeti.  As a direct and proximate result of Defendants' breach, Yeti has been damaged and is entitled to disgorgement of Defendants' unjustly gained profits.

378.    Defendants NPK, OGD, Rowe, Townsend and Tang will be unjustly enriched if they are allowed to retain the improper benefit they knowingly received as a result of the breach of fiduciary duty.  Accordingly, Yeti is entitled to a declaration that defendants NPK, OGD, Rowe, Townsend and Tang █████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████, in a constructive trust for the benefit of Yeti and an order directing restitution of the same to Yeti.

**FIFTEENTH CLAIM FOR RELIEF**

**(By Freq Water Against NPK, OGD, Weta, Rowe, Townsend and Tang)**

**Intentional Interference With Economic Relations**

379.    Freq Water realleges and incorporates by reference its allegations in each of the preceding paragraphs of this Complaint.

Page 68   -   THIRD AMENDED COMPLAINT

380.    Freq Water manufactures three plant wash products that are distributed by Green Planet in the United States under the marks, "Mega Wash," "White Wash," and "Freq Wash."

381.    On or about July 7, 2014, Freq Water and Green Planet entered into related agreements with Hydrofarm pursuant to which Hydrofarm agreed to become a distributor of the "Mega Wash," "White Wash," and "Freq Wash" products within the United States and Freq Water agreed to provide Hydrofarm with certain industry-standard manufacturer indemnifications in connection with Hydrofarm's distribution of the products.

382.    On or about July 24, 2014, Hydrofarm placed its first order for "Mega Wash," "White Wash," and "Freq Wash" products (the "July 24 Order"). In reliance on the order, Freq Water began manufacturing, bottling and labeling product to fill Hydrofarm's order.

383.    On information and belief, in late July 2014, NPK, OGD, and Weta became aware that Hydrofarm had entered agreements with Freq Water and Green Planet to distribute the "Mega Wash," "White Wash," and "Freq Wash" products in the United States through Hydrofarm's catalogue and had placed its initial order for products under the agreements. NPK, OGD, and Weta immediately set out to convince Hydrofarm to breach and abandon its agreement with Freq Water and to instead distribute NPK, OGD, and Weta's knockoff plant wash products.

384.    On information and belief, 



385.

386.

387.    On information and belief, █████ also falsely represented to █████ that Nicholas Jackson, who had sued NPK after being locked out of the company by Rowe, Townsend and Tang, had recently "lost his case" against NPK, and was threatening to sue Freq Water, Green Planet and anyone who distributed their plant wash products.  These

statements were false, as Jackson's claims against NPK remain pending and, on information and belief, Jackson has never threatened or suggested that he would sue Freq Water, Green Planet or the distributors of their products.

388.    On or about 

389.    On information and belief, Hydrofarm, in reliance on NPK, OGD and Weta's false representations, decided on or about August 4, 2014 that it would repudiate its agreements with Freq Water and Green Planet

390.    On or about August 5, 2014, Hydrofarm informed Green Planet that Hydrofarm had learned through unnamed sources that Jackson had lost his legal case against NPK and was threatening to sue Freq Water, Green Planet and the distributors of their plant wash products.  Hydrofarm also informed Green Planet that based on this purported discovery, Hydrofarm was rescinding the July 24 Order and would not release any future orders until Freq Water agreed to new indemnification provisions that materially varied from the terms of the existing agreement between Hydrofarm and Freq Water.

391.    By the time Hydrofarm informed Green Planet that it was purportedly rescinding the July 24 Order, Freq Water had already taken substantial steps towards

Page 71   -   THIRD AMENDED COMPLAINT

fulfilling they July 24 Order, including manufacturing a substantial number of totes of "Mega Wash," "White Wash," and "Freq Wash" product.

392.    On information and belief, 

393.    On or about

394.    On or about September 12, 2014, Hydrofarm informed Green Planet that with regard to the plant wash products manufactured by Freq Water and distributed by Green Planet, "we feel it would be prudent at this time to hold off on bringing on any products until the legal matters [purportedly concerning Jackson] are resolved."

