# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

YETI ENTERPRISES
INCORPORATED,
an Oregon corporation; ALEXANDER
J. HEAGLE, and individual;
and FREQ WATER, INC., an Oregon
corporation,

Civ. No. 1:13-cv-01203-CL

Plaintiff,

FINDINGS OF FACT &
CONCLUSIONS OF LAW

v.

ORION TANG, an individual;
OREGON GLOBAL DISTRIBUTION, INC.,
an Oregon corporation; RENY TOWNSEND,
an individual; RICHARD ROWE, an
individual; WETA, INC., an Oregon
corporation; IN AND OUT
GARDENS LLC, an Oregon limited liability
company; HEADQUARTERS, LLC, an Oregon
limited liability company; and NPK, LLC, an
Oregon limited liability company,

Defendants,

NICHOLAS JACKSON, an individual; and
JESSICA LILGA, an individual,

Counter-Defendants.

_____

CLARKE, Magistrate Judge.

On July 25 and 26, 2017, the Court held a bench trial and took this case under advisement. The following are my findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1). [1]

## FACTUAL FINDINGS

NPK, LLC ("NPK"), has sued Nicholas Jackson ("Jackson") and Jessica Lilga ("Lilga") for events taking place largely between October 2012 and December 2013, when NPK alleges Jackson and Lilga conspired with Jim Heagle ("Heagle") to eliminate NPK from the distribution market for frequency-water products.

NPK manufactures, distributes, and markets gardening supplies and materials. In 2009, NPK entered into a contract with Yeti Enterprises, Inc. ("Yeti), which was memorialized into a written distribution agreement on September 28, 2010, and again on November 11, 2010. The agreement provided that NPK would market, bottle, and distribute Yeti's product known as frequency water. [2] *See* Pl.'s Ex. 2. Heagle is the president and majority owner of Yeti. Subsequent to this agreement, NPK created three plant washes: Mighty Wash, Power Wash, and PM Wash, all of which contained and were marketed as containing frequency water. The products were sold to wholesale distributors. This partnership rapidly increased revenue for both NPK and Yeti.

Jackson owns 22.5 percent of NPK. In October 2012, Jackson was incarcerated for fourteen months. Prior to his incarceration, Jackson was also employed by NPK as vice president of sales; Jackson believed he was chronically underpaid for this position—he was paid $12,250.72 in 2011 and $28,733.98 in 2012. Pl.'s Exs. 76, 77. As soon as his incarceration began, NPK ceased paying Jackson wages, though he did retain his ownership interest in the

---

[1] The parties have consented to Magistrate Judge jurisdiction over this action pursuant to 28 U.S.C. § 636(c)(1).

[2] Yeti produces a liquid plant wash using a process called electronic frequency imprinting; the end-product is called frequency water.

company. As part of a deal apparently worked out between Jackson, Lilga, and NPK's President, Richard Rowe ("Rowe"), Lilga, at the time Jackson's girlfriend, would take over many if not all of Jackson's responsibilities at the company and be paid in his stead. At the outset, the setup proved difficult; Lilga complained of "being treated like an incompetent child," being overwhelmed, and being asked to do more than Jackson was ever asked to do. Pl.'s Ex. 115, at 11:26-12:1.[3] Although agreeing with Lilga that she was being treated improperly, Jackson told her to "[j]ust listen to them" and not to take anything personally. Pl.'s Ex. 115, at 12:26.

Nevertheless, Lilga's relationship with NPK continued to rapidly deteriorate; she described her treatment to Jackson as "[a]bsolutely awful," and stated Rowe told her that because she is not Jackson she would not like working at NPK, the job would be tough, and she would have to do what he says. Pl. Ex. 117, at 20:5. She felt her treatment was improper and described being "sick to [her] stomach" at work every day. Pl. Ex. 117, at 20:26. She further stated Rowe threatened to fire her three times in the first two weeks. By November 2012, Lilga no longer worked for NPK; she was employed by the company for three weeks.

Jackson's relationship with NPK appears to have been fraught prior to his incarceration. Part of his disillusionment with NPK arose because he felt NPK was attempting to improperly cut his pay. In addition to this, Jackson felt Rowe and the rest of NPK's management were excluding him from critical management-level decision-making; as he described it, "[N]obody talks to [me] that should be talking to [me] about business and what's going on out there besides my lady, you know, which you guys are keeping her in the dark." Pl.'s Ex. 118, at 3:2-5.

Jackson also felt NPK "stabbed" him in the back; indeed, he felt that if any of the other members had been in the legal predicament he was in, "they would have put a lot more energy towards" ensuring adequate legal representation. Pl.'s Ex. 117, at 18:21-24. He also testified that

<hr>

[3]Plaintiff's Exhibits 115-147 are transcripts of telephone calls Jackson made while incarcerated.

Rowe promised to take care of his family while he was incarcerated but that Rowe failed to follow through on this promise, at least to the extent Jackson expected. Finally, Jackson strongly believed Rowe was taking the company in the wrong direction by introducing products that were not "safe for the environment" and were outside of the markets he felt NPK stood to succeed in. Pl.'s Ex. 116, at 10:9. Consequently, at the outset of his incarceration, Jackson began talking with Lilga about the possibility of leaving NPK and working for Yeti, stating, "If all of a sudden, you know, me and you work for Yeti Enterprises . . . , so be it." Pl.'s Ex. 116, at 11:13-15. Jackson further said that he was "going to make sure that we have a game plan set up and that's with Jim [Heagle]." Pl.'s Ex. 117, at 6:10-11.

In addition to discussing these plans with Lilga, Jackson also routinely conversed with Heagle while incarcerated; the two discussed their common disdain for NPK and its other members, Jackson's intent to leave and work for Yeti or in a business partnership with Heagle, as well as Heagle's intent to end Yeti's distribution agreement with NPK. Heagle believed he had been "soaked [] for all of [his] resources," Pl.'s Ex. 119, at 3:4, and that NPK had breached their distribution agreement on multiple occasions by double billing and failing to pay Yeti in a timely matter, among other things. Jackson was well aware of Heagle's intent to end his distribution agreement with NPK; as Jackson stated to Lilga in October 2012, "Jim's gonna pull the line from them almost regardless, and it's pretty much regardless." Ex. 117, at 7:22-23. Jackson also knew that NPK was unaware of his conversations with Heagle and concurrent knowledge of Heagle's intentions, saying, "[T]hey don't know that I'm conversing with you like this." Pl.'s Ex. 122, at 14:8-9.

During this time, Jackson decided he wanted to sell his "part of the company," opining that he would "rather just be positive with [his] life instead of promote more of their negativity

or even their selfishness. . . ." Pl.'s Ex. 119, at 2:14-17. Heagle stated that he would wait to end his distribution agreement and to notify NPK of his intent to do so until Jackson was "taken care of," at which point, he stated, "I'm gonna jump ship" by "throw[ing] enough shit at them that they're not gonna want to go forward." Pl.'s Ex. 119, at 3:7-8; Ex. 119, at 4: 21-22. In addition to waiting for Jackson's exit, Heagle also wanted to ensure NPK signed a new five-year non-disclosure agreement with Yeti prior to ending their business relationship so that, as he told Jackson, he could guard against any attempt on NPK's part to "copy [his] product. . . ." Pl.'s Ex. 128, at 10:19. In January 2013, NPK did in fact renew the parties' non-disclosure agreement.