395.

396.    Freq Water had a business relationship and/or prospective economic relationship with Hydrofarm where Hydrofarm agreed to purchase plant wash products manufactured by Freq Water and distributed by Green Planet, and Freq Water agreed to provide Hydrofarm with certain industry-standard manufacturer indemnifications in connection with Hydrofarm's distribution of the products.

Page 72   -    THIRD AMENDED COMPLAINT

397.    NPK, OGD and Weta were not parties to Freq Water's business relationship with Hydrofarm.

398.    Upon information and belief, NPK, OGD and Weta intended to unlawfully interfere with Freq Water's business relationship with Hydrofarm.

399.    Upon information and belief, NPK, OGD and Weta interfered with Freq Water's business relationship with Hydrofarm through improper means including, but not limited to, deceit, misrepresentation, and fraud.

400.    Upon information and belief, NPK, OGD and Weta also interfered with Freq Water's business relationship with Hydrofarm for an improper purpose, including, among other things, the intention to injure Freq Water and reduce competition in the market for plant washes.

401.    At all times relevant, Rowe, Townsend and Tang were acting in their official capacities as officers and/or managing agents of NPK, OGD and Weta, and knowingly participated in the wrongful acts of NPK, OGD and Weta, or directed or approved of those acts.

402.    The conduct of Defendants NPK, OGD, Weta, Rowe, Townsend and Tang set forth above constitutes intentional interference with economic relations.

403.    Defendants' intentional interference has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Freq Water that cannot be adequately compensated or measured by money alone.  Freq Water has no adequate remedy at law and is entitled to permanent injunctive relief enjoining Defendants from further interference.

404.    In addition, as a direct and proximate result of Defendants' intentional interference, Freq Water has suffered and will continue to suffer damages, including lost profits, in an amount that is presently unknown but that will be determined according to proof at trial.  On information and belief, Defendants' wrongful conduct set forth above was

Page 73   -   THIRD AMENDED COMPLAINT

undertaken intentionally and for the purpose of injuring Freq Water and, thus, Freq Water is also entitled to punitive damages

405.    On information and belief, as a direct and proximate result of Defendants' intentional interference, Defendants have realized and will continue to realize profits, gains and other advantages from their breach, all to the detriment of Freq Water.  As a direct and proximate result of Defendants' intentional interference, Freq Water has been damaged and is entitled to disgorgement of Defendants' unjustly gained profits.

## SIXTEENTH CLAIM FOR RELIEF

### (By Yeti, Freq Water and Heagle Against All Defendants)

### Alter Ego Liability

406.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs of this Complaint.

407.    Rowe, Tang and Townsend collectively own, control, operate and/or manage, directly or indirectly, an association of businesses that include NPK, OGD, Weta, as well as:

- In and Out Gardens, Rowe, Tang and Townsend's Medford-based hydroponics and gardening retail store;

- One or more "grow houses" for cultivating and harvesting medical marijuana, usually operated, on information and belief, within residential properties developed, owned or managed by Foresite LLC or other entities controlled by Rowe, Townsend and Tang;

- Headquarters, a purported provider of bookkeeping and office management services that, on information and belief, has no bona fide clients or customers and solely exists to perform the bookkeeping for the businesses owned and controlled by Rowe, Tang and Townsend;

- ████████████████████████████████████████████████
  ██████████████████████████████████

Page 74    -    THIRD AMENDED COMPLAINT



- ██████ Hydropedia LLC and Gardenopedia LLC, two entities that Rowe, Townsend and Tang set up ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████ ;

- ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████ ; and

- BeOnd, Inc., formed at the same time as OGD and Griffin Holdings to act as an "investment group" and "holding company for future use".

408.    ████████████████████████████ ████████████████████████████████████ ████████████████████████████ (the "NPK Family").