In 2012, NPK was in the process of spinning off into three separate corporations, Griffin Holdings, Inc., Intelligent Technologies, Inc., and Oregon Global Distribution, Inc. Jackson was offered a 22.5 percent interest in each of the three companies; however, for the above-mentioned reasons, because he disagreed with the decision to split, and because NPK wanted Jackson to sign a two-year non-compete agreement, Jackson refused to sign the shareholder agreement for any of the new entities. Then, in December 2012, Jackson notified Rowe, via a letter from his attorney, that Jackson wanted a "full accounting" of the new entities and NPK's tax returns from 2010 onward. Pl.'s Ex. 28. After receipt of Jackson's attorney's letter, Rowe reached out to Jackson to inquire about Jackson's request. On December 21, 2012, Jackson described his conversation with Rowe to Lilga. According to Jackson, Rowe did not understand why Jackson wanted out of the company, to which Jackson said he replied, "[B]ecause I don't believe [you] have my best interests at heart." Pl.'s Ex. 126, at 3:19-20. He further stated he felt Rowe and others had minimally communicated with him since his incarceration and had gone forward without his consent on various decisions regarding the direction of NPK. Rowe implored Jackson to reconsider and then offered to buy Jackson out for ten or twenty thousand dollars. Jackson felt

the offer was far too low and said he believed it was necessary to have an internal audit of NPK performed to determine the value of his shares. Jackson said Rowe replied, "You don't have to do that . . . we can figure this out just me and you, Nick." Pl.'s Ex. 126, at 7:21-23. According to Jackson, Rowe did not want an audit because "he's been doing a lot of wrong stuff." Pl.'s Ex. 126, at 8:15-16.

During much of the next year, Jackson continued to negotiate his exit from NPK and continued to plan a future business relationship with Heagle. Meanwhile, in January 2013, with Jackson and Heagle continuing their communications about arranging a future business relationship, Jackson sent Heagle a draft copy of a proposed advertisement from NPK that depicted a series of products beyond those that Yeti was apparently aware of; as Jackson told Heagle, "They've been lying to you. I mean, sitting there telling you they weren't going to do other products. They already did. . . . They've got their whole nutrient line. . . ." Pl.'s Ex. 130, at 10:2-7. Jackson apparently received the advertisement from Rowe, and he never notified NPK that he forwarded it on to Heagle.

During the same month, Jackson and Heagle agreed that Heagle should move forward and terminate Yeti's distribution agreement with NPK, even though Jackson had not yet divested himself of his interest in NPK. Consequently, on January 28, 2013, Yeti, through its attorney, sent NPK a letter notifying NPK that it was in breach of the parties' distribution agreement, citing as "[t]he last straw" the above-referenced advertisement Jackson had passed along to Heagle. Pl.'s Ex. 5, at 1.[4] Yeti claimed this advertisement showed NPK was "blatantly" using Yeti's creation in an "attempt to market other products. . . ." Pl.'s Ex. 5, at 1. Yeti's attorney

---

[4]The distribution agreement between Yeti and NPK allowed Yeti to terminate the agreement for a number of reasons, including nonpayment. While other reasons for termination required notice, nonpayment did not. *See* Pl.'s Ex. 2.

attached a copy of the advertisement to the letter. NPK was given ten days to, in effect, end its relationship with Yeti and to turn over all of Yeti's property, including any money owed to Yeti.

Instead of abruptly ending their business relationship, however, Yeti and NPK worked out an agreement whereby Yeti would continue to supply its frequency water to NPK through January 2014. In exchange, NPK would turn over to Yeti certain frequency-water-related trademarks that NPK registered in its name. Heagle, however, still made clear to Jackson that, once the new contract expired in the beginning of 2014 and all trademarks were "handed over," he did not intend to continue distributing his product to NPK; Heagle stated to Jackson that he intended to walk off at that point "and just leave them alone and do our own business. . . ." Pl.'s Ex. 137, at 18:16; Pl.'s Ex. 137, at 13:17-18.

The new Yeti-NPK distribution agreement did not pan out. In April 2013, Yeti notified NPK that it was raising the prices it would charge NPK for its products, to which NPK objected and sent a letter asking for reassurance of performance; Yeti never responded. Shortly thereafter, NPK filed suit in Jackson County Circuit Court claiming Yeti tortuously interfered with NPK's relationship by wrongfully communicating and seeking business with NPK's customers. Subsequently, on June 17, 2013, Yeti filed a complaint in Multnomah County Circuit Court arguing NPK misappropriated Yeti's trademarks and had engaged in unlawful competition and false advertising.[5] The next day, Yeti notified NPK that it was terminating the parties' distribution agreement.

As stated, while the Yeti-NPK relationship deteriorated, Jackson and Heagle continued to develop their own business plans, and Jackson continued his attempt to divest from NPK. In January 2013, NPK presented Jackson with a membership-redemption agreement, offering to purchase his 22.5 percent ownership for $50,000. Jackson, however, believed this was an

---

[5] NPK removed the case to this Court on July 17, 2013.

insufficient sum of money and that his shares were worth much more; thus, he did not sign the offer and continued to press for an internal audit.

On February 8, 2013, having failed to receive an overt acceptance or rejection of its offer, NPK notified Jackson that it was revoking the redemption offer because it believed Jackson had breached his fiduciary duties to the company and improperly disseminated proprietary information. Indeed, NPK evidently tied Jackson to Heagle when NPK received the January 28, 2013, letter from Yeti's attorney containing a draft copy of NPK's proposed advertisement. Rowe testified that Jackson was the only person the proposed advertisement was sent to. In addition, NPK believed Jackson disseminated false, misleading, and damaging statements regarding NPK's products. On April 9, 2013, NPK notified Jackson, through his attorney, that it had "decided to pursue a judicial expulsion action against [him]." Def.'s Ex. 220. On April 12, 2013, NPK filed the expulsion action in Jackson County Circuit Court. The case is currently abated pending resolution of this case.

By this time, NPK's distribution agreement with Yeti had been terminated and NPK had relaunched its product line without Yeti's frequency water. Around the same time, Jackson began working in earnest with Dennis Hunter, owner of Left Coast Garden Wholesale ("Left Coast"), a former distributor of NPK's products, to launch a competitive product line using Yeti's frequency water. To aid in this endeavor, Jackson promised to supply Hunter with a list of 1,300 Sunlight Distributors, Inc. ("Sunlight"), stores. At the time, Sunlight was a major purchaser of NPK's products. Jackson later instructed Lilga to provide Hunter with a copy of "that list of all those stores." Pl.'s Ex. 144, at 9:25-26. It is not perfectly clear where this list originated. On October 14, 2012, early in Jackson's incarceration, he appeared to direct Lilga to download NPK's customer database, stating:

> And if you can—if you can find a way to download that database information, and I don't know, you know, you might have to be squirrelly about it or whatever, download it on a hard drive, but find a way to download all that so that we have it as well, and do it periodically.

Pl.'s Ex. 116, at 13:5-10. Jackson goes on to say that it is important to have all that information "because we've worked for that." Pl.'s Ex. 116, at 13:13-14. Lilga replies, "That's a good idea." Pl.'s Ex. 116, at 13:11. Lilga never confirms she took this database; however, Rowe testified at trial that NPK discovered Lilga had taken NPK's database of customers and every interaction with those customers, as well as trade secrets and sales processes. Rowe also testified, and the physical evidence confirms, that Left Coast had NPK's customer lists and sent out damaging e-mails to NPK's customers stating that it had "decided to discontinue distributing products from NPK industries" because NPK's new plant-wash line, which no longer contained frequency water, was susceptible to molding and that Left Coast[6] would now "provide the original frequency altered formulations and will be marketing under the trade names Mega Wash, White Wash, and Freq Wash. . . ." Pl.'s Ex. 24, at 4. Accordingly, it would seem that the list of 1,300 stores Jackson referred to was taken from NPK's database of customers.

Rowe testified at trial that Left Coast's damaging e-mails, as well as the introduction of Left Coast's new product line, halved NPK's sales, which had already been halved earlier in the year due to the loss of Yeti's frequency-water products. As Rowe put it, the goodwill that NPK had generated over the years marketing its plant washes transferred to Left Coast's new products.