409.    Rowe, Townsend and Tang collectively hold, either directly or indirectly, majority ownership of all businesses within the NPK Family, as follows:

    a.    On information and belief, Rowe owns at least 32.5% of NPK, ████████ ████████, Hydropedia and Gardenopedia indirectly (using Townsend as his proxy); at least 33% of OGD, Weta and BeOnd directly; and at least 33% of In and Out Gardens and Headquarters indirectly (using Charity Townsend, a/k/a Charity Savory-Rowe, as his proxy).

Page 75   -   THIRD AMENDED COMPLAINT

b. On information and belief, Townsend owns at least 22.5% of NPK, , Hydropedia and Gardenopedia directly (with an additional share of at least 32.5% owned as proxy for Rowe); at least 33% of OGD, Weta and BeOnd directly; and at least 22.5% of In and Out Gardens and Headquarters indirectly (using Charity Townsend as his proxy).

c. On information and belief, Tang owns at least 22.5% of NPK, ▮▮▮, Hydropedia and Gardenopedia directly; at least 33% of OGD, Weta and BeOnd directly; at least 22.5% of In and Out Gardens directly; and at least 20% of Headquarters indirectly (using Charity Townsend as his proxy).

d. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

410.   On information and belief, Rowe currently holds, and/or in the past has held, the title of President and/or CEO of NPK, OGD, Weta, In and Out Gardens, ▮▮▮ Hydropedia and Gardenopedia. Rowe is also an "employee" of Headquarters, who, on information and belief, together with Townsend and Tang holds and exercises management responsibilities for and "voting control" over the company either directly or through informal agreement and coordination with Charity Townsend, who is, on information and belief, nominally listed in corporate documents as President and/or CEO of Headquarters and is Rowe's former wife and Townsend's current wife.

411.   On information and belief, Townsend currently holds, and/or in the past has held, the title of Vice-President of NPK, OGD, Weta, In and Out Gardens, ▮▮▮▮▮, Hydropedia and Gardenopedia.  On information and belief, Townsend, together with Rowe

Page 76  -   THIRD AMENDED COMPLAINT

and Tang, holds and exercises management responsibilities for and "voting control" over Headquarters either directly or indirectly through informal agreement and coordination with his wife, Charity Townsend.

412.    On information and belief, Tang currently holds, and/or in the past has held, the title of Vice-President of Operations of NPK, OGD, Weta, In and Out Gardens, ██████ ██████s, Hydropedia and Gardenopedia.  On information and belief, Tang, together with Rowe and Townsend, holds and exercises management responsibilities for and "voting control" over Headquarters either directly or indirectly through informal agreement and coordination with Charity Townsend.

413.    On information and belief, since at least January 2010, Rowe, Townsend and Tang have entered into one or more express or implied agreements with each other and/or Charity Townsend, to manage and operate the businesses in the NPK Family as a single enterprise and have continuously managed and operated the businesses in the NPK Family as a single enterprise and without observing or maintaining corporate formalities.

414.    On information and belief, since at least January 2010, Rowe, Townsend and Tang have adopted and continuously employed a de facto management structure for the operation of NPK Family of businesses, with Rowe acting as President and/or CEO and Townsend, Tang and Charity Townsend each acting as a Vice-President. ████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

Page 77   -   THIRD AMENDED COMPLAINT

███████████████████████████████████████

███████████████████████████

415.    Since at least April 2011, Rowe, Townsend, and Tang, acting as the de facto management of the NPK Family of businesses, ████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████.

416.    On information and belief, no formal action by any entity in the NPK Family is undertaken without Rowe's approval or direction.  If Rowe is not listed in the corporate records as an officer or member of an entity, Rowe will either direct one or more of Townsend, Tang and/or Charity Townsend to undertake the action in their nominal capacity as a named officer or member, or Townsend, Tang or Charity Townsend will undertake the action only after consulting with and obtaining the consent of Rowe as de facto President/CEO.