Upon Jackson's release from prison in December 2013, he continued to work for Left Coast. *See, e.g.*, Pl.'s Ex. 17, 18. He remains a member of NPK, and on July 29, 2013, he filed suit against NPK, Rowe, and NPK's additional members in Jackson County Circuit Court

---

[6]Both Left Coast and Green Planet Wholesale are owned by Hunter. It appears that Green Planet Wholesale owned/owns Mega Wash, White Wash, and Freq Wash, and that Left Coast distributes the products. The Court's use of Left Coast refers to both companies.

seeking an assessment and payment of the value of his membership interest in the company. That case is also abated pending resolution of this matter.

## CONCLUSIONS OF LAW

### I.    Nicholas Jackson

NPK brings two claims against Jackson for fraudulent misrepresentation, as well as claims for violations of the Lanham Act, common law trade libel, conversion, and breach of the parties' nondisclosure agreement. NPK contends Jackson is liable for these claims on an individual basis and in concert with others and therefore is also liable for these tortious acts on the basis of civil conspiracy and aiding and abetting. The Court addresses each of these claims.

### A. Fraudulent misrepresentation – failure to disclose

To establish a claim for fraud in Oregon, a party must prove (1) a material misrepresentation that was (2) false, (3) made with knowledge of its falsity or with ignorance of its truth, (4) with the intention that it be acted upon by the party claiming fraud, and (4) that the acting party in fact justifiably relied on the material misrepresentation, (5) suffering an injury as a result. *Handy v. Beck*, 282 Or. 653, 659 (1978). The party bringing a claim for fraud must prove its case by clear and convincing evidence, not merely a preponderance of the evidence, since "[t]he stigma of fraud is not lightly laid upon a defendant." *Fahrenwald v. Hemphill*, 239 Or. 421, 425-26 (1965).

"Actionable fraud may be committed by a concealment of material facts as well as by affirmative and positive misrepresentations." *Musgrave v. Lucas*, 193 Or. 401, 410 (1951) (internal citation omitted). Indeed, typically, "mere silence is not fraud," but "[w]here the law imposes a duty on one party to disclose all material facts known to him and not known to the

other, silence or concealment in violation of this duty with intent to deceive will amount to fraud.
. . ." *Id.*

NPK contends Jackson "had a special relationship with [NPK] which included the duty to disclose to [NPK] all information which could damage its business," including his assistance in bringing competitive products to the market and assistance in cutting NPK out of the plant-wash distribution market. Pretrial Order, at 8. Because these detrimental activities were not disclosed, NPK contends Jackson breached this "special relationship."

Jackson had no duty to disclose information that could damage NPK's business. A manager of a limited liability company ("LLC") carries with him specific duties that are owed to the LLC. *See* ORS § 63.155(9)(a). Specifically, those duties include the obligation "to refrain from dealing with the limited liability company in a manner adverse to the limited liability company and to refrain from representing a person with an interest adverse to the limited liability company, in the conduct . . . of the limited liability company's business." ORS § 63.155(2)(b). Mere members of an LLC, however, who are not also managers of the company, "owe no duty to the LLC or the other members." *Synectic Ventures I, LLC v. EVI Corp.*, 353 Or. 62, 78 (2012) (citing ORS § 63.155(9)(a)). Hence, unlike managers, these passive members are not agents of the LLC and owe no duty of loyalty to put the company's interests first. *Id.*

Here, NPK readily acknowledges that, once Jackson's incarceration began, he was no longer paid for his role as vice president of sales. Indeed, the facts demonstrably show that, at this point, Jackson's only affiliation with NPK was his 22.5 percent membership interest; Lilga took on his former responsibilities and received his pay. Accordingly, without any management-level position at NPK, Jackson was simply a passive member of the company. Thus, as Oregon law makes clear, he owed "no duties to the limited liability company or the other members solely

by reason of being a member" of NPK and therefore no duty to put the company's interests first and to disclose his own business interests, which were adverse to NPK's. ORS § 63.155(9)(a). Beyond Jackson's relationship with NPK as a member, NPK fails to point to any other relationship that imposed upon Jackson a duty to disclose his private business dealings, and the Court finds none. Accordingly, NPK has failed to prove that Jackson's failure to disclose his negotiations with Heagle, Hunter, Lilga, or any others renders him liable for fraud.

## B. Fraudulent misrepresentation – active concealment of facts

Next, NPK contends Jackson "conspired to deprive NPK, LLC of the market for Frequency Water products" by setting up "an exclusive business relationship with Sunlight and Green Planet[7] and others in the marketplace to distribute" Yeti's frequency-water products and "to cause said entities to stop distributing" NPK's products. Pl.'s Trial Mem., at 6-7. NPK opines that "[t]hese activities were actively concealed from" NPK. Pl.'s Trial Mem., at 7. Finally, at trial, Rowe testified that Jackson concealed his intent to withdraw from NPK and concealed his communications with Heagle, Lilga, and Hunter. NPK charges Jackson had a duty to disclose these activities "as he is a member of that LLC." Pretrial Order, at 6.

As articulated in the prior section, when there is not duty to disclose, fraud requires an active misrepresentation of a material fact. "[E]ven in the absence of a duty to speak," however, "actions by a defendant to actively conceal the truth can constitute fraud." *Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 485 (2009) (internal citation omitted).

Here, there is nothing in the evidence showing Jackson actively concealed facts from NPK or from any manager at the company. First, the prison phone records NPK has submitted show that Jackson repeatedly attempted to leave NPK and made his intentions to do so quite clear. Second, while he did not disclose to NPK his ongoing negotiations with Heagle, Lilga, and

---

[7]Green Planet is referred to as Left Coast in the Court's Findings of Fact.

Hunter, and his intent to create a competitive product line to the detriment of NPK, he had no duty to disclose these activities to NPK. A failure to disclose private business negotiations is distinct from active concealment; as the Oregon Court of Appeals explained, "[A]n active concealment such as the filling in of [a] ditch . . . is to be distinguished from a simple nondisclosure." *Paul v. Kelley*, 42 Or. App. 61, 65 (1979) (internal citation omitted). Citing Prosser, the court further explained that active concealment is defined as "[a]ny words or acts which create a false impression covering up the truth, . . . or which remove an opportunity that might otherwise have led to the discovery of a material fact as by floating a ship to conceal the defects in her bottom[.] *Id.* at 66 (citing Prosser, Law of Torts § 106, at 695 (4th ed. 1971)).

The closest piece of evidence NPK can point to in demonstrating active concealment is a letter Jackson wrote to Heagle after Jackson discovered that Heagle's attorney had mistakenly forwarded to NPK the draft advertisement Jackson had secretly provided to Heagle. Indeed, upon finding out from Heagle that his attorney forwarded this draft advertisement, Jackson—worried that this would expose his coordination with Heagle—said, "I'm just gonna play—play stupid" and pretend to know nothing about the advertisement. Pl.'s Ex. 133, at 17:11-12. Later, though, he and Heagle decided that Jackson would write a mock letter to Heagle that would state— falsely—that Jackson sent the advertisement to Heagle because he thought Rowe wished him to do so. Upon receipt, Heagle stated he intended to "take the letter and stuff it in the envelope that I got on—back in the first letter I got from you," which contained the draft advertisement. Pl.'s Ex. 133, at 21:5-7. Hence, the letter would conceal the fact that Jackson and Heagle were working together to start their own business relationship without NPK.

While such a plan is unquestionably an attempt to actively conceal the truth, NPK has not shown, through physical evidence or testimony, that this letter was ever actually forwarded to

NPK. Consequently, while nefarious and unethical, the letter was never physically used to conceal anything from NPK. Fraud requires that the relying party actually rely on the concealment and do so to their detriment. *Handy*, 282 Or. at 659. That did not occur here.