417.    Rowe, Townsend and Tang manage and operate each of the businesses in the NPK Family from a single office, currently located at 1600 Skypark Drive Suite 215, Medford, Oregon, using the same computers, files, equipment, and personnel.  On information and belief, Rowe uses a single email account ("easyway444@gmail.com") in connection with all the businesses in the NPK Family, while Townsend and Tang interchangeably use email accounts with the npk-industries.com, ogdonline.com or inandoutgardens.com domains.

418.    Since NPK's formation in June 2010, Rowe, Townsend and Tang have used their common control of NPK, OGD, Weta, Headquarters and In and Out Gardens to maintain NPK as grossly undercapitalized and to divert assets, revenues, and business

Page 78  -   THIRD AMENDED COMPLAINT

opportunities from NPK to the other companies in the NPK Family, including but not limited to Headquarters, In and Out Gardens, OGD and Weta, without payment, compensation, or reasonable equivalent value to NPK, thereby depleting the assets, potential and value of NPK.

419.    On information and belief, Headquarters performs the bookkeeping, banking and financial reporting for all the businesses in the NPK Family, thereby facilitating Rowe, Townsend and Tang's ability to direct, allocate and shift revenues, costs, and assets between and among the NPK Family of businesses, including through the manipulation of assets and liabilities between entities to concentrate assets outside NPK and liabilities within NPK.

420.    On information and belief,



421.    On information and belief, Rowe, Townsend and Tang have used their control of NPK for purposes of milking and diverting NPK's revenues in other ways for the benefit of themselves, In and Out Gardens, Headquarters, OGD and Weta.  For example,

Page 79   -    THIRD AMENDED COMPLAINT

█████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████

422.    For example, ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

423.    On information and belief, Rowe, Townsend and Tang have used their
common control of the NPK Family of businesses to cause NPK to comingle its assets and
bank accounts with the other members of the NPK Family, including but not limited to OGD,
Weta, In and Out Gardens, and Headquarters.  For example, ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

424.    To facilitate their ability to conduct the business of NPK through OGD, on or
about January 13, 2013, Rowe, Townsend and Tang caused NPK to transfer its assumed
business name registration for "NPK Industries" into OGD's name.  On or about May 13,
2013, Rowe, Townsend and Tang caused OGD to further amend the registration to add NPK

Page 80  -    THIRD AMENDED COMPLAINT

as a co-registrant, thus enabling both NPK and OGD to hold themselves out to the public interchangeably as "NPK Industries" and thus further blur the distinction between the two.

425.    On information and belief, Rowe, Townsend and Tang continue to conduct and operate the business of NPK under the names and bank accounts of OGD, Weta, Headquarters and other business in the NPK Family.

426.    On information and belief, since at least April 2013, Rowe, Townsend and Tang have caused NPK to ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████

427.    On information and belief, Rowe, Townsend and Tang have placed assets of NPK in their own names and/or in names of other businesses in the NPK Family.  For example, many Internet domain names for the entities in Rowe, Townsend, and Tang's "family" of businesses, as well as the for the products they offer, are registered personally in the name of Rowe and list his home address (7367 Griffin Lane, Jacksonville, OR 97520) or a PO Box in Greenview, California, including but not limited to:  ogdonline.com, inandoutgardens.us, ultimate-wash.com, promiscontrol.com, raw-solubles.com, and the Yeti

Mark Domains.  On information and belief, Rowe also uses Princess Consulting LLC, an Oregon limited liability company owned, controlled and managed by him to hold assets belonging to NPK, including the domain names npk-industries.net, npk-industries. org, npk-industries.us, npk-industries.ca, npk-industries.info, npk-industries.me, and npk-industries.mobi.

428.    On information and belief, it is also the practice of Rowe, Townsend and Tang to use family members or other third party proxies to hold and conceal personal and business assets, including assets belonging to NPK and the other businesses in the NPK Family.

429.    For example, on information and belief, since at least 2010, Rowe has resided in a single family residence located at 7367 Griffin Lane, Medford, OR, title in which is listed, according to the records maintained by the Assessor's Office of Jackson County, in the names of Thomas and Christine Savory of Fort Jones, California.  On information and belief, Thomas and Christine Savory are the parents of Rowe's former wife and Townsend's current wife, Charity Townsend.