Beyond this letter, the record is devoid of clear and convincing evidence demonstrating Jackson did anything other than stay silent on his secretive business dealings with Heagle, Lilga, and Hunter. "[M]ere silence," however, "is not fraud," unless "the law imposes a duty on one party to disclose all material facts known to him and not known to the other. . . ." *Musgrave* 193 Or. at 410. As discussed, no such duty existed here. Accordingly, without any facts showing Jackson overtly concealed facts from NPK or its managers, NPK has failed to demonstrate that Jackson is liable for fraud.

## C. Lanham Act

NPK alleges Jackson distributed false statements to NPK's customers, stating that NPK's plant-wash products were susceptible to molding; that their products no longer contained frequency water; that frequency-water products would no longer be distributed by NPK; that Lest Coast and other wholesalers discontinued distribution of NPK's products; and that Yeti was releasing a "new and improved product line. . . ." Pretrial Order, at 11. Moreover, NPK contends Jackson aided in distributing e-mails falsely claiming NPK was being investigated and going to be shut down by the EPA, IRS, DEQ, and other agencies. Because the false statements were made in a commercial setting, in bad faith, and for the purpose of directing sales toward Jackson's competing product line and away from NPK, NPK argues it violated the Lanham Act.

To make out a claim for false advertising under the Lanham Act, a plaintiff must show:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to

> influence the purchasing decision; (4) the defendant caused its false
> statement to enter interstate commerce; and (5) the plaintiff has been or
> is likely to be injured as a result of the sale statement, either by direct
> diversion of sales from itself to defendant or by a lessening of the
> goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (internal citation

omitted). A plaintiff must prove each element of a Lanham Act claim by a preponderance of the

evidence. *See Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 415-16

(S.D.N.Y. 2013) (internal quotation and citation omitted) (stating that a plaintiff must prove its

false advertising claim under the Lanham Act by a preponderance of the evidence, meaning that

the existence of the fact is more probable than its nonexistence).

Here, there is no question that NPK sufficiently proved the fourth and fifth elements of a

false-advertising claim; indeed, by e-mailing these statements to NPK's customers throughout

the country, the statements entered interstate commerce. *Healthport Corp. v. Tanita Corp. of

Am.*, 563 F. Supp. 2d. 1169, 1180-81 (D. Or. 2008). Moreover, as set forth in the Findings of

Fact, Rowe testified that these e-mails halved NPK's sales and transferred its goodwill to West

Coast Wholesale, thus demonstrating injury as a result of the statements.

Additionally, it is more probable than not that Jackson participated in the distribution of

these statements. While the e-mails NPK cites in support of its claim are sent from Left Coast,

not Jackson, his statements while incarcerated clearly illustrate an intent to target NPK's

customers with the very statements NPK takes issue with. *See* Pl.'s Ex. 147, at 8:24-26, *and* Pl.'s

Ex. 142, at 18:8-9. Accordingly, Jackson's telephonic statements, combined with the fact that he

provided Hunter, Left Coast's owner, with NPK's customer database and overtly suggested

reaching out to these customers, sufficiently convinces the Court that Jackson participated in the

distribution of the statements at issue in NPK's Lanham Act claim.

Nevertheless, the evidence is insufficient to support a finding that all but two of these statements were false. A statement is false if a claimant can show that the statement was literally false, false by necessary implication, or literally true but likely to mislead or confuse customers. *Southland Sod Farms*, 108 F.3d at 1139. First, the statement that NPK's products no longer contain Yeti's frequency water is true and not likely to mislead or confuse consumers; indeed, at the time the statement was made, November 2013, Yeti had canceled its distribution agreement with NPK. Second, the statement that Left Coast and others discontinued distribution of NPK's products is also true and unlikely to mislead or confuse; Rowe admitted as much, stating all of the goodwill NPK had generated transferred to Left Coast. The same is true with the statement that Yeti was releasing a new-and-improved product line; Yeti agreed to supply frequency water to Left Coast to market the product under the tradenames Mega Wash, White Wash, and Freq Wash.

On the other hand, statements claiming NPK was being investigated by the EPA, IRS, DEQ, and other agencies, while perhaps not literally false—Rowe testified at trial that NPK was being investigated by various agencies during this time, though he claimed Jackson and Left Coast had prompted their investigations by providing false information—the statements were likely to, and in fact did, mislead or confuse consumers, as these statements implied the agencies were going to shut down the company. Similarly, the statement that NPK's products were susceptible to molding was also vigorously refuted by Rowe during trial, and there is nothing outside of Left Coast's unsupported statements to indicate NPK's products did in fact cause, or were susceptible to, mold. Hence, the Court finds NPK has sufficiently proved that these representations were false.

Next, the evidence clearly demonstrates the statements were commercial speech, therefore satisfying the first element of a Lanham Act claim. Indeed, Left Coast's statement about NPK's products' susceptibility to mold was made in an advertisement sent out to customers and thus was clearly made with the sole intent of burnishing its economic interests vis-à-vis NPK. *See Healthport Corp.*, 563 F. Supp. 2d at 1178 (internal citation and quotation omitted) (stating that "[c]ommercial speech is expression related solely to the economic interests of the speaker and its audience). Likewise, from the evidence the Court has been presented with, including Rowe's testimony at trial, it appears beyond doubt that that statements over NPK being investigated by state and federal agencies were made to undermine NPK in the eyes of the targeted audience, thus elevating West Coast's market share among NPK's customers or former customers.

The second element is also clearly met in this case. Neither party can dispute that these statements were made by individuals, including Jackson, who were in commercial competition with NPK; Jackson himself alludes to as much, stating, "[T]he resources that I have built for NPK are my resources. And once they know that I'm detached from that and that I'm promoting those washes, there's still going to be a huge market and that's what I've created []." Pl.'s Ex. 124, at 8:4-7.

Finally, NPK has supplied the Court with sufficient evidence to show that it is more likely than not that the two false statements described above were likely to influence the purchasing decision of the targeted audience and, thus, were material. In *Healthport Corp.*, the court held that false statements regarding the defendant's president's lofty credentials was a material claim because it "may deceive consumers and influence consumer decisions on whether to purchase" the defendant's product. 563 F. Supp. 2d at 1180. Here, as in *Healthport Corp.*,

false statements that NPK's products are susceptible to mold is material because it has the potential to deceive customers into believing that NPK's products did not work as intended and thus had the potential to influence consumers' decisions on whether to purchase NPK's plant-wash line. In addition, false statements indicating NPK would be shut down by regulatory agencies also had the potential to influence consumer decisions on whether to purchase NPK's products, since the notion that NPK could be shut down for regulatory noncompliance certainly raised the presumption that its products or business was operating improperly or outside the law.

Therefore, in sum, NPK has adequately proved that the statements regarding NPK's products' susceptibility to molding as well as statements indicating NPK would was being shut down by regulatory agencies violate the Lanham Act. Moreover, NPK has shown that it is more likely than not that Jackson contributed to the dissemination of these statements and, consequently, violated the Lanham Act.

## D. Common law trade libel

"Trade libel is the publication of matter disparaging the quality of another's property. . . ." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (Cal. Ct. App. 2001). Oregon has referred to this tort as slander of title. *See Woodard v. Pac. Fruit & Produce Co.*, 165 Or. 250, 255 (1940). As NPK points out, to make out a claim, a plaintiff must prove that the defendant made a false or malicious statement that was published to a third party, causing the plaintiff to suffer pecuniary damages as a result. *Id.* at 253. Malice may be shown by presenting evidence that the statement was published with knowledge of its falsity or with reckless disregard as to its truth or falsity. *Lonsdale v. Swart*, 143 Or. App. 331, 338-89 (1996) (internal citation and quotation omitted). Relying on the same evidence that it presented for its Lanham

Act claim, NPK contends that the false representations were made with knowledge of their falsity or with reckless disregard to their truth or falsity.