430.    On information and belief, since at least 2013, Tang has resided in a single family residence located at 6397 Pioneer Rd., Medford, OR, title in which is also listed in the names of Thomas and Christine Savory.

431.    As a result of Rowe, Townsend and Tang's continuous exercise of actual control over NPK and the other business in the NPK Family since at least 2010, and their management and operation of the NPK Family businesses as a single enterprise, Rowe, Townsend, Tang, together with OGD, Weta, Headquarters and In and Out Gardens, have exercised total domination of NPK, to the extent that NPK manifests no separate corporate interests of its own.

432.    On information and belief, Rowe, Townsend, Tang, OGD, Weta, Headquarters and In and Out Gardens have used NPK to carry out their business, rather than

Page 82    -    THIRD AMENDED COMPLAINT

its own, and to defraud Yeti by, among other things, inducing Yeti to agree to lower its prices to NPK and extend NPK credit on unpaid balances based on false and misleading statements regarding NPK's financial condition that were facilitated by their conduct.  On information and belief, Rowe, Townsend, Tang, OGD, Weta, Headquarters and In and Out Gardens' have also used their domination and control NPK to defraud Yeti, Heagle and Freq Water by rendering NPK judgment-proof against any monetary award in this action by, among other things, keeping NPK inadequately capitalized, milking NPK, and engaging in the fraudulent transfer of NPK's assets and business opportunities for less than reasonably equivalent value.

433.    The conduct of Defendants NPK, OGD, Weta, Headquarters, In and Out Gardens, Rowe, Townsend and Tang set forth above establishes them as alter egos of NPK.

434.    Defendants' domination and control of NPK has caused, and unless restrained and enjoined will continue to cause, irreparable harm to Yeti, Heagle and Freq Water that cannot be adequately compensated or measured by money alone.  Yeti, Heagle, and Freq Water have no adequate remedy at law and are entitled to permanent injunctive relief enjoining Defendants from further interference.

435.    In addition, as a direct and proximate result of Defendants' domination and control of NPK, Yeti, Heagle, and Freq Water have suffered and will continue to suffer damages, in an amount that is presently unknown but that will be determined according to proof at trial.  On information and belief, Defendants' wrongful conduct set forth above was undertaken intentionally and for the purpose of injuring Yeti, Heagle and Freq Water and, thus, Yeti, Heagle and Freq Water are also entitled to punitive damages

## IV.  DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims in this action.

Page 83   -   THIRD AMENDED COMPLAINT

## V.  PRAYER FOR RELIEF

WHEREFORE, Yeti and Heagle request a judgment in its favor and against Defendants, including the following:

**A.    On Yeti's First and Second Claims for Relief:**

1.    Pursuant to 15 U.S.C. § 1117(a), Yeti's actual damages, Defendants' profits, and the costs of the action;

2.    Pursuant to 15 U.S.C. § 1117(a)(3), enhanced damages in an amount up to three times actual damages;

3.    Pursuant to 15 U.S.C. § 1117(a)(3), Yeti's reasonable attorneys' fees and costs; and

4.    An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, using in the future Yeti's Marks, or any colorable imitation or confusingly similar variation of Yeti's Marks, or any indication that Yeti's Products are affiliated with Defendants' products; or any false advertising.

**B.    On Yeti's Third Claim for Relief:**

1.    Yeti's actual damages in an amount to be determined at trial;

2.    Defendants' profits;

3.    Yeti's reasonable attorneys' fees and costs; and

4.    An injunction against Defendants' continued unfair competition using Yeti's Marks.

**C.    On Yeti's Fourth Claim for Relief (Counts 1 through 5):**

1.    Yeti's actual damages in an amount to be determined at trial;

2.    Punitive damages;

3.    Yeti's reasonable attorneys' fees and costs;

4.    A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 003 is invalid and void;

Page 84  -    THIRD AMENDED COMPLAINT

5.    A declaratory judgment that NPK's trademark registration of "Mighty Wash" in international Class 005 is invalid and void.