As discussed, the Court finds that the evidence proves it is more likely than not that Jackson participated in the distribution of statements NPK contends were false. Moreover, the Court finds that the statements regarding NPK's products' propensity to mold, in addition to statements that NPK was being investigated by federal and state agencies and was set to be shut down, were false; however, the Court finds all other statements cited by NPK to be true. Next, because the statements were e-mailed to NPK's customers, they were plainly published to third parties. *See Wallulis v. Dymowski*, 323 Or. 337, 343 (1996) (internal citation omitted) ("a statement is published when it is communicated to a third party"). Fourth, Rowe testified that the statements caused NPK's sales to halve; thus, the company clearly suffered some sort of pecuniary damage due to these statements. The only issue that remains, then, is whether Jackson made or aided in the distribution of these statement maliciously or with knowledge that they were false. And while there is evidence that points in both directions, the Court finds that it is more likely that he did not.

First, the setting and context in which Jackson makes his statement about NPK's products molding is illustrative. Indeed, the prison phone transcripts demonstrate that Jackson mentions molding while educating Hunter's workforce on the benefits of frequency water; in doing so, he states that because NPK no longer puts "frequency" in their water, "it's molding, it's you know, having really negative results, because all they're doing essentially is PH'ing water." Pl.'s Ex. 147, at 8:24-26. There is nothing in this statement to indicate Jackson knew what he was saying was false; in fact, the context of the statement leads the Court to conclude he believed what he

was saying, as he was attempting to explain the perceived virtues of frequency water, one of which, he believed, was that it prevented molding.

Nor is there evidence of malice. As stated, to show malice, NPK must show Jackson acted with reckless disregard as to whether his statement was true or false. Recklessness requires the actor to be aware of and consciously disregard the risk that the statement was false. *See, e.g., State v. Stuart*, 283 Or. App. 672, 676-77 (2017) (defining recklessness). As Jackson's comments indicate, he was not aware of the risk that his statement might be false; in fact, the statement is made as part of his overall argument that frequency water prevents mold: "And that will help obviously, when you research bugs or mildew, will help in killing and kind of controlling the situation. And that's where this frequency comes into play." Pl.'s Ex. 147, at 8:26-9:1-3. Hence, it seems more likely than not that Jackson truly believed that, without adding Yeti's frequency water, NPK's products were susceptible to molding, thus leading to his statement. Consequently, the Court finds he did not act maliciously.

This is not to say that Jackson did not demonstrate a complete disdain for NPK; he expressed his adverse feelings repeatedly throughout the phone transcripts, and, in fact, in the statement at issue here, he refers to NPK's management as "the three stooges." Pl.'s Ex. 147, at 8:23. But disdain toward NPK, without more, does not translate into a finding that he made a malicious or knowingly false statement about NPK, especially where, as here, the context in which his statement was made indicates his belief in its veracity.

The same is true with respect to statements involving agency investigations into NPK. At one point while incarcerated, Jackson tells Hunter, "OSHA and DEQ is going to come in and probably stop sale to a lot of their products." Pl.'s Ex. 142, at 18:8-9. Again, however, nothing in the evidence suggests Jackson knew this statement was false, or believed it was at risk of being

untrue. To the contrary, he explicitly says that his brother-in-law, at the time an employee of NPK, told him that that was the case. Hence, there is no evidence of malice.

Thus, while Jackson expressed a clear disdain, perhaps even hatred, for NPK and its members, the evidence the Court has been presented indicates it is more likely than not that Jackson truly believed NPK's products were inferior because they were susceptible to mold and that NPK would be shut down by one or more state or federal agencies. In sum, then, NPK has failed to make out a claim for common law trade libel.

## E. Conversion

In Oregon, conversion is defined as the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663 (1969) (internal quotation and citation omitted). Each element of conversion must be proved by a preponderance of the evidence. *Mason v. Miller*, 90 Or. App. 538, 541 (1988).

NPK contends that at the direction of Jackson, Lilga improperly obtained NPK's customer database prior to her termination of employment, as well as all customer files, corporate minutes, proprietary marketing information, exclusive distribution contacts, and proprietary customer information.

First, the record is replete with evidence that Jackson or Lilga took customer files, corporate minutes, proprietary marketing information, exclusive distribution contacts, and proprietary customer information. While Rowe testified at trial that Lilga snuck back in after she was terminated and stole these documents, Rowe's explanation for how he discovered Lilga's "break-in" was nonexistent and unconvincing at best. Moreover, no other evidence suggests she did so.

The evidence does, however, show that Jackson directed Lilga to download NPK's customer database; in fact, he stated as much:

> And if you can—if you can find a way to download that database information, and I don't know, you know, you might have to be squirrelly about it or whatever, download it on a hard drive, but find a way to download all that so that we have it as well, and do it periodically.

Pl.'s Ex. 116, at 13:5-10. Jackson goes on to say that it is important to have all that information "because we've worked for that." Pl.'s Ex. 116, at 13:13-14. The evidence also confirms Lilga's improper procurement of NPK's customer database, as Jackson later promises to supply Hunter with a copy of the database and later instructs Lilga to provide Hunter with a copy of "that list of all those stores." Pl.'s Ex. 144, at 9:25-26.

Jackson's procurement of NPK's customer database, with the help of Lilga, constitutes conversion. First, the evidence shows he exercised control over the property, as demonstrated by his ability to direct Lilga to provide it to Hunter. Second, his exercise of control over it constituted a serious interference because it severely impacted the economic value of the database. *See Fogh v. McRill*, 153 Or. App. 159, 166-67 (1998) (citing Restatement (Second) Torts § 222A(2) (1965)) (stating that one of the factors the court looks at in evaluating whether conversion occurred is the harm done to the chattel). Indeed, as Rowe testified, the only value in NPK's customer list was the competitive advantage the expansive contact list provided over competitors like Left Coast. As soon as that information was out, the value of the customer list was vastly diminished. Hence, Jackson severely interfered with NPK's right to exclusive control of this proprietary information.

NPK has not, however, provided the Court with an accurate assessment of the value of any of the information it claims was converted, including NPK's customer database. Generally, "the measure of damages for conversion . . . is the reasonable market value of the goods

converted at the time and place of the conversion with interest thereon from that date." *Hall v. Work*, 223 Or. 347, 357 (1960) (internal citation omitted). Here, NPK has provided no estimate of the value of the goods Jackson allegedly converted—or did convert in the case of the customer database. Instead, NPK simply states, "Damages for the conversion are the same as they are for the other claims at issue." Pl.'s Trial Mem., at 16.

Nevertheless, NPK's failure to attach any market value to the converted property does not preclude the Court from coming to a satisfactorily accurate assessment of the damages NPK incurred. Indeed, "if the property has no market value at the time and place of conversion, either because of its limited product, or because it is of such a nature that there can be no general demand for it, and it is more particularly value to the owner than any one else, then it may be estimated with reference to its value to him." *Barber v. Motor Inv. Co.*, 136 Or. 361, 366 (1931) (internal citation and quotation omitted). Here, the Court finds no specific market value for NPK's customer database; the customer database is clearly a proprietary piece of information of unique and limited production. Because of this, there is no general demand for it; indeed, as a piece of secret, proprietary corporate information, it is not for sale in the marketplace. Accordingly, its value may be estimated by reference to its value to NPK.

At trial, when asked about the value of this information, Rowe stated that it was, at the very least, the cost NPK incurred in developing the goodwill necessary to successfully market and sell its line of plant-wash products. The Court believes that NPK's customer database, while valuable, is only a single component derived from its marketing campaign and cannot represent the entire value of NPK's goodwill, which includes other elements such as name recognition. Nevertheless, the customer relationships it developed while marketing its product is clearly an integral part of the value of its goodwill. Accordingly, as will be discussed in greater detail

below, the Court believes the conversion of NPK's customer database, when combined with the other violations the Court finds herein, adds up to damages in the amount the Court finds were directly and proximately related to marketing and developing the reputation of its Mighty Wash, Power Wash, and PM Wash.