6.    A declaratory judgment that NPK's trademark registration of "Power Wash" in international Class 003 is invalid and void;

7.    A declaratory judgment that NPK's trademark registration of the "Power Button" mark in international Class 003 is invalid and void; and

8.    A declaratory judgment that NPK's trademark registration of the "PM Wash" in international Class 003 is invalid and void;

**D.    On Yeti's Fifth Claim for Relief (Counts 1 and 2):**

1.    Yeti's actual damages in an amount to be determined at trial;

2.    Punitive damages; and

3.    Yeti's reasonable attorneys' fees and costs.

**E.    On Yeti's Sixth Claim for Relief (Counts 1 through 10) and Seventh Claim for Relief:**

1.    Damages in the amount of $20,013.56 for insurance costs;

2.    Damages in the amount of $56,860.31 for interest on untimely paid invoices;

3.    Yeti's lost profits in an amount to be determined at trial;

4.    Yeti's reputational damage in an amount to be determined at trial;

5.    An injunction enjoining NPK, its successors and assigns, and all persons acting in concert with it, from producing, selling, marketing, distributing or manufacturing any product that contains Pink Sauce prior to January 1, 2016 and directing NPK to assign Yeti all right, title and interest claimed by NPK in the trademarks MITES SUCK (Reg. No. 4161214), MIGHTY WASH (Reg. Nos. 4121193 & 4241438), the "Power

Page 85   -   THIRD AMENDED COMPLAINT

Button" design (App. Ser. No. 58/842,905), PM WASH (App. Ser. No. 85/782,754) and

POWER WASH (App. Ser. No. 85/785,212), together with all associated goodwill;

      6.      Pursuant to section 21 of the Agreement, Yeti's reasonable attorneys'

fees and costs.

      **F.**      **On Yeti's Eighth Claim for Relief:**

      1.      A declaratory judgment that: (a) the Distribution Agreement

terminated by no later than December 31, 2013; (b) the Agreement does not give NPK

exclusive rights to distribute of Yeti's Products; (c) NPK has breached the Agreement; (d)

Yeti's communication with Sunlight or any other buyer does not constitute tortious

interference; and (e) Yeti may sell its Products directly to Sunlight or any other buyer using

Yeti's Marks.

      **G.**      **On Yeti's Ninth Claim for Relief:**

      1.      Pursuant to 15 U.S.C. § 1117(a), Yeti's actual damages, Defendants'

profits, and the costs of the action;

      2.      Pursuant to 15 U.S.C. § 1117(a)(3), enhanced damages in an amount

up to three times actual damages;

      3.      Pursuant to 15 U.S.C. § 1117(d), at Yeti's election, statutory damages

in an amount of not less than $1,000 and not more than $100,000 per domain name;

      4.      Pursuant to 15 U.S.C. § 1117(a)(3), Yeti's reasonable attorneys' fees

and costs; and

      5.      An injunction against NPK, Rowe, Townsend and Tang, their

successors and assigns, and all persons acting in concert with them, compelling the transfer

of the Yeti Mark Domains to Yeti and enjoining them from registering, trafficking in, or

using, in bad faith, domain names identical to confusingly similar to Yeti's Marks.

Page 86  -    THIRD AMENDED COMPLAINT

**H.      On Yeti's Tenth and Eleventh Claims for Relief:**

1.      A declaration that:  (1) Yeti is the owner of the "Mighty Wash," "Power Wash," "Power Button," "PM Wash" and "Frequency Logo" marks; (2) Yeti's use of the "Mighty Wash," "Power Wash," "Power Button," "PM Wash" and "Frequency Logo" marks does not infringe U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896 and 4,400,010, or any valid or enforceable right of NPK; and (3) U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896, 4,400,010, and 4,623,730 are invalid and must be cancelled.

2.      An order directing the USPTO to cancel U.S. Trademark Registration Nos. 4,121,193, 4,241,438, 4,346,896, 4,400,010, and 4,623,730.