## F. Breach of nondisclosure agreement

On April 11, 2011, Jackson signed a nondisclosure agreement with NPK. The agreement prevented the disclosure of confidential information, which was defined to include company know-how, business and contractual relationships, as well as customer lists. The agreement expired two years after the signing date; however, it expressly stated that Jackson's "obligations under this Agreement shall survive termination of the Agreement between the parties and shall be binding upon" Jackson and his heirs, successors, and assigns for a period of five years after the signing date. Pl.'s Ex. 3, at 2. As both parties acknowledge, the agreement was signed by Jackson in his official capacity as an employee of NPK, namely vice president of sales. Nevertheless, nothing in the agreement indicates that Jackson's obligations of confidentiality terminated upon the end of his employment with NPK.

Because Jackson distributed NPK's customer lists to Hunter, NPK contends Jackson breached the parties' nondisclosure agreement. NPK also argues Jackson distributed all customer files, proprietary marketing information, corporate minutes, exclusive distribution contacts, and proprietary customer information, also in violation of the nondisclosure agreement.

Under Oregon law, which governs this nondisclosure agreement, a plaintiff in a breach-of-contract action "has the burden to establish the existence of a valid contract and the breach thereof." *Pendleton Grain Growers v. Pedro*, 271 Or. 24, 28 (1975). Moreover, "[t]he rule in Oregon is that a party seeking to recover damages for an alleged breach of contract"—as NPK

does here—"must plead *and* prove either substantial performance on his part or a valid excuse for his own failure to perform." *Aurora Aviation, Inc. v. AAR W. Skyways, Inc.*, 75 Or. App. 598, 602 (1985) (internal citation omitted) (emphasis in original). The plaintiff must establish each of the above-mentioned factors by a preponderance of the evidence. *Nw. Nat. Gas Co. v. Chase Gardens, Inc.*, 333 Or. 304, 312 n.3 (2002). Additionally, the plaintiff must establish damages with reasonable certainly; damages that are too speculative will not suffice. *Bixler v. First Nat'l Bank of Or.*, 49 Or. App. 195, 201-02 (1980). Damages as a consequence of the breach, such as those alleged by NPK as a result of Jackson's breach of the nondisclosure agreement, must be reasonably foreseeable by the parties at the time they entered into the contract. *Nw. Pump & Equip. Co. v. Am. States Ins. Co.*, 144 Or. App. 222, 228 (1996) (internal citation omitted).

Here, Jackson does not dispute that the nondisclosure agreement is an enforceable contract between the parties, nor that it was applicable at the time of the allegedly wrongful conduct, as the alleged conduct occurred well within the agreement's five-year timeframe. Accordingly, the three questions are whether his distribution of NPK's customer files and proprietary marketing information to third parties constituted a breach of that contract, whether NPK substantially performed its side of the bargain or excusably failed to perform, and whether NPK has sufficiently proved damages.

First, there is no question that Jackson breached the express terms of the contract; the parties' nondisclosure agreement explicitly prevents Jackson from disclosing NPK's customer lists, yet the evidence shows both that Jackson directed Lilga to download NPK's customer database and that he then distributed that information to Hunter via Lilga. The evidence also proves Jackson distributed proprietary marketing information, in violation of the nondisclosure agreement, in the form of the proposed advertisement he forwarded to Heagle. There is,

however, insufficient evidence to find that Jackson, or anyone on Jackson's behalf, wrongfully took and distributed customer files, corporate minutes, exclusive distribution contacts, and proprietary customer information. Nevertheless, by disclosing NPK's database of customer lists and by disclosing a proposed advertisement, Jackson plainly breached the nondisclosure agreement.

Next, Jackson did not present evidence, nor did the Court find any, to suggest NPK failed to substantially perform any part of the nondisclosure agreement. Thus, NPK has adequately proved the existence of a contract, Jackson's breach, as well as its performance of the contract. Finally, as will be shown below, NPK suffered ascertainable damages that were foreseeable by the parties at the time they entered into this agreement. Consequently, NPK has shown Jackson breached the parties' nondisclosure agreement.

### G. Civil conspiracy and aiding and abetting

NPK contends Jackson, Lilga, Heagle, and others conspired with each other to damage NPK by converting proprietary information, commercially disparaging NPK and its products, and making false claims to the industry about NPK. NPK contends these parties aided, advised, and acted in concert with each other "for the express purpose of damaging [] NPK, LLC." Pl.'s Trial Mem., at 18.

"A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not itself unlawful by unlawful means." *Bonds v. Landers*, 279 Or. 169, 174 (1977) (internal citation and quotation omitted). While a criminal act is not required, the conspiracy's primary purpose "must be to cause injury to another." *Id.* (internal citation omitted). Likewise, "all who aid, command, advise, or countenance the commission of a tort by another, or who approve of it after it is done, if done for

their benefit, are liable in the same manner as they would be if they had done the same tort with their own hands." *Perkins v. McCullough*, 36 Or. 146, 149 (1899).

"Neither 'conspiracy' nor 'aid and assist' is a separate theory of recovery." *Granewich v. Harding*, 329 Or. 47, 53 (1999) (internal citation omitted). "Rather, conspiracy to commit or aiding and assisting in the commission of a tort are two of several ways in which a person may become jointly liable for another's tortious conduct." *Id.* The case *Sprinkle v. Lemley*, 243 Or. 521 (1966) sets out this principle well. In that case, a patient was injured due to her doctor's negligence. The patient sued her general practitioner and a specialist, who was called into assist the patient's general practitioner. *Id.* at 523-24. The court explained that "[a] general practitioner or family physician who calls in a specialist to treat or perform surgery on a patient is not liable for the negligence of the specialist if there is no concert of action." *Id.* at 528. On the other hand, "[t]he court there stated that persons acting in concert can be liable . . . for harm resulting from the other's negligence." *Granewich*, 329 Or. at 54 (discussing *Sprinkle*, 243 Or. at 528). Because the doctors acted together in treating the plaintiff, they were found jointly liable. *Springle*, 243 Or. at 523-31.

Here, NPK argues that, as with the doctors in *Sprinkle*, the Court should impute liability to Jackson for acting in concert with Lilga, Heagle, and others to "convert proprietary information, to commercially disparage the products of [] NPK, LLC, and to make false claims to the industry regarding the business of [] NPK, LLC." Pretrial Order, at 19. First, the Court has already found Jackson violated the Lanham Act. Additionally, it found that NPK has adequately proved Jackson wrongfully converted NPK's customer database. Thus, neither civil conspiracy nor aiding and abetting provides an independent basis of recovering for either of these claims.

Beyond these two claims, NPK has failed to present evidence showing any other tort was committed, either by Jackson or by individuals whom he acted in concert with. Hence, because

none of the individuals Jackson purportedly acted in concerted with committed a tort for which Jackson did not independently commit, Jackson cannot, as a matter of law, be independently liable on a theory of conspiracy or aiding and abetting.

## H. Damages

NPK seeks damages in the amount it contends it spent marketing its original, frequency-altered product line. Prior to and during its case-in-chief, NPK submitted dozens of exhibits consisting of meal and hotel receipts, costs of attending trade shows to market the frequency-altered product line, fuel expenses, and many others. Rowe, NPK's president, testified that each of these exhibits were independent expenses NPK incurred in marketing its product and developing the product line's, as well as the company's, goodwill, all of which was lost as a result of Jackson's actions. NPK represented that the exhibits added up to roughly $625,000. On cross-examination, however, Jackson pointed to numerous duplicative expenses within these exhibits, prompting NPK to acknowledge that its damages figure of $625,000 was clearly incorrect and indeed lower, though it did not present the Court with a number. Jackson also called into question many expenses' purported relationship to NPK's marketing of its frequency-altered product line, stating that some expenses were incurred to promote different products.