**I.      On Yeti and Heagle's Twelfth Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial; and

2.      An injunction against Defendants' continued unauthorized use and/or disclosure of Yeti and/or Heagle's confidential information.

**J.      On Yeti and Heagle's Thirteenth Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

2.      Defendants' profits;

3.      Punitive damages;

4.      Yeti's reasonable attorneys' fees and costs pursuant to ORS 646.467; and

5.      An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, enjoining their continued misappropriation of Yeti and Heagle's trade secrets.

**K.      On Yeti's Fourteenth Claim for Relief:**

1.      Yeti's actual damages in an amount to be determined at trial;

Page 87   -   THIRD AMENDED COMPLAINT

2.      Defendants' profits;

3.      Punitive damages;

4.      An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, enjoining their continued breach of fiduciary duties owed to Yeti;

5.      An order that defendants NPK, OGD, Rowe, Townsend and Tang hold ███████████████████████████████████████████████████████████ ████████████████████████████████████████ in a constructive trust for the benefit of Yeti and directing restitution of the same to Yeti.

**L.      On Freq Water's Fifteenth Claim for Relief:**

1.      Freq Water's actual damages in an amount to be determined at trial;

2.      Defendants' profits;

3.      Punitive damages; and

4.      An injunction against Defendants, their successors and assigns, and all persons acting in concert with them, enjoining their continued intentional interference with Freq Water's economic relations.

**M.      On Yeti, Heagle and Freq Water's Sixteenth Claim for Relief:**

**1.**      An order that Defendants are each the alter ego of NPK and are each liable, jointly and severally, for all claims, damages, and judgments against NPK

**N.      On All Claims for Relief:**

1.      Yeti and Heagle's prevailing party fees, attorneys' fees, costs, pre-judgment and post-judgment interest; and

2.      For such further relief as the Court deems just and equitable.

Page 88   -   THIRD AMENDED COMPLAINT

DATED: March 31, 2015.

STOEL RIVES LLP


/s Steven E. Klein/
STEVEN T. LOVETT, OSB No. 910701
stlovett@stoel.com
STEVEN E. KLEIN, OSB No. 051165
seklein@stoel.com

Attorneys for Plaintiffs Yeti Enterprises Inc.
    and Alexander J. Heagle

Page 89  -    THIRD AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing on the following **THIRD AMENDED**

**COMPLAINT** named persons on the date indicated below by

☐   mailing with postage prepaid

☐   hand delivery

☐   facsimile transmission

☐   overnight delivery

☒   ECF Filing

to said persons a true copy thereof, contained in a sealed envelope if by mail, addressed to

said persons at his or her last-known addresses indicated below.

Renée E. Rothauge
Jeffrey M. Edelson
Chad Colton
Steffan Alexander
Markowitz, Herbold, Glade & Melhaf, PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204-3730
ReneeRothauge@MHGM.com
JeffEdelson@MHGM.com
ChadColton@MHGM.com
SteffanAlexander@MHGM.com

Attorneys for Defendants NPK, LLC and
Oregon Global Distribution, Inc.

Philip S. Griffin
Griffin Law Group
121 SW Salmon St Ste 1100
Portland, OR 97204
503-471-1400
Fax: 503-244-3264
Email: phil@griffinlawgroup.com

Attorneys for Third-Party Defendant
Nicholas Jackson

Robert B. Miller
Kilmer Voorhees & Laurick PC
732 NW 19th Avenue
Portland, OR 97209
bobmiller@kilmerlaw.com

Attorneys for Defendants Orion Tang,
Richard Rowe and Reny Townsend

Page 1   -   THIRD AMENDED COMPLAINT

DATED:  March 31, 2015.          STOEL RIVES LLP


_/s Steven E. Klein/_
Steven E. Klein, OSB No. 051165
Telephone:  (503)-224-3380
Attorneys for Plaintiffs

Page 2   -   THIRD AMENDED COMPLAINT