A plaintiff must prove damages caused by tortious conduct by a preponderance of the evidence. *See Dizick v. Umpqua Cmty. Coll.*, 287 Or. 303, 311 (1979) (holding that the standard of proof for all torts, including fraud, is preponderance of the evidence). "Proof by a 'preponderance of the evidence' means that the jury must believe that the facts asserted are more probably true than false." *Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 402 (1987). NPK's damages are compensatory, as it seeks to be compensated for the cost it incurred developing its product line's and the company's goodwill. *See Allen v. Cty. of Jackson*, 191 Or.

App. 185, 201-02 (2003) ("compensatory damages are damages sufficient in amount to indemnify the injured person for the loss suffered") (internal quotation and citation omitted). "It is the law with respect to compensatory damages that a tort-feasor is liable to the person injured for all the natural and direct proximate consequence of his wrongful act or omission." *Gilman v. Burlingham*, 188 Or. 418, 423 (1950).

Next, as explained above, in a claim for breach of contract, a plaintiff must establish damages with reasonable certainly, meaning they cannot be unduly speculative. *Bixler*, 49 Or. App. at 201-02. Damages as a consequence of the breach, such as those alleged by NPK as a result of Jackson's breach of the nondisclosure agreement, must be reasonably foreseeable by the parties at the time they entered into the contract. *Nw. Pump & Equip. Co.*, 144 Or. App. at 228.

Third, a claim for damages for false advertising under the Lanham Act does not require "empirical quantification nor expert testimony," *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012), it does require, as an essential element "actual evidence of some injury *resulting from the deception*. . . ." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) (emphasis in original).

Finally, if the plaintiff proves with the requisite degree of certainty that the defendant's violative actions have resulted in damage, the actual amount of damages need not be proved with exact certainty. *Sol-o-Lite Laminating Corp. v. Allen*, 223 Or. 80, 94 (1960). Indeed, "[i]t is well settled that [a] plaintiff is not required to prove the amount of his damages with mathematical certainty." *N. Pac. Lumber Co. v. Moore*, 275 Or. 359, 366 (1976). That said, however, the plaintiff must "establish the fact of damage *and* evidence from which a satisfactory conclusion as to the amount of damage can be reached." *Id.* (emphasis added).

Here, while NPK has not proved its actual amount of damages with exact certainty, it has certainly proved that it suffered damages as a direct and proximate result of Jackson's actions. First, it is certainly true that at least some of the financial consequences NPK suffered were a result of Heagle's independent decision to end his agreement with NPK and the fact that NPK could no longer inject frequency water into its plant-wash line of products. However, as Rowe testified, due to Jackson's conversion and subsequent distribution of NPK's customer database in violation of the parties' nondisclosure agreement, as well as Jackson's role in disseminating false statements regarding NPK's products' susceptibility to mold and the fact that the company may be shut down by federal or state regulators, NPK went from sales of $3 million in 2012 and a profit of around $125,000 to virtually no revenues and strictly losses in the years since. He further testified that scores of customers transitioned to Left Coast or other competitors as a result; indeed, as he put it *all* of NPK's goodwill transferred to Left Coast. Thus, NPK was certainly damaged as a result of Jackson's conduct. The question, however, is the amount of damages it is entitled.

Damages for loss of goodwill are recoverable damages. *Sol-o-Lite Laminating Corp.*, 223 Or. at 91; *see also Southland Sod Farms*, 108 F.3d at 1139 (internal citation omitted) (stating that for a claim under the Lanham Act, the plaintiff must show he "has been or is likely to be injured as a result of the sale statement, either by direct diversion of sales from itself to defendant or *by a lessening of the goodwill associated with its products*) (emphasis added). And while, "such damages are not capable of exact ascertainment," "[u]ncertainty precluding recovery of damages relates to uncertainty whether any damages have resulted, not to damages which are the certain result . . . but which are uncertain in amount." *Sol-o-Lite Laminating Corp.*, 223 Or. at 91, 93-94 (internal citation omitted). Here, for reasons mentioned, there is uncertainty as to the amount of

expenses which were in fact incurred in the process of developing the goodwill behind the product line involved in this case; however, as explained, there is no uncertainty that NPK suffered damages as a direct and proximate result of Jackson's conduct.

It is clear by NPK's own admission, however, that its request for $625,000 was too generous and that that number was arrived at by including the same expenses more than once, as well as tangentially related items such as food and coffee receipts. Beyond this, the Court is not convinced that each of the expenses NPK submitted was incurred in developing, marketing, and producing goodwill for its frequency-altered product line and not other products.

That said, it is clear upon examination of these exhibits that many of them were incurred in marketing frequency-induced Mighty Wash, Power Wash, and PM Wash; after all, as Rowe testified, these were NPK's main products. Thus, after assessing NPK's exhibits, the Court believes an adequate amount of damages for the injury NPK suffered to its goodwill is $165,961.80.

This is the amount of damages the Court has concluded, based on physical evidence and Rowe's testimony, are directly and proximately related to marketing and developing the reputation of its Mighty Wash, Power Wash, and PM Wash. These expenses include non-duplicative costs for attending trade shows to promote the plant-wash product line; the provision of sample products without charge for trade shows and for new customers, which Rowe testified was critical to developing name recognition[8]; and the cost of advertising the plant-wash line in various industry-wide magazines. *See* Pl.'s Exs. 49, 58, 59, 60, 62, 63, 66, 75, 79, 84, 89, 91, 94, 95, 97, 109. The Court has excluded from its assessment of damages any exhibits whose origins

---

[8]It was unclear to the Court whether some of the exhibits purporting to be samples that NPK provided to new customers had in fact been given away free of charge or at the expense of NPK. Additionally, others were duplicative. Accordingly, the damages figure the Court arrives at includes only those in which the Court was certain that NPK incurred the cost and that the cost was not duplicative. *See* Pl.'s Ex. 75, at 1, 3, 4, 6, 8, 10, 13, 14, 15, 16, 18, 19, 20.

were unclear, duplicative, or simply tangentially related to development of goodwill. Moreover, it has excluded the expenses NPK incurred in building Yeti's factory in Jackson County, Oregon. To the extent NPK failed to recoup any of its expenses for building this factory, the Court believes that was solely the consequence of Yeti's cancellation of its contractual relationship with NPK and had nothing to do with NPK loss of goodwill. Finally, the Court excludes the salaries NPK paid Jackson; NPK received the benefit of Jackson's personal services in exchange for this salary, and therefore was not damaged.

The arrival at $165,961.80 is not, however, the end of the Court's analysis. As stated, Heagle's decision to terminate Yeti's distribution agreement is also responsible for NPK's loss in goodwill. Given the dueling reasons for NPK's loss of goodwill—Heagle's termination of the distribution agreement and Jackson's and others' unlawful actions—the Court believes the damages figure should be divided by one-half to properly account for this. Therefore, the amount is $82,980.90; however, as will be discussed below, Jackson is not independently, or even jointly and severally, liable for this entire award, as Lilga shares some responsibility.

## II.     Jessica Lilga

NPK alleges Lilga committed, conspired to commit, or aided others in converting proprietary information, in commercially disparaging NPK and its products, and in making false claims to the industry about NPK. Lilga failed to appear in this matter, and on April 13, 2015, the Court entered an order of default against her. On January 19, 2017, NPK moved for a default judgment against Lilga. On March 7, 2017, the Court denied with leave renew the motion at trial, and NPK did so.

The evidence undeniably shows Lilga acted in concert with Jackson in converting NPK's customer database; in fact, she was the one who downloaded the database from NPK's computer

network. Tortfeasors who act in concert to cause injury to a plaintiff are liable jointly and severally for the damages caused to the plaintiff. *Am. Fed'n of Teachers-Or., AFT, AFL-CIO v. Or. Taxpayers United PAC*, 209 Or. App. 518, 522 (2006) (quoting *Granewich*, 329 Or. at 47, 55). Consequently, Lilga is jointly and severally liable for the damages caused by her and Jackson's conversion.

As the Court stated, there is no reasonably ascertainable market value for NPK's converted customer database; however, given Rowe's testimony about the database's integral importance to the company, the Court believes that it is reasonable to value it at $27,660.30 (one-third of the damages figure). Indeed, developing an extensive customer database and thereby a recurrent relationship with customers is certainly an important component in any company's strategy of developing goodwill. Hence, because Lilga acted in concert with Jackson in converting this property, she is jointly and severally liable for this amount.

Next, there is no evidence to show Lilga played any part in disseminating the false statements that gave rise to Jackson's liability on the Lanham Act. At best, NPK could show she supplied the customer database to Hunter, which he then used to supply false statements to NPK's customers. But "[j]oint tortfeasor liability [under the Lanham Act] is available only when the defendant has 'knowingly participated in the creation, development and propagation of the false advertising campaign.'" *In re Century 21-RE/MAX Real Estate Advert. Claims Litig.*, 882 F. Supp. 915, 925 (C.D. Cal. 1994). And there is no evidence Lilga was aware of or participated in the creation, development, and propagation of the false statements at issue here. Thus, she cannot be held jointly liable simply by suppling Hunter with the customer database.

Nevertheless, Lilga's distribution of NPK's customer database to Hunter constituted a breach of her nondisclosure agreement with NPK. Indeed, her nondisclosure agreement

precluded her from distributing information of commercial value. Pl.'s Ex. 4. The customer database would certainly fall under this category: It was information, in the form of NPK's customers, and had commercial value based on the competitive advantage that Rowe testified the database provided NPK over its rivals. Because Lilga's turning over of the database to Hunter led directly to the dissemination of false information and therefore to the loss of goodwill on the part of NPK, the Court believes NPK has adequately shown it suffered damages as a consequence of Lilga's breach. These damages were also foreseeable; in fact, the purpose of the parties' nondisclosure makes clear that it was to prevent the disclosure of NPK's confidential and proprietary information to competitors, like Hunter, due to the potential that such disclosures could result in a loss in NPK's competitive or commercial advantage.

As with its other claims, NPK seeks damages in the amount of goodwill it lost as a result of this breach. As discussed, damages for loss of goodwill are recoverable. *Sol-o-Lite Laminating Corp.*, 223 Or. at 91. And while they may not be alleged with exact precision, any "[u]ncertainty precluding recovery of damages relates to uncertainty whether any damages have resulted, not to damages which are the certain result . . . but which are uncertain in amount." *Id.* at 91, 93-94 (internal citation omitted).

Here, as explained, there can be no question that Lilga's actions were certain to and did in fact damage NPK. The only uncertain question is the amount in which NPK was damaged. As set forth above, the Court calculates that one-third of the damages figure resulted from converting NPK's database; the remaining two-thirds, then, resulted from the dissemination of false statements to NPK customers. And but for Lilga's distribution of NPK's customer database—*i.e.*, the breach of her nondisclosure agreement—this dissemination could not have occurred. Accordingly, her breach played a critical role in this injury. Notably, though, Lilga did

not act alone. Instead, she acted at the behest of Jackson, who directed her to turn over the database to Hunter. And, as discussed, Jackson's direction to turn over the database breached his own nondisclosure agreement. The Court therefore believes that another third of the damages figure—or $27,660.30—should be attributed to Jackson's and Lilga's breaches; thus, it follows that Lilga is independently liable for one-sixth, or $13,830.15, for breaching her nondisclosure agreement. The remaining one-third of damages is attributable to the Lanham Act violation.

Therefore, in sum, the Court finds the following:

Jackson and Lilga are jointly and severally liable for $27,660.30 in damages, and Lilga is independently liable for $13,830.15.[9] Jackson is individually liable for the remaining $41,490.45, which is derived from the breach of his nondisclosure agreement as well as his Lanham Act violation.

| Total loss of goodwill | $165,961.80 |
|---|---|
| Amount attributable to Yeti | $82,980.90 (1/2 of total) |
| Amount attributable to Lilga and Jackson | $82,980.90 (1/2 of total) |
| Amount attributable to conversion | $27,660.30 (1/3 of $82,980.90) |
| Amount attributable to Lanham Act | $27,660.30 (1/3 of $82,980.90) |
| Amount attributable to breach of nondisclosure agreements | $27,660.30 (1/3 of $82,980.90) |
| Amount attributable to Lilga's breach of her nondisclosure agreement | $13,830.15 (1/2 of $27,660.30) |
| Amount attributable to Jackson's breach of his nondisclosure agreement | $13,830.15 (1/2 of $27,660.30) |

/ / /

---

[9]The Court does not find sufficient evidence to conclude Lilga committed any other tort, either independently or in concert with others. Notably, there is no evidence to suggest Lilga committed fraudulent conduct during the three weeks she worked at NPK.

## III. Injunctive relief

Finally, NPK also seeks injunctive relief; it contends it "is entitled to a permanent injunction restraining and enjoining [] Jackson from possessing or otherwise using the proprietary information of [] NPK, LLC including but not limited to its customer lists, corporate minutes, distribution contracts, customer files and advertising data." Pretrial Order, at 23.

28 U.S.C. § 2202 as well as ORS § 28.080, which is based on the federal act, *Samuel v. Frohnmayer*, 308 Or. 362, 365 (1989), provide for "[f]urther necessary or proper relief based on a declaratory judgment . . . after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.

Here, as discussed, the evidence indicates Jackson improperly procured, and apparently still possesses, NPK's customer lists, though there is insufficient evidence to suggest he retains NPK's corporate minutes, distribution contracts, or customer files and advertising data. Accordingly, the Court will enter a judgment in NPK's favor finding Jackson wrongfully procured, and retains possession of, NPK's customer database. However, "[a]ny injunctive relief due plaintiff is appropriate only after a declaratory judgment has been entered in his favor and there has been notice and a hearing on his request for further relief." *Southworth v. Steelworkers W. Indep. Shops Pension Plan*, No Civ. 04-6252-AA, 2004 WL 2958419, at *2 (D. Or. Dec. 21, 2004); *see also Ken Leahy Const., Inc. v. Cascade Gen., Inc.*, 329 Or. 566, 575 (1999) (stating ORS § 28.080 requires that, once a declaratory judgment or decree has been entered in the plaintiff's favor, the court mandate that the adverse party show cause why further relief, such as injunctive relief, should not be granted). Consequently, once this declaratory judgment is entered, the Court will order Jackson to show cause why injunctive relief should not be granted in NPK's favor.

## CONCLUSION

NPK established by a preponderance of the evidence that Jackson and Lilga acted in concert to convert NPK's customer database. NPK also demonstrated by a preponderance of the evidence that Jackson and Lilga violated their respective nondisclosure agreements. Finally, NPK proved by a preponderance of the evidence that Jackson violated the Lanham Act. In total, Jackson and Lilga caused NPK to suffer damages in the amount of $82,980.90. Of this amount, Jackson and Lilga are jointly and severally liable for $27,660.30; Lilga is individually liable for $13,830.15; and Jackson is individually liable for the remaining $41,490.45. Pursuant to NPK's request for injunctive relief, the Court will enter judgment declaring Jackson in unlawful possession of NPK's customer database and in violation of the Lanham Act. He will be ordered to show cause why further injunctive relief should not be granted in NPK's favor.

DATED this _14_ day of August, 2017.

MARK D. CLARKE
United States Magistrate Judge